UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 16-3391                                    Caption [use short title]

Motion for: Reconsideration

                                                    CFTC v. Walji

Set forth below precise, complete statement of relief sought:

For the court to allow briefing,

and determine jurisdiction

MOVING PARTY: Appellant Abdul Walji          OPPOSING PARTY: Appellee, CFTC counsel
☐ Plaintiff          ☐ Defendant
☒ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Abdul Walji, pro se          OPPOSING ATTORNEY: Mary T.   Connelly
                [name of attorney, with firm, address, phone number and e-mail]

Federal Prison Camp La Tuna          Commodity Futures Trading Commission

P.O. Box 8000                        1155 21st St. NW

Anthony TX 88021                     Washington DC 20581

Court-Judge/Agency appealed from: 12-CV-9043   Paul Englemayer - SDNY

Please check appropriate boxes:                    FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                   INJUNCTIONS PENDING APPEAL:
Has movant notified opposing counsel (required by Local Rule 27.1):   Has request for relief been made below?        ☐ Yes ☐ No
☒ Yes ☐ No (explain): _____   Has this relief been previously sought in this Court?  ☐ Yes ☐ No
                                                   Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☒ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☒ Don't Know

Is oral argument on motion requested?    ☐ Yes ☒ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☒ No  If yes, enter date: _____

Signature of Moving Attorney:
_____ Date: 12/26/2016   Service by: ☐ CM/ECF   ☒ Other [Attach proof of service]

Form T-1080 (rev. 12-13)

IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

ABDUL WALJI                          )
                                     )
        Appellant,                   )        Appeal No. 16-3391
                                     )
v.                                   )        USDC No.12-CV-9043-PAE
                                     )
COMMODITY FUTURES TRADING            )
COMMISSION,                          )
                                     )
        Appellee                     )

---

## MOTION FOR RECONSIDERATION

### (Federal Appellate Rules 35)

---

STATEMENT OF JURISDICTION

Pursuant to Federal Rules of Appellate Procedure 35 along with 2nd circuit rules, Petitioner Abdul Walji hereby petitions for panel rehearing and for rehearing en banc of the panel decision filed in the above captioned case on December 14, 2016.

Petitioner believes that a panel rehearing is necessary as the decision overlooks or misapprehends several points of fact and law. Petitioner also petitions for rehearing en banc because the Panel decision conflicts with Heckler v. Chaney as well as Steel Co. Moreover, the panel decision is in conflict with Supreme Court authority underlying those decisions; and,

the binding precedent of this circuit.

The proceeding involves questions of exceptional importance, that is, whether the Petitioner actually signed and executed a settlement agreement; whether the Petitioner had the capacity and authority to bind third parties to the terms of an agreement; and whether the federal courts actually had jurisdiction over the subject matter.

## II.

### PROCEDURAL BACKGROUND

On December 12, 2012, Appellee, Commodity Futures Trading Commission ("Commission" or "CFTC") filed a civil complaint against Arista, LLC ("Arista"), a California Limited Liability Company, Appellant Abdul Walji ("Walji") as a purported "principal of Arista", together with another individual, who is President and the managing member of the LLC ("Francisco"). See Southern District of New York, Case No. 12-CV-9043-PAE).

The complaint alleged that Arista was an investment fund, owned and operated by Appellant. The complaint further alleged, as the entire basis for the complaint, that Appellant had carried out a fraudulent scheme to misappropriate funds from Arista's investors. (see CFTC civil complaint).

Although the CFTC claims that the complaint was pursuant to its "enforcement authority", notably, a scheme to misappropriate investor funds is statutorily defined as a [SECURITIES LAW] violation, and clearly not within the statutory authority of the CFTC.

2.

While the complaint alleged violations of the Commodity Exchange Act, the entire and exclusive basis for all the claims arise from, and depend on a Securities violation. (see complaint)

That same year, in a parallel criminal prosecution, based on the same underlying facts, Petitioner pled guilty to one count of Securities Fraud, and one count of commodities fraud, in exchange for a promise of probation. Petitioner was fraudulently enduced into pleading guilty to a securities law violation, which the Securities and Exchange Commission has revealed, does not actually exist.

Although a fabricated case or controversy divests a district court of subject matter jurisdiction under Article III of the Constitution, the district judge nevertheless failed to determine jurisdiction, and sentenced Petitioner to 151 months incarceration and proceeded to forfeit assets, which were the subject of the settlement agreement with the CFTC.

Noting the conflict of interest of defense counsel, between the civil and criminal proceedings, as well as the false statements and misrepresentations regarding probation and settlement, Petitioner fired and terminated defense counsel in the criminal case. Notably, this same counsel represented, or purported to represent an opposing party in the CFTC civil action, while still representing Petitioner in the criminal action.

While the conflict of interest prevented defense from providing effective assistance of counsel in the criminal case, by serving the interests of an opposing party in the civil

3.

case, together with a 151 month prison term, rather than the promised probation, removed any and all purpose, intent or desire to settle with the CFTC, or to agree to any settlement agreement.

Although counsel did not represent Petitioner in the civil action, but instead represented the interests of an opposing party, Petitioner nevertheless notified counsel that he rejected, refused and repudiated any settlement agreement of the CFTC, and further withdrew his counter proposal, which was the only version of any settlement agreement ever signed, or considered by Petitioner.

Notably, each and every version of any settlement agreement ever offered or presented by CFTC counsel was rejected, in part because Petitioner lacked the standing and authority to bind third parties, or to surrender third party assets. (see docket Nos. 74, 75, 76, 77).

While CFTC counsel was advised and aware that Petitioner had withdrawn his counter proposal, and rejected each and every other version of all settlement agreements, they nonetheless, removed the unsigned signature pages from the "complete agreement" and filed an altered, incomplete and unsigned, partial agreement with the District Court, so that they could obtain money and property to which there was no legal or legitimate claim.

In nearly identical evidence tampering and fraud as that of Nicholas Marsh in the Ted Stevens Case, or more recently, the creation of false evidence by Robert Murray, when he fabricated dialog constituting a confession and altered transcripts, it cannot be contested that CFTC counsel disregarded the notice, withdrawal and rejection by Petitioner, and simply filed portions of an

4.

incomplete and altered version of a settlement agreement, which included terms and provisions that had already been rejected by Petitioner.

Although Petitioner did not sign, consent, agree, or enter into any settlement agreement, nevertheless, CFTC counsel knowingly presented an unsigned, incomplete and partial version of a settlement agreement, while falsely representing that it was the "entire agreement", and that Petitioner had "agreed" to its terms.

Indeed, Petitioner lacked the authority to agree, or to bind third parties such as Calpension, Inc.; Stone-Lamm Trust; and Allied Benefits Trust, who are clearly unrelated third parties, not before the Court, and notably did not sign or agree. (see docket No. 77).(See also Docket No. 92-1).

Moreover, CFTC counsel knew full well that Petitioner lacked any and all authority, standing or capacity to bind third parties to any settlement agreement, because the National Futures Association ("NFA") had already notified CFTC that Petitioner was merely a contract manager to a limited liability company, and had no authority to agree, or enter into any settlement agreement on behalf of Arista or any third party, thus demonstrating the fabrication of the settlement agreement at issue.(See Exhibit 8).

CFTC counsel has successfully perpetrated its fraud for for nearly two years, and through several legal proceedings, including Petitioner's section 2255 proceedings in the criminal case. Notably, it was not until the Securities and Exchange Commission revealed the jurisdictional defects, and usurpation

5.

of power, that the full extent and magnitude of fraud and corruption was discovered.

Further, it was not until the arbitration proceeding, where CFTC counsel disclosed for the first time the altered, tampered and unsigned settlement agreement, which is the basis for the order signed by judge Englemayer, that Petitioner discovered CFTC counsel's submission of an unsigned, incomplete version of a settlement agreement. (See Exhibit 4 at 4, lines 22 - 28)

Petitioner then sought to undo the fraud and corruption by seeking to vacate and set aside the fraudulently obtained consent order pursuant to Federal Civil Rule 60. Notably, Petitioner also challenged the jurisdiction of the district court to have issued the order in the first instance.

Although the court ordered CFTC counsel to file a response to the Rule 60 motion, CFTC counsel instead submitted an ex parte communication, which included a signature page from some unknown and unauthenticated document, that purported to be part of the " entire agreement" submitted as docket No. 77, and signed by the Court. (See Docket No. 92 at 41).

Unfortunately, CFTC counsel had inserted the signature page from the previously withdrawn counter proposal, and fraudulently represented that it was the signature page from the complete agreement filed as Docket No. 77. Apparently CFTC counsel forgot they had already represented to the Court that Docket No. 77 was the "entire agreement", as well as the admission that Petitioner "had not signed", the very same document they now claim is signed.

Although CFTC counsel was required to serve Petitioner, and provide notice of the mythical and newly discovered, unauthenticated signature page, CFTC counsel nevertheless failed and refused to notice or serve Petitioner in any way whatsoever, which fact is confirmed by the Institution mail and legal system, together with the lack of any certificate of service by CFTC counsel.

Notably, the unauthorized submission does not meet the requirements of Federal Rules of Civil Procedure, 4.1, 5 or 11, and was submitted ex parte, not by counsel of record, but instead by former counsel who had previously withdrawn from the case, and without notice to Petitioner, nor certificate of service.

Not only does the improper submission violate the Rules of Civil Procedure, and the Federal Rules of Evidence, but indeed contains false statements and misrepresentations.

Moreover, Petitioner could have moved to strike the improper ex parte submission, or to reply to the false statements, and exposed the fraudulent addition of a signature page from a separate document. Indeed, Petitioner is entitled to his due process right to notice and opportunity to be heard. However the district judge knowingly accepted the improper, ex parte submission, from former counsel, without any notice to Petitioner, and in violation of the Federal Rules of Evidence, and in violation of the Federal Rules of Civil Procedure, and of Due Process, and abused his discretion for the purpose and with the intent of protecting and concealing the fraud and corruption which has occurred in the United States Courts.

7.

STATEMENT OF THE CASE

On December 12, 2012, Appellee, Commodity Futures Trading Commission ("Commission" or "CFTC") filed a civil complaint against Arista, LLC ("Arista"), a California Limited Liability Company, Appellant Abdul Walji ("Walji") as a purported "principal" of Arista, together with another individual, believed to be the managing member of the LLC. ("Francisco"). (See Southern District of New York, Case No. 12-CV-9043-PAE).

The thrust of the CFTC's claim is that the offer and sale of the Arista securities violated the Securities Acts, particularly 15 U.S.C. § 78j, which then resulted in a commodities violation under 7 U.S.C. § 1 et seq, solely and exclusively because Arista was a "commodities pool operator". (see civil complaint).

Although there is no allegation that any commodity or futures contract violated any statute, rule or regulation, it was the mere fact that Arista was alleged to have committed "Securities Fraud" in the offer and sale of its securities, as a commodities pool operator, that constituted the entire basis and premise for the purported commodity violation. Indeed, the entire basis and premise for jurisdiction of the federal district court, is a securities law violation under 15 U.S.C. § 78j(b). (Securities Fraud).

In light of the fact that the Securities Acts are administered exclusively by the United States Securities and Exchange Commission ("SEC"), Appellant recently discovered several distrubing facts, which implicate the CFTC counsel in egregious misconduct and Fraud upon the Court, when the SEC revealed that it never authorized

8.

authorized the enforcement of the Arista securities which are the basis for the purported offense. Indeed, the SEC revealed that it refused to prosecute or enforce any of the Arista securities, or Walji through either civil or criminal process. (See Exhibit 1).

Notably, the SEC's refusal to prosecute or enforce, through either civil or criminal process clearly demonstrates the CFTC lacks any and all jurisdiction over the Arista securities, which are the basis for the offense, but also the fabrication of the purported offense, and usurpation of the SEC's authority, not to mention conflict with the binding law of this Circuit.

Moreover, CFTC counsel knew full well the SEC had refused to prosecute or enforce any Arista securities, refused to issue a referral, and refused to provide access of its files to the CFTC, which under the Supreme Court holdings in Heckler v. Chaney, and the binding law of this Circuit, demonstrates that attorneys for the CFTC have falsified the entire basis, not only for the purported Commodity violation, but the entire basis for the case, particularly the Securities violation, which does not, and never did actually exist.

STATEMENT OF THE FACTS

On December 12, 2012, the Commodity Futures Trading Commission ("CFTC" or "Commission"), filed a civil complaint against Defendants Arist LLC ("Arista") a California based limited liability company, and Appellant, Abdul Walji ("walji") as a purported "principal" of Defendant Arista.

Although the Civil Complaint alleged violations of the Commodity Exchange Act, (7 U.S.C. §§ 1 et seq), the entire basis and premise for jurisdiction, as well as the basis for the purported commodity violation itself, was a falsified violation of the Securities Exchange Act (17 U.S.C. § 78j(b), which the Securities and Exchange Commission has recently revealed, does not actually exist.

Newly discovered evidence received from the United States Securities and Exchange Commission ("SEC"), through a FOIA request has revealed that the SEC never authorized the investigation or enforcement of the Securities statute at issue, nor the intervention of the Arista Securities which are the basis for the purported commodity claims. Indeed, the SEC refused to enforce, through either civil or criminal process, the Arista securities which are the entire and exclusive basis for the CFTC claims. (See Exhibit 1)

Further, in light of the SEC refusal to prosecute or enforce, under the Supreme Court holdings of Heckler v. Chaney, as well as the binding law of this Circuit, demonstrates the attorneys for the CFTC have not only flasified the entire basis and premise for

the purported commodity violation, but also usurped the function
and authority of the SEC, in order to claim a securities violation,
as well as, contravened the SEC's refusal to prosecute the very
same Arista Securities which are the sole and exclusive basis for
the CFTC claims.

Notably, the falsified securities violation is interdependent,
and inextricably intertwined with the purported commodity violation.
Absent the fabricated securities violation, there is no violation
upon which the CFTC can base its claims. Not even the CFTC claims
the commodity transactions alone violated any statute, but instead
the only claim is that the Arista securities violated the Securities
Laws, thus resulting in a subsequent and interdependent violation
of the commodity laws. (See Docket No. 77, paragraphs 1 - 84).

Unfortunately, the SEC has revealed that none of the CFTC
claims are true. Not only are there no violations of the Securities
laws, but indeed the purported violation has been falsified and
fabricated by CFTC counsel in an effort to manufacture jurisdiction
over a falsified commodity violation, which does not, and never did
actually exist. (See Exhibit 1)

CFTC counsel knew full well there was no basis for any
purported violation, and they knew full well the SEC had refused
to prosecute or enforce, through either civil or criminal process,
any of the Arista securities. However, without a securities
violation, there was no violation upon which to base their purported
commodity violation. Thus CFTC counsel usurped the function and
authority of the SEC, and falsified a securities violation which

did not actually exist, and used the fabricated offense to deceive the Court, and to coerce Appellant Walji into settlement negotiations, while concealing their fraud and misconduct.

As part of the fraudulent scheme, CFTC counsel provided false information and fabricated evidence to the Department of Justice, for the purpose and with the intent of initiating a criminal case against Appellants. CFTC counsel then used the criminal case as coercion and duress against Appellant, to either surrender and forfeit millions in assets and property to the CFTC, or in the alternative, to go to prison.

Although Appellant desired to settle certain claims of the CFTC, and to avoid a prison term, he nevertheless lacked the authority and capacity to bind Arista or its members to any settlement or consent agreement, or to surrender third party assets. Moreover the National Futures Association ("NFA") affidavit identified substantial sums which were legally and legitimately owed to Appellant. Not only did CFTC counsel ignore the audit and findings of the NFA, but indeed attempted to utilize the legal sums in its loss calculation, thus increasing the bounty to CFTC, without any credit or offset to Appellant. (See Exhibit 8 at 12, #20)

Ultimately, settlement negotiations failed, despite Appellant's best efforts, due directly to the fact that CFTC counsel was attempting to obtain assets and money, to which there was no legal or legitimate claim, and to which Appellant had no legal authority or control. Particularly, the assets of unrelated third parties.

Notably, in one version of a revised, proposed settlement agreement, CFTC counsel had included numerous assets of unrelated third parties. Specifically, on Page 32 and 33 of Docket No. 77 (one version of a revised, proposed settlement agreement), CFTC counsel actually listed assets they wanted to be "liquidated, released and transferred", including item (b) California Bank and Trust, "Amigos Grove"; (k) Darryl Sheetz Esq "attorney client trust account"; (m) Farmers and Merchants Bank, "Calpension Inc."; (n) Farmers and Merchants Bank, "Stone Lamm Pension"; (q) Interactive Brokers, "Allied Benefits Trust"; (dd) Wells Fargo, "J.H. Coffman & Sons, Inc. (See Docket No. 77 at 32-33)

It cannot be disputed that Appellant had no authority, standing or control to surrender third party assets, nor to bind third parties to a settlement agreement. Appellant has no capacity to bind or agree on behalf of the third parties, nor did any counsel. Indeed, the NFA had identified that Appellant was not even a control person of Arista, but instead a Contract Manager of an LLC, who lacked the standing and capacity to bind Arista, much less unrelated third parties.(See Exhibit 3 at 18, # 6.4, 45; Exhibit 9 at 2, 3, 4)

Despite Appellant's intent and desire to avoid incarceration, the terms and provisions of the numerous drafts of revised, proposed settlement agreements created an impass to settlement. The failed settlement process is well documented in the Record, particularly Docket Nos. 72-77, which ultimately required Appellant to submit a counter proposal, identified in Docket No. 76. Also significant in Docket No. 76 is Appellant's intent [NOT] to be bound by the terms and provisions of Docket No. 77.

13.

Although Appellant had submitted a counter proposal to the CFTC in his attempt to both settle the dispute with the CFTC, as well as avoid incarceration, he nevertheless substantially altered and made significant changes to the revised, proposed settlement agreement submitted by CFTC counsel. Notably, the third party assets had been removed from the counter proposal; Counsel did not represent Appellant in the counter proposal; and Counsel had "approved" the counter proposal as to form only, and [NOT] as to its content. (See Counter Proposal, dated September 29, 2013)

On October 1, 2013, the District Court ordered a stay of the civil proceedings, in order to give the CFTC time to consider Appellant's Counter proposal, and that the parties would advise the Court by November 25, 2013, whether the terms of Appellant's counter proposal were acceptable to the CFTC. (See Docket No. 76)

However, the parties never did advise the Court whether Appellant's counter proposal was acceptable. Indeed in an un-expected turn of events, on November 15, 2013, Appellant was sentenced to 151 months incarceration in the parallel criminal case, including 120 months for a securities law violation, which the SEC has now disclosed, does not actually exist. (see Judgment and sentence). Notably, the purported securities law violation has been falsified and fabricated by CFTC counsel, as part of their fraudulent scheme to obtain money and property to which there is no legal or legitimate claim, including the assets of the same thrid parties, which Appellant had stricken and removed from the revised, proposed settlement agreement.

14.

On December 2, 2015, Appellant had learned, for the first time that CFTC counsel had usurped the function and authority of the SEC. The SEC disclosures revealed that CFTC counsel had falsified the existence of a securities violation, for the purpose and with the intent, to falsify the existence of a commodity violation, neither of which actually exist. Appellant also discovered that the CFTC had apparently circumvented the mandatory arbitration provisions of the Arista securities agreements, in order to manufacture "statutory authority" over a purported violation, which did not actually exist. (See Exhibit 1)

Based on a good faith belief that the provisions of the arbitration agreements were "valid, irrevocable, and enforceable" Appellant filed a motion to stay the enforcement of the fraudulent consent agreement until the statutorily mandated arbitration could be had, and the resolution of the arbitrable issues under Title 9 U.S.C. §§ 3 and 4. Notably, the stay motion sought only to stay the enforcement of the fraudulent settlement agreement, and to enforce the provisions of Title 9. The Stay motion was [NOT] seeking any relief under Federal Civil Rule 60, nor did it constitute an "independent action". Instead, the "Stay Motion" sought only and simply to [STAY] an order obtained in violation of the Federal Arbitration Act, through the fraud of CFTC counsel.

Although the District Court denied the stay motion, it did so based entirely upon the false statements and continuing fraud perpetrated by Hates Hurand and Douglas Yatter, counsel for the CFTC.

15.

In an effort to conceal their misconduct, falsification of evidence, fabrication of an offense, usurpation of SEC authority, and FRAUD on the court, CFTC counsel stepped further into misconduct and made new false statements to the court, claiming that Appellant had agreed to all the terms and provisions of an unsigned, draft, revised, proposed settlement agreement, with absolutely nothing to support this fraudulent claim.

Moreover, CFTC counsel knew full well that Appellant was [NOT] represented by counsel. They knew full well that Appellant had never received, possessed, read, and notably never agreed to their version of a settlement agreement at issue here as Docket No. 77. Further, CFTC counsel knew Appellant lacked the authority and capacity to agree or sign any settlement agreement on behalf of third parties, or to bind third parties to the proposed terms, even if Appellant was in agreement. In addition addition, CFTC counsel knew full well when the criminal case resulted in Appellant's incarceration, there was no purpose, no intent and no desire to settle any claims, nor to agree to any terms.

Perhaps most significant here, although CFTC counsel has specifically noted for the Court that Docket No. 77, one of many versions of a revised, proposed settlement agreement, contains a clause on page 38, at paragraph 130, which states "Entire Agreement and Amendments: This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to amend or modify this Consent order, in any respect whatsoever, unless: (a) reduced to writing

16.

(b) signed by all parties hereto; and (c) approved by order of this Court." And yet, CFTC counsel failed and refused to file the entire agreement with the Court, but instead submitted an incomplete, partial document, which somehow, coincidentally, did not include any signature pages. Notably, the entire agreement is also required before signature by the District judge.

While submitting partial and incomplete portions of the "entire agreement" to the District Court, CFTC counsel concealed the fact that Appellant had not actually seen, read, agreed to, entered into, executed or signed that particular version of the revised, proposed, draft settlement agreement at issue here.

Moreover, the partial, incomplete portions of the settlement agreement also concealed the fact that Appellant was unrepresented by counsel in relation to the draft, proposed, revised settlement agreement, as well as the fact that purported counsel to Arista, had not approved or accepted the content of the draft, revised, proposed settlement agreement.

On December 12, 2015, in light of these facts, Appellant filed a motion seeking to stay the enforcement of the fraudulent settlement agreement, until the statutorily mandated arbitration could be had, and the resolution of the arbitrable issues, under Title 9 U.S.C. § 3 and 4. Appellant also filed a Petition to Compel Arbitration in the Central District of California, seeking to enforce the mandatory arbitration provisions in the Arista Securities. as well as to expose the fraud and corruption of CFTC counsel.

17.

Although the district court denied the Motion to Stay the Enforcement of the settlement agreement until Arbitration was had, it did so based entirely upon the false statements, and continuing fraud perpetrated by Gates Hurand and Douglas Yatter, counsel for the CFTC.

Notably, CFTC counsel Hurand and Yatter failed to mention, or even suggest how or when Appellant had purportedly signed or agreed to any of the draft, revised, proposed settlement agreements, much less the version at issue here, but instead simply asserted some mythical acquescence to the incomplete version of the document filed as Docket No. 77.

CFTC counsel never, at any point claimed, or even suggested that Appellant had actually signed or executed the version of the settlement agreement constituting Docket No. 77, nor did they ever produce, surrender, disclose or turn over the complete agreement, nor any signature pages. (See Exhibit 4).

Despite both the opportunity, as well as the obligation to turn over the complete agreement, including signature pages, or file it with the Court, CFTC counsel was unable to produce any signature pages, but instead in the absence of any evidence whatsoever, merely asserted that Appellant had "agreed", or in the alternative, that Appellant's counsel had "agreed" on his behalf. id.

Meanwhile, in the arbitration proceeding in the Central District of California, Petitioner filed a motion to compel the production of the original, signed settlement agreement. Notably, in response to the Motion to Compel Production of the signed

18.

settlement agreement, and appointment of a Master to take custody of, and examine the signatures, Mary Connelly, new counsel to the CFTC, was forced to admit, and represented to the Court, that the settlement agreement was not signed by Appellant. Moreover, CFTC counsel was unable to offer one single piece of evidence to support, or even suggest that any agreement was ever reached, or that any document was eversigned. Indeed, CFTC counsel opposed appointment of a Master to take custody of and examine the signed settlement agreement, claiming there was [no] signed settlement agreement to turn over. But instead, CFTC counsel merely asserted that Appellant had "agreed", or in the alternative that Appellant's counsel had agreed on his behalf, in the absence of a signed agreement.

On March 12, 2016, Appellant received written confirmation from the United States Securities and Exchange Commission, of its refusal to prosecute either Appellant, or the Arista securities which are the sole and exclusive basis for the purported securities violation alleged in the unsigned settlement agreement, and the sole basis for the purported criminal offense. (See Exhibit 1).

This newly discovered evidence not only questions the subject matter jurisdiction of the district court, but also demonstrates the falsification of evidence, and fabrication of an offense by Hurand and Yatter. Particularly the fabrication of a securities violation, which is the sole and exclusive basis for the purported commodity violation. These indisputable facts not only destroy the CFTC's claims, but indeed destroy any claims of jurisdiction.

On August 25th, 2016, Appellant thus filed a Petition to vacate the judgment of the District Court pursuant to Federal Civil Rule 60(d)(1) & (d)(3), for Fraud on the Court, based upon the discovery of CFTC counsel admitting that Appellant Walji had "not signed" the revised, proposed, draft consent agreement, which resulted in the "consent order" at issue here.

Seemingly, the fraud and corruption of Hurand and Yatter was exposed by the Securities and Exchange Commission, as well as the jurisdictional defects, and must certainly result in relief under Rule 60, as well as serious repercusions against Hurand and Yatter. However, despite the documented fraud that has been perpetrated by CFTC counsel, as well as the prior admission that Appellant had "not signed" the settlement agreement, suddenly, as if my magic, Gates S. Hurand is back as trial counsel, with yet another new story, in an attempt to fix the falsity of his prior story.

This time, Gates Hurand now claims that, notwithstanding the prior admissions of CFTC General Counsel, or his own prior statements or the inability to produce any signature pages, or the representations in the Arbitration proceeding, or the record evidence, now, amazingly, Hurand claims that Appellant did in fact sign the draft, revised, proposed settlement agreement, and now was able to produce a signature page, purporting to be the signed, executed settlement agreement at issue here. (See Docket No. 92).

Unfortunately, none of these new claims are true either. Indeed, Gates Hurand has now committed new criminal fraud, to conceal his previous criminal misconduct, and introduced a

signature page, from a different, separate and distinct document, not Docket No. 77, and fraudulently inserted it into the exhibit presented to the United States Court.

In furtherance of his fraudulent scheme to deceive the Court, and to obstruct the discovery of his fraud and misconduct, Gates Hurand knowingly and with purpose, failed and refused to serve, or notice Appellant, and intentionally withheld the altered document from Appellant, while submitting same to the Court.

Notably, the prison mail records demonstrate that Appellant never received the response, or the altered documents. Not from the CFTC and not from the Court.

Moreover, implicating the district judge in the Fraud, the honorable Paul A. Englemayer, immediately denied the Appellant's relief, based entirely and exclusively on the altered document, while knowing full well that Appellant had not received notice, that the documents were unauthenticated documents of unknown origin, and that they were inadmissible and outside the record. Indeed, in light of this reality, the district judge likely knew the documents were fakes and forgeries, and had been altered and tampered. (See Docket No. 92, without certificate of service).

Notably, had the district court not violated Appellant's due process rights, and provided notice and opportunity to be heard, rather than relying on altered documents and denying due process, then Appellant could have easily address the jurisdictional defects, and the evidence tampering. Clerly the district judge intended that Appellant not discover the fraud which has been perpetrated upon the United States Court.

21.

The district judge knowingly used altered and tampered evidence in violation of the Federal Rules of Evidence, and knowing that Appellant had not received notice or been served with the fraudulent ex parte submission, acted with purpose, and with the intent to protect and conceal the fraud which was being purpetrated, and knowingly violated due process so that Appellant could not discover the evidence tampering and altering of documents.

Clearly CFTC counsel believed they could submit, ex parte, the altered documents and defraud the Court without Appellant ever discovering the tampered evidence. Clearly the district judge believed he could withhold the altered evidence he used and relied upon to deny the Appellant's relief, while obstructing Appellant's rights, and indeed obstructing justice. Indeed, there can be no other explaination for the willful submission of false documents, or the willful denial of due process, but to conceal the fraud and misconduct from the Appellant, and from the public.

Appellant has received nothing from the District Court. Not the the response to the motion, not the purported agreement, not the order of the District Court, and notably, nothing related to the record on appeal, including the altered documents. Although Appellant has filed a motion pursuant to Appellate Rules 10 & 11, as of this date, Appellant has no record on appeal, and cannot adequately or fully brief the issues. Although Appellant has sought an order instructing the District Clerk to immediately, certify and forward the record on appeal, this Court has thus far not ruled on the motion, and the district court has failed or refused to comply with its obligations under the law.

22.

## MATERIAL FACTS THE PANEL FAILED TO CONSIDER

In the instant appeal, the Petitioner's only burden was to demonstrate that the fraudulently obtained consent order, was based upon a settlement agreement, which was never signed, executed or agreed upon.  Additionally, Petitioner lacks any authority or standing to enter into, agree or to bind third parties.  Even if the Petitioner actually had signed the settlement agreement, and even if the actually had authority to agree, or to bind third parties, the record evidence clearly demonstrates this never did, or could take place.

The Panel overlooked, or failed to consider the fact that despite the false and fraudulent statements of former CFTC counsel, Petitioner was not represented by counsel, as demonstrated by the falsified signature page, fraudulently inserted into the "entire agreement".

The panel failed to consider the fact that the National Futures Association had identified both the Petitioner did not have the authority to agree, enter into, execute, nor bind third parties to any settlement agreement.  Further, the NFA had also identified the Petitioner was legally and legitimately owed substantial sums which were not only withheld, but indeed Petitioner should have received, but were improperly included in CFTC's loss calculation. Notably, these facts further demonstrate that Petitioner did not agree or consent to terms of any settlement agreement, which is contrary to law. (See NFA affidavit, attached as Exhibit 4)

Petitioner is not pleased the district judge is implicated in the fraud and cover-up of egregious misconduct, however these are the facts. The district judge knew full well that Petitioner had not been served or noticed by CFTC counsel. He knew full well there was no certificate of service, and he knew full well that Gates Hurand was not an attorney of record, when he submitted his fraudulent, ex parte communication.

Although the district judge asserted the instant appeal was frivolous, he did so to conceal the fraud, and obstruct Petitioner's ability to redress the fraud of CFTC counsel. Of course, if there is another explaination for judicial misconduct and abuse of discretion, then the Appellee may certainly address it in their brief.

Moreover, the district judge failed to resolve the jurisdictional defects, or to determine jurisdiction in the first instance, which further demonstrates the actions of the judge, are willful rather than abuse of discretion or mere inadvertance.

Notably, had the district judge simply and properly placed the burden on CFTC counsel to establish jurisdiction, as he is [required] to do, the fraud, corruption and lack of jurisdiction would have instantly and easily been exposed. Perhaps that is why the judge disregarded his jurisdictional obligations.

Nevertheless, the jurisdiction of the Federal Courts is not frivolous, but instead is required under Article III of the Constitution, as well as the authority of the Supreme Court.

24.

MATERIAL FACTS THE PANEL OVERLOOKED

THE CONTRACT IS VOID:

The panel misapprehends the facts and law in its decision, and failed to consider that the contract is void ab initio.

A settlement agreement is a contract that is subject to the ordinary rules of contract construction and interpretation. See Bank of New York v. Amoco Oil Co, 35 F. 3d 643, 661 (2nd Cir. 1994). Accordingly, it requires an offer, an acceptance and consideration to be enforceable, and will be construed in accordance with the intent of the parties. See Taylor v. Gordon Flesch Co.,793 F.2d 858, 826 (7th Cir. 1986); Degerman v. S.C. Johonson, 875 F. Supp 560, 562 (ED Wis. 1995).

Interwoven in the analysis of the offer and the acceptance is the requirement of mutual assent, which considers whether there has been a meeting of the minds between the parties on [ALL] essential terms of the agreement. See Schurr v. Austin Galleries, 719 F. 2d 571, 576 (2nd Cir. 1983).

In the instant case, the Appellant claims that no such meeting of the minds occurred because (1) the CFTC counsel lacked the authority to enter into the settlement agreement or to bind the United States; (2) the Appellant lacked the authority to agree, enter into, or execute the purported contract, or to bind third parties; and (3) the contract was rescinded prior to signing by CFTC counsel or submission to the Court; and (4) the Appellant never agreed, signed, executed or entered into the version of the

25.

contract which was submitted to the court as a basis for a consent order.

In view of the Court's factual findings and the well established principles of Contract Law, the Court's role is prescribed, in the first instance, to determine whether an enforceable agreement came into existence. See White v. United States Department of Interior, 639 F. Supp 82 (M.D. Pa. 1986), noting "Federal law applies to construction of settlement agreements with respect to the United States".

This analysis, in turn, entails an inquiry concerning (i). what the parties understood the terms of the Appellee's offer, and Appellant's counter offer to be; (ii) whether the offer was accepted by the Appellant, or the counter offer accepted by the Appellee; and (iii) whether the agents were authorized to enter into the agreement and bind the principles.

This inquiry is obfuscated to some extent by such issues as the authority of CFTC counsel to bind the United States government to a settlement, and moreover, a lawyer's duty of candor to the Court. This latter princlple looks unkindly upon attorneys who knowingly or unwittingly, squander a court's limited resources by submitting a settlement agreement without communicating to all parties, and the court, that such agreement exceeds their settlement and statutory authority.

In light of the present record, and the case law holding that a void contract provides a basis to vitiate the settlement. The well settled principle of agency law that requires the acts of an

26.

agent, including a government attorney, to be ratified by its
principal in order for the principal to be bound, the Court
regards the necessity of government ratification to constitute an
implied condition precedent to the existence of a valid contract.
See Reed by and Through Reed v. United States, 717 F. Supp 1511
(SD Fla 1988). id. ("Our law has long recognized that principles
of Contract Law apply with equal force when the government is a
party.") citing In re Smoot, 82 US 36, 21 L.Ed 107 (1872).
Noting, " The United States cannot be bound to a settlement
agreement where the agent of the United States who signed the
agreement lacked the authority to enter into the agreement."

This holding is also premised on the standard principles of
agency; namely that an agent must have authority, whether apparent,
actual or implied, to bind the principal. Here there is no
question that that Appellant lacked the authority to agree, enter
into, or to bind third parties, as demonstrated by the books,
records and filings of both Arista, as well as the third parties
listed in the settlement agreement. Indeed, the National Futures
Association (NFA) audit, attached hereto as Exhibit 8, clearly
established Appellant as a third party contract consultant, and
not a principal of Arista as alleged in the purported agreement,
and relied upon by the district court. (see exhibit 8 attached)

Moreover, the Securities and Exchange Commission has now
revealed the usurpation of power and authority over the securities
transactions, which are the sole and exclusive basis for the offense,
as alleged in the settlement agreement itself. Both the SEC, and

27.

the securities laws make clear that the CFTC has no statutory, or any other authority over the securities which are the exclusive basis for the Appellee's claims, as well as the settlement agreement.

Where an agent responsible for negotiating a contract on behalf of its principal, acts outside the scope of its agency, and the other party to the contract is unaware that the agent is acting outside the scope of its agency, any resulting contract is [VOID] for want of actual and apparent authority, not to mention fraud. See Spere Drake Ins Ltd. 236 F. 3d at 23, citing Scientific Holdings v. Plessey Inc, 510 f 2d 15 (2nd Cir. 1974).

Not only is the contract void and unenforceable, but the district court had an affirmative to first determine whether a valid contract ever came into existence. The Panel failed to consider the fact that the contract is void and no legal basis exists for the district court's findings.

Although the CFTC counsel claimed they were acting within the scope of their authority, and concealed the misconduct from both the Appellant as well as the court, the usurpation of authority over the securities which are the basis for the entire case, as well as the settlement agreement, has been confirmed by the United States, by and through the Securities and Exchange Commission, thus there can be no doubt the CFTC counsel was acting outside the scope of their authority when signing or entering into the void agreement at issue here.

Notwithstanding the duty of candor and agency issues, because the Appellant was unilaterally mistaken with respect to such issues,

28.

the Government knew, or should have known of this mistake, but
failed to disclose it to the Appellant. Nothing more need be said.
The contract is void. That ends the inquiry.


## THE APPELLANT LACKS AUTHORITY TO AGREE

It is an elemental principle of contract law that "no contract
can be formed unless the parties intend to be bound". Ogden Martin
Systems of Tulsa Inc, v. Tri-Centinental Leasing, 734 F. Supp 1057
(SDNY 1990), and under New York law, when parties to a [proposed]
agreement "do not intend to be bound by an agreement until it is
in writing and signed by all parties, then there is no contract
until that event occurs." R.G. Group, Inc, v. Horn & Hardart Co.,
751 F. 2d 69 (2nd Cir. 1984).

Considering the above factors in the context of this case,
there is a firm and definite conviction that the district court
erred in concluding that the parties intended that the unexecuted
draft settlement agreement, constitute a binding and valid agreement.
See United States Gypsum Co, 333 US 364, 92 L.Ed 746 (1984), Finding
clear error where trial court's findings conflicted with un-
controverted documentary evidence. Winston, 777 F.2d at 83
finding clear error where a district court had enforced a settlement
agreement, and three of four factors indicated that the parties
had not intended to be bound in the absence of a signed agreement.

The primary question on this appeal is one of intent. Banking
& Trading Corp v. Floete, 257 F.2d 765 (2nd Cir. 1958). While
other questions of a valid agreement and jurisdiction similarly,
must be briefed and adjudicated.

29.

Under the general principles of contract law, there is no
contract if the parties faile to agree on all the essential
terms, or if some of the terms are too indefinite to be enforceable.
See V'Soske v. Barwick, 404 F. 2d 495 (2nd Cir. 1968)  Here, the
CFTC concedes, as it must, in light of the NFA's disclosures and
certified audit, not to mention the altered signature page, that
no agreement was reached as to any of the unrelated third party
entities.  Notably, the trusts and other entities are not a party
to, or even listed in the submitted version, nor are there any
signatures for any of the third parties. (See Docket 92-1 at 47)

It is uncontroverted that Appellant lacks the authority to
enter into, agree, execute or to bind third parties to the version
of the contract at issue here.  Thus the contract is void from its
inception.  Notwithstanding the fraud of CFTC counsel, duty of
candor to the court, or the fact that Appellant was [UNREPRESENTED]
by counsel, the clear and undisputed facts are that Appellant was
not authorized by law, to agree, enter into, or execute the
particular version of the contract submitted by CFTC counsel.

Despite the void contract, and Appellant's undisputed lack
of authority, or the fact that Appellant was unrepresented by
counsel, it is fundamental in contract law that courts cannot make
a contract, where none exists, nor can they modify, add to or
subtract from the terms of a contract already in existenc."

Appellant specifically challenges the district court's
holding that an unsigned, draft, revised, proposed settlement
agreement, had actual or apparent authority to bind Appellant.

30.

Appellant further challenges the district court findings that
the purported, unauthenticated, undocketed signature page, taken
from one document, and fraudulently inserted into another, could
somehow constitute a valid agreement. Notably, the district court's
conclusions rested entirely on misrepresentations of CFTC counsel,
and altered documents.

A settlement agreement is a contract that is interpreted
according to general principles of contract law. (see Red Ball
Interior v. Palmadessa, 173 F. 3d 481,484 (2nd Cir. 1999)).
"A judgment rendered in accordance with a stipulation of the parties
is to be regarded and construed as a contract, thus our resolution
of the claims is guided by the principles that govern the
construction of contracts."

Even if Appellant had actually signed the settlement agreement,
(which he did not), the contract is nevertheless void in light of
the fact that he lacked any and all authority to sign or agree,
and notably, according to the unauthenticated, undocketed, altered
signature page, submitted by CFTC counsel, Appellant was
[UNREPRESENTED] by counsel. (See Docket No. 92-1 at 41).

According to the binding law of this Circuit, and under the
authority of the Supreme Court, the contract was void, due directly
to the fact that Appellant never agreed, never entered into, and
lacked any and all authority to agree. Clearly the panel overlooked
or failed to consider these undeniable and inescapable facts, when
it dismissed the appeal.

31.

AMBIGUITY IN THE SIGNED VERSION

Appellant further argues that the purported signed version of the settlement agreement submitted ex parte by CFTC counsel, while unauthenticated, undocketed, and inadmissable under the Federal Rules of Evidence, nevertheless cannot be the controlling document, because as written, its terms are unlawful, unenforceable, and harm the stockholders of third party entities, further demonstrating the tampering with evidence and altering of documents, by CFTC counsel. It simply cannot be disputed that CFTC counsel has taken a signature page, the only signature page, from the rescinded counter proposal, previously offered by appellant, and the subject of the district court's order of October 1, 2013 (see Docket No. 76). Notably, because it is the only version of any agreement which was ever signed, and did not contain any of the terms or provisions, or third parties which are listed in the current, altered version.

Although the purported signature page submitted by CFTC counsel, demonstrates the fact that Appellant was unrepresented by any attorney, and that the third parties are not parties, or represented, and thus cannot be part of the submitted version, but instead taken from a previously rescinded, draft, counter proposal, and fraudulently inserted into the current version. Notably, it is the only signature page CFTC counsel ever had, and the only one which ever existed. Thus demonstrating the FRAUD.

It is generally accepted that ambiguity in contracts or the terms are construed against the drafter. (see Kerin v. United States

Postal Service, 116 F. 3d 988, 992 (2nd Cir. 1997). As such it is appropriate to consider extrinsic evidence that is probative of Appellant's intent, as well as his authority to enter into the current version of the settlement agreement.

It is undisputed, and supported by the record, that Appellant's intent in signing the counter proposal, was to remove certain terms and provisions from the settlement. Notably, because he did not agree to all the terms, and lacked the authority to bind third parties, or place certain assets at risk. (see docket 72-76)

Although the counter proposal was already rescinded, the ambiguity and differances between the counter proposal, and the version submitted by CFTC counsel, are shocking, and render it void and unenforceable.

The district court had an affirmative duty to examine the extrinsic evidence, and record evidence and make supported findings as to the ambiguity and differences in the contracts.

In view of the court's factual findings, or lack thereof, as well as the well established principles of contract law, the Court's role is prescribed, in the first instance to determine whether an enforceable agreement ever came into existence. See White v. Department of the Interior (Supra).

Notably, the district judge failed to ever obtain or examine the other versions of the draft, revised, proposed settlement agreements, but instead relied on undocketed, unauthenticated, documents of unknown origin, which have unquestionably been altered.

33.

<u>THE CONTRACT WAS RESCINDED</u>

Although the record is clear, that the Appellant never signed, agreed to, entered into, or executed any version of the draft, revised, proposed settlement agreement, and certainly not the version submitted by CFTC counsel, in the same fabrication of false documents as Nicholas Marsh, Michael Nifong, and Robert Murray, here CFTC counsel have created false evidence and submitted altered documents to the court in the most egregious fraud and misconduct since Robert Murray altered transcripts with fabricated dialog.

Notably however, the record and docket clearly support these documented facts. It cannot be disputed that Appellant lacked any and all authority to enter into any version of a settlement agreement offered by CFTC counsel. Notwithstanding the fact that CFTC counsel lacked authority to offer the settlement, or to bind the United States, and was acting absent any statutory or enforcement authority, the record nevertheless supports and confirms that no agreement had been reached, and that Appellant had issued a counter proposal, which removed the third parties, terms and provisions, that CFTC counsel was insistant on including.

While the parallel criminal proceeding was also initiated through the fraud and misconduct of CFTC counsel, and lacks any and all jurisdiction, Appellant was unaware of the jurisdictional defects, and usurpation of authority when in good faith issuing a counter proposal, which removed specific assets, terms and provisions.

34.

And; while unrepresented by counsel, Appellant relied upon the promise of probation in the criminal proceeding, in exchange for settlement of certain claims with CFTC counsel in the civil proceeding.

Noting that counsel to Co-Defendant Arista actually represented the interests of Arista, and its members, the conflict of interest prohibited defense counsel from representing the interests of Appellant, or third parties. Thus, when the misrepresentations of of counsel, and broken promises resulted in 151 months imprisonment in the criminal case, there remained nothing for Appellant to settle.

Notwithstanding the breach of promises and tacit agreement for probation, upon receiving a sentence of imprisonment, rather than probation as promised, Appellant had not purpose, reason or desire to enter into, any agreement, nor to settle any claims. Notably, on November 15, 2013, more than ten (10) days prior to CFTC counsel signing any version of any settlement agreement, Appellant rescinded and abrigated any and all settlement agreements and openly noticed counsel of his intent not to be bound, and not to agree to any contract or settlement.

Knowing full well that Appellant was both unrepresented by counsel, and that Appellant had already rescinded any and all versions of any settlement agreement, counsel for CFTC submitted an altered, modified and tampered version of a settlement agreement to the Court, while Appellant was in custody, and concealed the altered and changed version of the agreement from Appellant.

35.

According to the general principles of contract law, rescission based on a mistaken understanding of the terms of an agreement, or notably on a party's unilateral unmaking of a contract for legally sufficient reasons, such as the other party's breach, or a judgment rescinding the contract, each result in a void contract which is unforceable. See Gebble v. Cadle Co, 49 Conn App 265 267-77, 714 A2d 678 684 (1988), "Recission based on a mistake which has been caused by the other party's fraud".

The submission by CFTC counsel of an undocketed cover letter purportedly sent to the court cannot satisfy the standard of the statute of frauds, even if the contract was not void ab initio. See Scheck v. Francis, 26 NY 2d 466, holding that a cover letter, written for the purpose of forwarding documents to the parties for signatures, is insufficient to satisfy the statute of frauds. Thus, even if the district court had made the required findings, and even if the appellant had actually executed the particular version of the settlement agreement, and even if he had actual authority to enter into the agreement on behalf of the third parties, and even if the contract was not void, the docket and record evidence clearly demonstrate that although the court stayed the proceedings for the purpose of considering Appellant's counter proposal, any and all versions of the settlement agreement, including the counter proposal, were rescinded, abrigated, and withdrawan prior to signing or submitting to the court.

Notably, no counsel did, or could agree on behalf of Appellant, because Appellant was unrepresented by any counsel in regards to the purported enforcement action, despite the usurpation of power.

36.

## THE CLAIMS ARE NOT FRIVOLOUS

Evidence tampering, fraud on the court, usurpation of power, and the jurisdictional defects resulting from such misconduct, are serious matters, which are not only in the interests of justice, but indeed in the public interest, and clearly are not frivolous.

Anyone who would assert that such serious issues of fraud and misconduct are frivolous, are of the same ilk as those who claim that altering transcripts and evidence tampering are merely "a joke". (See In re Robert Murray). Such misconduct undermines the public trust, obstruct justice, and clearly are no laughing matter.

Frivolousness, for the purpose of sanction is determined, [NOT] in the abstract, but in relation to the arguments actually made by the party, and contained in the brief. Stoner v. Young Concert Artists, Inc. 626 Fed Appx 293. Notably, the panel overlooked the fact that Appellant has not yet filed a brief, nor has the time for filing expired, and thus any determination of frivolousness, is not only premature, but indeed in conflict with prior panel decisions, and cannot be overturned by this panel.

A void contract contract produces no legal obligation. To bind a principal to a contract, a putative agent must be vested with actual or apparent authority. See Herolfson Mgmt A/S v. of Supply, Kingdom of Jordan, No. 88 Civ 7542, 1991, U.S. Dist. Lexis 6966 (SDNY May 22, 1991) "If an agent lacks such authority, [any agreement] entered into on behalf of a principal [is void], it never came into legal existence."

"But all such contracts must come within the powers of the corporation, must not exceed the powers of the agency that makes them, and must not violate the rights of the stockholders, or contravene public policy." Pennsylvania Railroad Co v. St. Luis Railroad Co., 118 US 313, 30 L.Ed 83, nor can the CFTC do any valid act, unauthorized by statute.

Here, Appellant has made a prima facie showing that, not only did he lack the authority to agree, enter into, execute or sign the submitted version of the settlement agreement, but also, that CFTC counsel lacked the statutory authority to enter into, the particular agreement, or to bind the United States, but instead usurped the function and authority of the Securities and Exchange Commission, contravened the SEC's absolute discretion over "when, whether and to what extent to investigate or enforce" the very securities, which are the basis for the purported offense. (See Heckler v. Chaney). (See also, Molchatsky v. United States).

Moreover, it is the SEC, and not the Appellant that has revealed the usurpation of authority over the securities transactions, which are the sole and exclusive basis for all CFTC claims, and are the basis for the version of the settlement agreement submitted by CFCT counsel. Unless the CFTC counsel intends to dispute the absolute authority of the United States Securities Commission, as well as the binding law of this circuit, then these undisputed facts must be addressed by the court, and cannot be subject to an "off the cuff" determination of frivolousness, without even considering the brief.

38.

Here, an independent review of the record evidence, and relevant case law reveals not only that the district judge abused his discretion, but also that the court was in conflict with the binding law of this circuit. Notably, the CFTC counsel has made only conclusory allegations of frivolousness, and did not provide any particularity evidence.

Notably, the documents provided by former CFTC counsel Hurand, in his unauthorized ex parte communication, are not only documents of unknown origin, but indeed, outside the record, and maynot be considered as part of the record on appeal, or by the Court. The documents must be either (1) part of the record below, and included in the record on appeal, or (2) they are not part of the record on appeal, and may not be considered now. See International Business Machine Corp v. Edelstein, 526 F. 2d 37 (2nd Cir. 1975).

Noting further, that the United States Securities and Exchange Commission has revealed the usurpation of authority, resulting in the jurisdictional defects, and the void settlement agreement, thus precludes any claims that the appeal is frivolous.

Frivolousness is determined not in the abstract, but in relation to arguments actually made by the Appellant. Anderson v. Steers, Sullivas, McNamar & Rogers, (1993 CA 7 Ind) 988 F. 2d 495. Therefore, Appellant's claims that the district court abused its discretion, due process violations, judicial misconduct, and evidence tampering may not be summarily dismissed as frivolous, unless and until fully briefed, and jurisdiction fully established.

## THE APPELLANT NEVER SIGNED THE CONTRACT

The undisputed and uncontroverted fact that Appellant lacks any and all authority to enter into, sign, execute, agree to, or to bind unrelated third parties, clearly demonstrates that Appellant, never, at any time agreed to, entered into, or signed the particular version of the settlement agreement submitted by CFTC counsel. (See Docket No. 77) (see also Docket No. 92).

Notably, Appellant had already provided evidence, supported by the docket, the record, and disclosures of the Securities and Exchange Commission, as well as the admission by CFTC general counsel, that the version of the settlement agreement submitted by CFTC counsel, was not signed by Appellant. That ends the inquiry.

Although CFTC counsel noted in Exhibit 4, that the agreement provided that it was the "entire agreement", the record supports, and CFTC general counsel disclosed that the version of the settlement agreement submitted by CFTC counsel had no signature page, and was "not signed by Walji". That ends the inquiry.

Notwithstanding the fact that the purported signature page submitted ex parte by CFTC counsel was clearly not part of the original document, nor ever filed with the court as part of the "entire agreement", or the unknown origin of the unauthenticated and undocketed document extrinsic to the record evidence, or the prior admission of CFTC general counsel, the district judge nevertheless, permitted CFTC former counsel, who is not an attorney of record, who has not filed an entry of appearance, to submit an ex parte communication, with unauthenticated documents

of unknown origin, outside the record, and without notice to Appellant, nor opportunity to be heard.

Appellant submits the purpose and intent of the unauthorized submission, as well as the due process violations, not to mention violations of the Rules of Civil Procedure, Rules of Evidence, and due process, is due directly to the fact that the all the facts and evidence clearly support that Appellant never signed, agreed, executed or entered into any settlement agreement, and the district judge knew it. Clearly, had Appellant been provided with the requisite notice and due process, he would have, and could have exposed the fraud and corruption of CFTC counsel at the district court.

The district judge knew full well that Gates Hurand was no longer attorney of record, and had left the employ of the CFTC. The judge knew full well Hurand was unauthorized to submit an ex parte communication, and to attached fabricated documents, which are unauthenticated and outside the record. Notably, the judge knew full well that Appellant was required to receive notice, and an opportunity to object and to expose the fraud being perpetrated by Hurand. Appellant submits that is exactly why the district judge acted improperly and violated due process. Simply put, the district judge was protecting both the fraud and evidence tampering, as well as his own misconduct, and did not desire for Appellant to expose the truth. Why else act in clear abuse of discretion, and judicial misconduct, and knowingly violate Appellant's due process rights, if not to conceal the truth.

41.

## THE COURT LACKS STANDING UNDER ARTICLE III

On every appeal, the first and most fundamental question is that of jurisdiction, both of this court, and the district court. Under the facts, and newly discovered evidence, and the circumstances presented here, this court unquestionably lacks standing under Article III of the Constitution.

This Court may not proceed to the merits, nor make determinations of frivolousness of the appeal, until both its jurisdiction, as well as the jurisdiction of the district court has been conclusively determined. See Steel Co v. Citizens for a Better Environment, 523 US 83, 140 L.Ed 2d 210 (1988) "We are mindful of our [DUTY] to avoid deciding what we have no authority to decide...thus our first, and in this case our only inquiry, is whether we, as well as the district court, properly have jurisdiction." id.

A challenge to the Court's jurisdiction may be raised at any time, and this Court remands jurisdictional defects for additional proceedings, or for dismissal if jurisdiction cannot be determined. United States v. Bustillos, 31 F. 3d 931 (10th Cir. 1994). citing Steel Co.

Subject matter jurisdiction is the first question in every appeal, and if the court concludes that it lacks jurisdiction, it [MUST PROCEED NO FURTHER]. Illinois v. City of Chicago, 137 F. 3d 474, 478 (7th Cir. 1998). "The first step in the analysis is to presume the district court lacks jurisdiction and to require the party asserting jurisdiction, to prove that jurisdiction actually exists. Kokkon v. Guardian Life Ins., 511 US 357 (1994).

The panel failed to consider the jurisdictional defects, and disregarded its jurisdictional obligations, and acted wholly without any jurisdiction, and issued an impermissable advisory opinion that the merits of the appeal were frivolous. Although the panel ignored jurisdiction, and proceeded to the merits in conflict with the Supreme Court mandates in Steel Co., and then issued an advisory opinion that the merits of the appeal are frivolous, absent any brief or arguments being presented, nevertheless the district court lacks any and all jurisdiction due to two fatal jurisdictional defects:

1. The Court lakcs subject matter jurisdiction because the case or controversy required by Article III of the United States Constitution, does not actually exist. Although the jurisdictional defect was concealed from Appellant, and not discovered until the Securities and Exchange Commission revealed the usurpation of authority by CFTC counsel. Notably, the fabrication of a securities violation, which does not actually exist, and never occurred, as the entire and exclusive basis for jurisdiction, does not purport to, or does meet the requirements of Article III.

2. The Court lacks standing, because there is no causal connection between the purported injury and the Appellant. Notably, Appellant has no ownership, control or interest in either Arista, or the securities transactions, which are the basis for the offense, even if an actual securities violation had occurred, and had not been fabricated by CFTC counsel.

43.

## Article III Case or Controversy

There is no case or controversy in the underlying matter. There is no offense, no violation, no scheme, no conspiracy, but instead, the entire basis and premise for an offense or violation has been falsified and fabricated by CFTC counsel.

Newly discovered evidence confirms that the purported securities violation, which is the entire and exclusive basis for the purported commodity violation, and thus the basis for the claim of enforcement authority, is a ruse, a sham to manufacture jurisdiction which does not actually exist.

Not only does this newly discovered evidence demonstrate the fraud which has been perpetrated upon the court, but unquestionably divests the court of all jurisdiction under Article III.

Noting that it is the United States, an Executive Branch Agency of the Federal Government, that has revealed this evidence, and confirmed these facts. thus leaves no doubt that the district court, and thus this court lack subject matter jurisdiction.

The United States Constitution limits the exercise of judicial power to actual "cases and controversies". Lujan v. Defenders of Wildlife, 504 US 555 (1992). Mere allegations of an injury, or a possible or threatened injury, are not sufficient to meet the stringent requirements of Article III. See Clapper v. Amnesty International, 133 S. Ct. 1138 (2013).

This Court, as well as the district court lack any and all jurisdiction, because the case or controversy does not actually exist, but instead has been fabricated by CFTC counsel, to manufacture statutory authority and enforcement powers.

44.

## CFTC LACKS STANDING UNDER ARTICLE III

Article III of the United States Constitution limits the jurisdiction of Federal Court to the adjudication of "cases" or "controversies". U.S. Constitution Article III § 2 Clause 1. "We may pass ONLY upon matters that are properly justiciable under Article III." See Morgan v. McCotter, 365 F. 3d 882, 887 (10th Cir. 2004) "A key component of justiciability is Article III standing."

To establish standing, "the litigant seeking to avail itself of Federal jurisdiction bears the burden of demonstrating the following three elements: (1) an injury in fact; (2) a causal connection between the injury and the alleged injury and the conduct complained of; and (3) a likelihood that a favorable decision will redress the injury." Lujan supra.

After the Appellant discovered the usurpation of authority, and the fabrication of an offense by CFTC counsel, the Supreme Court issues its opinion in Spokeo inc. v. Robins, 136 S. Ct. 1540, 194 L.Ed 2d 635 (2016). Spokeo addressed the issue of what a plaintiff must plead to adequately allege a "concrete injury" for purposes of article III standing. id at 1549.

Given the change Spokeo effected in the standing doctrine, it cannot be disputed that the fabrication of an offense, and usurpation of authority not only fail the standards of standing, but also that plaintiff failed to meet, or plead those requirements. See Warth v. Seldin, 422 US 490, 45 L.Ed 2d 343 (1975), noting that if standing does not adequately appear from all materials of record,

the complaint must be dismissed. Notably, this Circuit remands cases to allow the district court to address the standing questions in the first instance.

Clearly the Panel failed to consider, or disregarded the law of this circuit, holding "we review de novo whether a plaintiff has constitutional standing to bring a claim. W.R. Huff Asst. Mgmt Co. v. Deloitte & Touche, LLP, 549 F. 3d 100, 106 (2nd Cir. 2008). Notably, CFTC counsel has failed to plead, and cannot show a cognizable injury sufficient to support Article III standing.

First, the Plaintiff must show that it has suffered an "injury in fact," meaning a concrete and particularized invasion of a legally protected interest. id. Second, the plaintiff must demonstrate a "causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." (See Lujan, supra).

Notably, the only injury which purportedly exists, or even alleged to exist, is the securities fraud, which is the sole and exclusive basis for the purported commodity violation, as well as the purported enforcement authority claimed by CFTC counsel.

Fortunately, the SEC has now revealed that no injury, actual or concrete ever occurred, or actually exists, but instead has been falsified and fabricated by CFTC counsel. Notably however, absent the purported securities violation, there is no violation, upon which a commodity violation can rest, nor any claim of enforcement authority. Thus the first prong of the analysis fails, and no injury actually exists.

46.

Indeed, the version of the settlement agreement submitted by
CFTC counsel, specifically provides, on Page 19, Paragraph 83:
"by the conduct described in paragraphs 1 through 80 above,
[Defendants cheated or defrauded, or attempted to defraud, and
willfully deceived, or attempted to deceive Arista's investors by
(i) misappropriating investors' funds, and (ii) providing investors
with false and misleading statements...in connection with the
making of contracts of sale of any commodity". (See Docket 77 at 19).

Unfortunately, none of that was true. While paragraphs 1
through 80 clearly and specifically contain "conduct" which
purports to violate the securities laws, the United States Securities
and Exchange Commission has now revealed that none of it is true,
and that no securities violation actually exists. Nothing more
need be said. Notably, Paragraph 83 quoted above, not only
relies on the purported securities violation alleged in paragraphs
1 through 80, but indeed establishes the usurpation of authority
in claiming a securities violation in "defrauding Arista's investors"
which the SEC has confirmed, never happened.

Further, Paragraph 83 demonstrates the reliance upon the
purported securities violation as the basis for the purported
commodity violation, which also does not, and cannot exist.
(see docket No. 77 at 19).

Appellant does not create these facts. It is the SEC that
has confirmed the purported conduct in paragraphs 1 through 80,
never occurred. It is the SEC that confirmed that Arista's
investors were not defrauded, nor deceived, but instead received
everything to which they were legally and contractually entitled.

47.

Second, the causal connection between Appellant and the conduct complained of also fails. Although CFTC counsel has falsified an offense, and usurped authority over the securities which are the basis for the offense, CFTC counsel has also fabricated a causal connection by falsely claiming Appellant is a "principal" of Arista.

Not only did CFTC counsel fabricate claims that Appellant had "defrauded Arista's investors", but indeed in Paragraph 84, CFTC counsel falsely claims that "Walji and Francisco committed the acts of misappropriation and misrepresentation described above, within the scope of their employment, office or agency with Arista." Indeed, paragraph 16, actually states "Walji is the manager, Chief Executive Officer, Secretary and Treasurer of Arista." Unfortunately none of that was true either.

Supporting both the facts that Appellant Walji lacked the authority to enter into the version of the settlement agreement submitted by CFTC counsel, as well as the fact that Walji never, at any point signed, agreed to, executed or entered into that particular version of the settlement agreement, is the inescapable, and undeniable fact that Appellant has no ownership, control, agency, office or employment with Arista, but instead was a contract consultant, whose only function was to manage commodity trades on behalf of Arista, by and through its members.

Moreover, these undisputed facts were known to CFTC counsel, when they fabricated and manufactured an offense, as confirmed by the NFA's audit which confirms both that Appellant was merely and only a contract consultant, but also that he was owed large sums

48.

of money, which are legally and legitimately payable pursuant to the consulting agreement between Appellant, and Arista's owners.

In addition, Arista's books, records and filings clearly establish Arista is an LLC, which never offered or sold any investment contracts as represented by CFTC counsel. But instead, Arista is owned and controlled by its members, it possess no "investors", and Appellant has no ability, authority, or control to make any false representations, or to defraud Arista's investors, even if any of the purported conduct alleged in Paragraphs 1 through 80, had actually occurred, or if any of it were actually true.

The cold hard truth is that Appellant lacks any and all authority, ownership, interest or control to make the required "causal connection" between the purported conduct, and the fabricated injury, even if CFTC counsel had not manufactured the entire case.

As a result of these false and fabricated claims, the CFTC has failed to meet the burden of establishing traceability. CFTC counsel bases standing solely on the belief that Appellant was responsible for the acts and conduct of a third party entity, which was outside his ownership and control. He lacks the authority and capacity to make any misrepresentations, or to defraud any investors, even if such events had actually occurred.

Standing exists only if the injury is "fairly tracable" to the challenged actions of the defendant, and not the result of the independent actions of some third party. Lujan, 504 US at 560. (See NFA Audit and Affidavit, Exhibit 8 at 2 & 8, noting Appellant is not a principal, officer, control person, or owner). id.

49.

Notwithstanding the fact that no misrepresentations were
actually made, or that no investors were actually "defrauded" and no
investors funds were actually "misappropriated", nonetheless,
even if all these events had not been fabricated by CFTC counsel,
there is absolutely [NO] causal connection between Appellant, and
the purported injury.

While the CFTC claims that Appellant was the owner, control
operson, Principal, Chief Executive Officer, and whatever other
false claims they could pile on, not only are these claims false,
but indeed, Arista's documents, securities and filings, not to
mention the SEC and the NFA, all confirm and establish that Appellant
is nothing more than a third party, contract consultant, and
notably, CFTC counsel offer nothing to support their false and
conclusory claims. (See Exhibit 3 at 18-21; Exhibit 9).

A causal connection between the injury and the challenged
conduct is required, and notably that burden falls to the CFTC.
False assumptions and conclusory statements are not sufficient
to meet the stringent requirements of constitutional standing.
The fact that Appellant had no ownership or control over Arista,
in and of itself destroys any claim of standing, and unless or
until the CFTC can produce something to support their false claim,
then no standing does or can exist, and the complaint must be
dismissed.

Under the binding law of this Circuit, and the authority of
the Supreme Court, this Court must resolve the standing issues,
before making any determination on the merits, or dismissing.

CONCLUSION

The panel's decision clearly conflicts with the binding
law of this circuit, and has overturned prior panel decisions,
which can only be done en banc. Further, the Panel's decision
is in conflict with Supreme Court authority, particularly in
consideration of the facts of jurisdiction, standing, and
not even considering the brief, or permitting briefing.

Although the conduct of CFTC counsel constitutes egregious
misconduct, and while Appellant clearly understands the court's
desire to avoid such serious issues, Appellant respectfully reminds
the court that it is the United States Government that has made
the disclosures, and identified the conflicts, and confirmed the
misconduct, and exposed the jurisdictional defects. Appellant
does not create these facts, he merely points them out.

As recently identified by Chief Judge Alex Cozinski, the
"epidemic" of Brady violations, fraud and misconduct of Government
attorneys, is most recently exposed with Robert Murray, while
altering transcripts, and fabricating testimony. Although Murray
believes his evidence tampering and other misconduct was merely
"a joke", clearly egregious misconduct is no laughing matter,
it undermines the public trust, and the interests of justice, and
thus cannot be deemed "frivolous".

Therefore, Appellant respectfully requests this Honorable
Court reconsider the serious issues presented in this appeal,
and at the least provide for appellant to properly and fully
brief the issues being raised and for full consideration by an
en banc court.

51

In the alternative, Appellant requests this court to remand this matter to the district court with instructions to dismiss for want of jurisdiction, and for any and all appropriate and available relief.

Respectfully submitted on this __26th__ day of __December__ 2016.


_____
Abdul Walji
Federal Register No. 64127-112
Federal Prison Camp La Tuna
P.O. Box 8000
Anthony TX 88021

52.

E X H I B I T    1



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

March 14, 2016

Mr. Abdul Walji
Federal Prison Camp La Tuna
P.O. Box 8000
Anthony, TX 88021

      Re:  Freedom of Information Act (FOIA), 5 U.S.C. § 552
           Request No. 16-02296-FOIA

Dear Mr. Walji:

    This letter is in response to your request, dated February 11, 2016 and received in this office on March 03, 2016, for information regarding Arista, LLC.

    Based on the information you provided in your letter, we conducted a thorough search of the SEC's various systems of records, but did not locate or identify any information responsive to your request.

    If you still have reason to believe that the SEC maintains the type of information you seek, please provide us with additional information, which could prompt another search. Otherwise, we conclude that no responsive information exists and we consider this request to be closed.

    You have the right to appeal the adequacy of our search or finding of no responsive information to the SEC's General Counsel under 5 U.S.C. § 552(a)(6), 17 CFR § 200.80(d)(5)(iv). The appeal must be received within ninety (90) calendar days of the date of this adverse decision. Your appeal must be in writing, clearly marked "Freedom of Information Act Appeal," and should identify the requested records. The appeal may include facts and authorities you consider appropriate.

    You may file your appeal by completing the online Appeal form located at https://www.sec.gov/forms/request_appeal, or mail your appeal to the Office of FOIA Services of the Securities and Exchange Commission located at Station Place, 100 F Street NE, Mail Stop 2465, Washington, D.C. 20549, or deliver it to Room 1120 at that address. Also, send a copy to the SEC Office of the General Counsel, Mail Stop 9612, or deliver it to Room 1120 at the Station Place address.

Abdul Walji                                          16-02296-FOIA
March 14, 2016
Page 2


    If you have any questions, please contact me at
smithLR@sec.gov or (202) 551-8328.  You may also contact me
at foiapa@sec.gov or (202) 551-7900.

                         Sincerely,

                         La Kisha R. Smith
                         FOIA Research Specialist

E X H I B I T   2

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


ARISTA LLC, and ABDUL WALJI   )
                           )
     Petitioners/Plaintiffs,  )
                           )
V.                       )   Case No. 15-9304-GW (DTBx)
                           )
ROBERT ROODE, et al,        )
                           )
     Respondents/Defendants.  )

---

## EMERGENCY MOTION TO PRODUCE DOCUMENTS
## APPOINT A MASTER AND EVIDENTIARY HEARING

---

COMES NOW Petitioner Abdul Walji, pro se and acting on his own behalf as a layman pursuant to Haines v. Kerner, 404 US 519, and appears before this Honorable Court to seek the appointment of a Master pursuant to Federal Civil Rule 53, to immediately take custody of documents and evidence, and to conduct an evidentiary hearing based thereon.

### GROUNDS FOR THE MOTION

On December 12, 2012, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), filed a complaint against Defendants Arista LLC ("Arista") and Appellant Walji ("Walji") as a purported "principal" of Defendant Arista. (See Southern District of New York Case No. 12-CV-9043-PAE).

Although the Civil Complaint alleged violations of the
Commodity Exchange Act, 7 U.S.C. §§ 1 et seq, the entire basis
and premise for jurisdiction and the purported violation, was a
falsified and fabricated violation of the Securities Exchange Act
15 U.S.C. § 78j(b), which did not actually exist.

Newly discovered evidence received from the United States
Securities and Exchange Commission has revealed that the SEC
never authorized the enforcement of the Securities in question,
indeed, the SEC refused to enforce, through either civil or criminal
process, thus leaving the securities in question, authorized, legal
and legitimate.

Further, in light of the SEC refusal to prosecute, under the
Supreme Court holding of Heckler v. Chaney, demonstrates the
attorneys for the CFTC have falsified the entire basis and premise
not only for the purported commodities violation, but also the
existence of the securities violation, which the commodities claims
are based upon, and inextricably intertwined.

The CFTC knew full well there was no basis for the purported
violation, and it knew full well the SEC had refused to enforce
the securities in question through either civil or criminal process,
thus attorneys for the CFTC usurped the function and authority
of the SEC and fabricated a violation which did not actually exist,
and used the fabricated offense to deceive and coerce Walji into
a consent order to resolve the purported dispute in favor of the
CFTC.

2.

Although Appellant Walji was agreeable to settle certain claims of the CFTC as to himself, Walji openly disclosed, and advised his counsel that he lacked the capacity and authority to bind Arista or its members to any settlement or consent order.

Ultimately, settlement negotiations failed despite Walji's best efforts, due to the fact that the CFTC was attempting to obtain assets of Arista to which there was no legal or legitimate claim, and to which Walji had no authority or control.

Despite Walji's desire to end the dispute, the mandatory arbitration provisions of the Arista securities created an impass to settlement on behalf of Arista and its members, thus the CFTC was legally unable to settle or negotiate with Appellant Walji, and bound by the mandatory provisions of the Arbitration Act.

On December 2, 2015, Appellant learned that the CFTC had usurped the function and authority of the SEC, for the purpose and with the intent to falsify the existence of a commodities violation which does not actually exist, and further obstructed the Federal Arbitration Act to further its scheme to obtain assets to which there was no legitimate or legal claim.

On December 12, 2015, Appellant filed a motion to stay the enforcement of the fraudulently obtained consent order, until the statutorily mandated arbitration could be had, and the resolution of the issues which were the subject of arbitration were resolved.

Although the District Court denied the motion to stay, it did so based entirely upon the false statements and fraud on the Court perpetrated by Gates Hurand and Douglas Yatter, counsel for the CFTC.

3.

In an effort to conceal misconduct, falsification of evidence, fabrication of an offense, and FRAUD on the Court, CFTC counsel Hurand and Yatter stepped further into misconduct and made false and misleading statements to the District Court regarding the existence and enforcability of the "Consent Order" as the ultimate authority in the case, and the basis for jurisdiction.

Hurand and Yatter actually represented to the Court that Appellant Walji had "agreed to" and "entered into" the consent order, and further "consented to the jurisdiction of this court".

Notably, Hurand and Yater failed to mention whether Walji had actually signed or executed the consent order agreement, but instead simply relied upon some unidentified acquiescence to a consent order as the basis for jurisdiction, and the support to their false and misleading claims.

Meanwhile, the instant proceeding in the Central District of California, to compel arbitration and enforce the mandatory provisions of the Arbitration Act was initiated, wherein the false claims and misconduct of counsel Hurand and Yatter were exposed. (See Central District of California No. 15-CV-09304-GW).

On February 9, 2016, Douglas Yatter, counsel of record for the CFTC filed a motion to withdraw as attorney of record in the District court in New York.        Notably Mr. Yatter's sudden departure from the CFTC, and his new employment with Latham & Watkins was so abrupt and unannounced that Mr. Yatter failed to notice the Appellant, or indeed the CFTC and the Court as to the status of the case, or his representation, or make the required filings and appearances.

4.

On February 17, 2016, Walji filed a notice of appeal, resulting in an appeal from the order of the District Court in New York which was based on the fraud and misrepresentations of both Yatter and Hurand in obtaining the fraudulent consent order.

On February 29, 2016, just 12 days after exposure of the fraud and misconduct, Gates Hurrand mysteriously and suddenly left the employment of the CFTC as "trial counsel", and is now employed by Morvillo Abramowitz Grand Iason & Anello, P.C. in New York. Notably, Mr. Hurrand's departure from the CFTC was so sudden and abrupt, that he also forgot to inform the parties, notice the Court, or even seek leave to withdraw as counsel as required. Indeed the CFTC was left "holding the bag" to the extent that the CFTC failed to timely or properly notice the New York Courts or even enter an appearance as required by law.

On March 7, 2016, Appellant received from the Clerk of the Court, an updated docket sheet, noting that Mr. Hurand had been "terminated" without seeking leave, or notice to the parties, or compliance with the rules of Court. He simply quit.

On March 12, 2016, Walji received written confirmation from the United States Securities and Exchange Commission, of its refusal to prosecute either Walji, or the securities in question, thus demonstrating both the defects in subject matter jurisdiction, as well as the falsification of evidence, and the fabrication of a commodities violation by Yatter and Hurand.

On April 4, 2016, Walji filed a Motion in the New York Court of Appeals, to remand and determine jurisdiction in that appeal,

5.

based on the disclosures by the SEC, demonstrating the FRAUD on the Court and jurisdictional defects in the District Court.

On April 7, 2016, Mary Connelly, new counsel to the CFTC, upon entering a late notice of appearance, in violation of New York's local rules, served on Walji, in the California litigation, an opposition to the Petition to Compel Arbitration.

Notably, attached as an Exhibit to the opposition and submitted to the United States District Court, is a purported "consent order". Although the attached Exhibit submitted by the CFTC, by and through Ms. Connelly, and represented to be both the "entire agreement", as well as the basis for jurisdiciton of the CFTC action, the purported consent order submitted by the CFTC is a fake, or forgery, and was never signed or executed, and has been presented for the purpose and with the intent to defraud the Federal District Court in California, in the same manner it has defrauded the Federal District Court in New York.

Moreover, Walji has never before seen this purported consent agreement, much less agreed to its terms or provisions.

Further, Walji lacks all legal standing and authority to bind Arista or its members to the terms of the purported consent order, or consent to jurisdiction. (See Southern District of New York, case no. 12-CV-9043-PAE, docket No. 77. Compare Central District of California, case no. 15-CV-09304-GW, docket no. 17).

Walji respectfully requests this Court take judicial notice of the following facts and records of the United States Courts.

1. CFTC counsel Mary Connelly represents the purported consent order is the "entire agreement" and relies upon the

6.

agreement to establish both the jurisdiction of the District Court, as well as the authority for the CFTC's actions.

Page 38, paragraph 130 states: "Entire Agreement: This Consent Order incorporates all of the terms and conditions of the settlement among the parties herety. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court." (see consent order docket no 17).

2. Page 39, paragraph 136 states: "Counterparts and Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent order...shall be deemed for all purposes as constituting good and valid execution". (See consent order at 39).

Walji requests this Court take judicial notice that Walji never, at any point, signed, agreed to, entered into, or executed the purported consnet order submitted to the Court. Indeed the signature block and counterparts are not even contained in the purported consent order.

This purported consent order has been altered, tampered and falsified to defraud the court and to create the illusion of consent and jurisdiction, based entirely on an unsigned, and unenforceable document, which Walji has never even seen, and may not actually exist.

7.

ARGUMENT

Fraud on the court and tampering with evidence are serious matters, which when brought to the attention of the Court, through credible allegations, and court records, must be addressed and resolved.

Although Fraud on the Court, as well as Subject Matter jurisdiction may be raised at any time. Walji is nevertheless under certain time requirements and limitations of Court Schedules, thus demonstrating the urgent need for this motion.

Presently, Walji has an obligation to timely file a reply to various opposition of the CFTC in Walji's efforts to seek the truth and justice.  However the newly discovered fraud on the Court through the presentation of fraudulent documents and false claims may seriously impact Walji's ability to timely reply and address the misconduct which has only recently been discovered.

Civil Rule 53, provides for appointment of a master to conduct hearings and examine evidence.

28 U.S.C. § 1361 provides authority to compel an  employee or agency of the United States to perform certain duties and obligations owed to a party.

Therefore, Walji submits that the interests of justice require and the authority of this Court permits the appointment of a special master to immediately take custody of the signed, original consent order, and to conduct an evidentiary hearing, to examine the contents of the original document, and determine whether

8.

it is signed by all parties, or instead if the signatures are valid, authentic, or even exist.

In light of the fact that Walji never signed, executed, or indeed had never before seen the purported consent order, as well as the fact that he lacks the authority and standing to sign on behalf of Arista, or to bind Arista to the terms contained in the unsigned consent order, the original document must be examined.

If Walji and Arista actually entered into or agreed to the document purported to be the consent order, and filed with the Court, then there can be no harm or prejudice to any party to simply surrender and turn over the documents and evidence the CFTC claims to possess and represented to the Courts, and to examine the original documents and determine if the signatures are authentic, or indeed, if the consent order is actually signed by all parties, or at all.

Therefore, for good cause shown, and for the reasons stated above, Petitioner respectfully requests this Court GRANT this motion in its entirety, and for the following relief:

1.  For an order to appoint a master to take custody of the original, signed consent order, and to conduct evidentiary hearings and ensure the documents are authentic and signed by all parties.

2.  In the alternative, for this Honorable Court to take custody of and examine the original, signed consent order and to ensure it is authentic and signed by all parties.

3.  If the CFTC is unable, or unwilling to surrender and turn over the signed, original consent order for inspection and a determination of authenticity and jurisdiction, then Walji respectfully requests a referral for the investigation and prosecution of the evidence tampering, fraud on the court and other misconduct of the CFTC in this Court.

9.

4.  If the CFTC respondent is unwilling or unable to surrender and
    turn over the original, signed consent order, which contains
    all the terms, provisions and admissions purported by the
    respondent, then Walji requests this Court Grant the Petition
    to arbitrate, and for immediate restoration of all assets.

5.  For any and all other relief, which this Court may deem just
    or proper under the extraordinary circumstances presented here.

Respectfully submitted on this 22nd day of _____April_____ 2016.


                                   Abdul Walji
Abdul Walji
Federal Register No.64127-112
Federal Prison Camp La Tuna
P.O. Box 8000
Anthony TX 88021

CERTIFICATE OF SERVICE


I hereby certify that on this date I have made and served a true and correct copy of this emergency motion to produce documents, appoint a master, and evidentiary hearing, on the parties and entities listed below, using the inmate filing and mail system (mailbox rule) Houston v. Lack, 101 L.Ed 2d 245 (1988) by placing same in a sealed, first class, postage prepaid envelope and deposited same at the Federal Prison Camp La Tuna, P.O. Box 8000, Anthony Texas 88021.


Clerk of the Court
312 N. Spring Street
Room G-8
Los Angeles, CA 90012

Kent A. Kawakami
300 N. Los Angeles Street
Room 7516
Los Angeles, California, 90012


Mary T. Connelly
US CFTC
1155 21st Street N.W.
Washington DC 20581

National Futures Association
300 South Riverside Plaza
Suite 1800
Chicago, IL 60606

Kneafsey & Friend, LLP
800 Wilshire Blvd, Suite 710
Los Angeles, CA 90017


I declare under penalty of perjury that the foregoing is true and correct under the laws of the Untied States, Title 28 U.S.C. § 1746



Dated: _____4/22nd/2016_____          _____Abdul Walji_____
                                        Abdul Walji

E X H I B I T   3

# ARISTA, LLC

# Operating Agreement

# February 25, 2010

CONFIDENTIAL

PLAINTIFF 266

**EXHIBIT 3 - PAGE 1**

TABLE OF CONTENTS

ARTICLE I:   DEFINITIONS . . . . . . . . . . . . . . . . . . . . 1
    1.1.   "Act" . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2.   "Agreement" . . . . . . . . . . . . . . . . . . . . 1
    1.3.   "Articles of Organization" . . . . . . . . . . . . 1
    1.4.   "Assignee" . . . . . . . . . . . . . . . . . . . . 1
    1.5.   "Assigning Member" . . . . . . . . . . . . . . . . 2
    1.6.   "Capital Account" . . . . . . . . . . . . . . . . . 2
    1.7.   "Capital Contribution" . . . . . . . . . . . . . . 2
    1.8.   "Capital Event" . . . . . . . . . . . . . . . . . . 2
    1.9.   "Code" . . . . . . . . . . . . . . . . . . . . . . 2
    1.10.  "Company" . . . . . . . . . . . . . . . . . . . . . 2
    1.11.  "Economic Interest" . . . . . . . . . . . . . . . . 2
    1.12.  "Encumber" . . . . . . . . . . . . . . . . . . . . 2
    1.13.  "Encumbrance" . . . . . . . . . . . . . . . . . . . 2
    1.14.  "Fair Market Value" . . . . . . . . . . . . . . . . 2
    1.15.  "Initial Member" or "Initial Members" . . . . . . . 3
    1.16.  "Involuntary Transfer" . . . . . . . . . . . . . . 3
    1.17.  "Losses." . . . . . . . . . . . . . . . . . . . . . 3
    1.18.  "Majority of Members" . . . . . . . . . . . . . . . 3
    1.19.  "Manager" . . . . . . . . . . . . . . . . . . . . . 3
    1.20.  "Member" . . . . . . . . . . . . . . . . . . . . . 3
    1.21.  "Membership Interest" . . . . . . . . . . . . . . . 3
    1.22.  "Notice" . . . . . . . . . . . . . . . . . . . . . 3
    1.23.  "Percentage Interest" . . . . . . . . . . . . . . . 4
    1.24.  "Person" . . . . . . . . . . . . . . . . . . . . . 4
    1.25.  "Profits and Losses" . . . . . . . . . . . . . . . 4
    1.26.  "Regulations" . . . . . . . . . . . . . . . . . . . 4
    1.27.  "Reserve" . . . . . . . . . . . . . . . . . . . . . 4
    1.28.  "Substituted Member" . . . . . . . . . . . . . . . 4
    1.29.  "Successor in Interest" . . . . . . . . . . . . . . 4
    1.30.  "Transfer" . . . . . . . . . . . . . . . . . . . . 4
    1.31.  "Triggering Event" . . . . . . . . . . . . . . . . 5
    1.32.  "Vote" . . . . . . . . . . . . . . . . . . . . . . 5
    1.33.  "Voting Interest" . . . . . . . . . . . . . . . . . 5

ARTICLE II:  ARTICLES OF ORGANIZATION . . . . . . . . . . . . . 5
    2.1.   Formation. . . . . . . . . . . . . . . . . . . . . 5
    2.2.   Name. . . . . . . . . . . . . . . . . . . . . . . . 5
    2.3.   Address of Company. . . . . . . . . . . . . . . . . 5
    2.4.   Agent. . . . . . . . . . . . . . . . . . . . . . . 5
    2.5.   Purpose of Company. . . . . . . . . . . . . . . . . 5
    2.6.   Term. . . . . . . . . . . . . . . . . . . . . . . . 5
    2.7.   Names and Addresses of Members and Managers. . . . 6

ARTICLE III: CAPITALIZATION . . . . . . . . . . . . . . . . . . 6
    3.1.   Initial Capital Contributions. . . . . . . . . . . 6
    3.2.   Failure to Make Capital Contributions. . . . . . . 6

CONFIDENTIAL                                    PLAINTIFF 267

EXHIBIT 3 - PAGE 2

3.3.  Capital Account. . . . . . . . . . . . . . . . 6
3.4.  Withdrawal of Capital. . . . . . . . . . . . . 6
3.5.  No Interest. . . . . . . . . . . . . . . . . . 6
3.6.  Limited Liability. . . . . . . . . . . . . . . 6
3.7.  Priority of Members. . . . . . . . . . . . . . 7

ARTICLE IV:  ALLOCATIONS AND DISTRIBUTIONS . . . . . . . . 7
4.1.  Allocation of Taxable Income and Loss . . . . . 7
4.2.  Special Allocations . . . . . . . . . . . . . 7
4.3.  Unrealized Appreciation and Unrealized Depreciation.7
4.4.  Assignment of Economic Interest. . . . . . . . 8
4.5.  Cash Distributions. . . . . . . . . . . . . . 8
4.6.  Distributions of Non-Cash Proceeds  . . . . . 8
4.7.  Liquidating Distributions. . . . . . . . . . . 8

ARTICLE V:  MEMBERS . . . . . . . . . . . . . . . . . . . 8
5.1.  One Class of Membership. . . . . . . . . . . . 8
5.2.  Limited Liability. . . . . . . . . . . . . . . 8
5.3.  Management Vested with Managers. . . . . . . . 9
5.4.  Admission of Additional Members. . . . . . . . 9
5.5.  Transactions with the Company. . . . . . . . . 9
5.6.  Remuneration to Members. . . . . . . . . . . . 9
5.7.  Meetings. . . . . . . . . . . . . . . . . . . 9
5.8.  Remuneration to Managers. . . . . . . . . . . 9
5.9.  Certificate of Membership Interest. . . . . . 11

ARTICLE VI:  MANAGEMENT AND CONTROL OF THE COMPANY . . . . 11
6.1.  Exclusive Management by Managers. . . . . . . 11
6.2.  Board of Managers . . . . . . . . . . . . . . 12
6.3.  Meetings of Managers . . . . . . . . . . . . 12
6.4.  Powers of Managers . . . . . . . . . . . . . 13
6.5.  Members Have No Managerial Authority . . . . 16
6.6.  Performance of Duties; Liability of Managers . . 16
6.7.  Devotion of Time  . . . . . . . . . . . . . . 17
6.8.  Competing Activities  . . . . . . . . . . . . 17
6.9.  Transactions Between the Company and Managers . . 19
6.10.  Acts of Managers as Conclusive Evidence of
        Authority  . . . . . . . . . . . . . . . . . 19
6.11.  Appointments of Officers  . . . . . . . . . . 19
      (a) Appointment  . . . . . . . . . . . . . . . 19
      (b) Removal. . . . . . . . . . . . . . . . . . 20
      (c) Resignation. . . . . . . . . . . . . . . . 20
      (d) Filling of Vacancy. . . . . . . . . . . . 20
      (e) Salaries of Officers. . . . . . . . . . . 20
      (f) Duties and Powers of the Chairman. . . . . 20
      (g) Duties and Powers of the Chief Executive Officer.20
      (h) Duties and Powers of the President  . . . 21
      (I) Duties and Powers of the Secretary. . . . 21
      (j) Duties and Powers of the Chief Financial
          Officer. . . . . . . . . . . . . . . . . . 21

-ii-

   (k) Acts of Officers and Conclusive Evidence of
     Authority. . . . . . . . . . . . . . . . . . 22
  6.12. Limited Liability. . . . . . . . . . . . . . 23
  6.13. Annual Operating Budget . . . . . . . . . . . 23

ARTICLE VII: ACCOUNTS AND RECORDS . . . . . . . . . . . 23
  7.1. Location of Books and Records. . . . . . . . 23
  7.2. Annual Financial Statements; Fiscal Year End. . . 23
  7.3. Contents of Books and Records. . . . . . . . 23
  7.4. Tax Status. . . . . . . . . . . . . . . . . 24
  7.5. Tax Return Information. . . . . . . . . . . . 24
  7.6. Tax Elections. . . . . . . . . . . . . . . . 24
  7.7. Tax Matters Partners. . . . . . . . . . . . 25

ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS . . . . . 25
  8.1. Notice of Withdraw. . . . . . . . . . . . . 25
  8.2. No Transfer or Encumbrance of Membership Interest. 25
  8.3. Triggering Events. . . . . . . . . . . . . . 26
  8.4. Involuntary Transfer. . . . . . . . . . . . 26
   (a) Divorce. . . . . . . . . . . . . . . . . 26
   (b) Death. . . . . . . . . . . . . . . . . . 37
  8.5. Right of Refusal. . . . . . . . . . . . . . 27
  8.6. No Voting Interest. . . . . . . . . . . . . 28
  8.7. Fair Market Value/Appraisers Valuation. . . . . 28
  8.8. Substitute Member Admission. . . . . . . . . 28
  8.9. Substitute Member Agreement. . . . . . . . . 29
  8.10. Terms. . . . . . . . . . . . . . . . . . . 29

ARTICLE IX: DISSOLUTION AND WINDING UP . . . . . . . . . 29
  9.1. Dissolution. . . . . . . . . . . . . . . . . 29
  9.2. Notice of Commencement. . . . . . . . . . . 30
  9.3. Return of Member Investment. . . . . . . . . 30

ARTICLE X: ARBITRATION . . . . . . . . . . . . . . . . 30
  10.1. Arbitration. . . . . . . . . . . . . . . . . 30

ARTICLE XI: INDEMNIFICATION AND INSURANCE . . . . . . . . 31
  11.1. Indemnification of Agents. . . . . . . . . . 31
  11.2. Payment of Expenses in Advance. . . . . . . . 31
  11.3. Insurance. . . . . . . . . . . . . . . . . . 32

ARTICLE XII: INVESTMENT REPRESENTATIONS . . . . . . . . . 32
  12.1. Investment Intent. . . . . . . . . . . . . . 32
  12.2. Residency. . . . . . . . . . . . . . . . . . 32
  12.3. Economic Risk. . . . . . . . . . . . . . . . 32
  12.4. No Registration of Membership Interest. . . . . 33
  12.5. Membership Interest in Restricted Security. . . . 33
  12.6. No Obligation to Register. . . . . . . . . . 33
  12.7. No Disposition in Violation of Law. . . . . . 33
  12.8. Legends. . . . . . . . . . . . . . . . . . . 34

-iii-

CONFIDENTIAL          PLAINTIFF 269

**EXHIBIT 3 - PAGE 4**

12.9.   Investment Risk. . . . . . . . . . . . . . . . 34
12.10. Investment Experience. . . . . . . . . . . . . 35
12.11. Restrictions on Transferability. . . . . . . . 35
12.12. Information Reviewed. . . . . . . . . . . . . . 35
12.13. No Representations by Company. . . . . . . . . 35
12.14. Consultation with Professional Advisor. . . . . 36
12.15. No Assurance of Tax Benefits. . . . . . . . . . 36
12.16. Compliance with Other Instruments. . . . . . . 36

ARTICLE XIII: GENERAL PROVISIONS . . . . . . . . . . 36
13.1.   Counsel to the Company. . . . . . . . . . . . 36
13.2.   Complete Agreement. . . . . . . . . . . . . . 36
13.3.   Counterparts. . . . . . . . . . . . . . . . . 36
13.4.   Choice of Law. . . . . . . . . . . . . . . . . 36
13.5.   Binding Effect. . . . . . . . . . . . . . . . 37
13.6.   Pronouns; Statutory References. . . . . . . . 37
13.7.   Further Assurances. . . . . . . . . . . . . . 37
13.8.   No Limitation of Members' Businesses. . . . . 37
13.9.   Absence of Agency. . . . . . . . . . . . . . . 37
13.10. Authority and Capacity of Members. . . . . . . 37
13.11. Headings. . . . . . . . . . . . . . . . . . . 37
13.12. Amendment. . . . . . . . . . . . . . . . . . . 37
13.13. Time of the Essence. . . . . . . . . . . . . . 38
13.14. Benefit of the Parties. . . . . . . . . . . . 38
13.15. Intention to be a Limited Liability Company. . 38
13.16. Interpretation. . . . . . . . . . . . . . . . 38

-iv-

OPERATING AGREEMENT

FOR

ARISTA, LLC

THIS OPERATING AGREEMENT ("Agreement") is entered into
as of the 25th day of February 2010 between Calpension, Inc., a
California corporation (hereinafter referred to separately as
"Member" or "Initial Member"). Any other person who becomes a
Member shall execute a counterpart signature page to this
Agreement and be identified on Exhibit B attached hereto and made
a part hereof.

  A. The Initial Member desires to form a limited
liability company (Company) under the Beverly-Killea Limited
Liability Company Act.

  B. The Initial Member enters into this Operating
Agreement to form and provide for the governance of the Company
and the conduct of its business and to specify the relative
rights and obligations of the Members.

  NOW THEREFORE, the Members hereby agree as follows:

ARTICLE I: DEFINITIONS

  Each capitalized terms used in this Agreement shall
have the meanings ascribed to it in this Article or elsewhere in
this Agreement, and when not so defined shall have the meaning
set forth in California Corporations Code Section 17001.

  1.1. "<u>Act</u>" means the Beverly-Killea Limited Liability
Company Act (California Corporations Code Sections 17000-17705),
including amendments thereto from time to time.

  1.2. "<u>Agreement</u>" means this Operating Agreement, as
originally executed and as amended from time to time.

  1.3. "<u>Articles of Organization</u>" means the Articles of
Organization of the Company originally filed with the California
Secretary of State, as amended from time to time.

  1.4. "<u>Assignee</u>" means a person who has acquired a
Member's Economic Interest in the Company, by way of a Transfer
in accordance with the terms of this Agreement, but who has not
become a Member.

CONFIDENTIAL          PLAINTIFF 271

EXHIBIT 3 - PAGE 6

1.5. "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.6. "Capital Account" means, as to any Member, a separate account maintained and adjusted in accordance with Article III, Section 3.3 hereof.

1.7. "Capital Contribution" means, with respect to any Member, the amount of the money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) in consideration of a Percentage Interest held by such Member. A Capital Contribution shall not be deemed a loan.

1.8. "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.9. "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision thereto.

1.10. "Company" means the company named in Article II, Section 2.2 hereof.

1.11. "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

1.12. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.13. "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.14. "Fair Market Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

-2-

CONFIDENTIAL

PLAINTIFF 272

EXHIBIT 3 - PAGE 7

(a)   The Fair Market Value of any property contributed by a Member to the Company shall be the value of such property, as mutually agreed by the contributing Member and the Company;

(b)   The Fair Market Value of any item of Company property distributed to any Member shall be the value of such item of property on the date of distribution, as mutually agreed by the distributing Member and the Company; and,

(c)   Fair Market Value for purposes of Article VIII, Section 8.7 shall be as determined under that section.

1.15.   "Initial Member" or "Initial Members" means those Person(s) whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

1.16.   "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.17.   "Losses" See "Profits and Losses."

1.18.   "Majority of Members" means a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members.

1.19.   "Manager" is defined in California Corporations Code Section 1700(w), as applied to the Company.

1.20.   "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.21.   "Membership Interest" means a Member's rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.22.   "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, or any other

-3-

CONFIDENTIAL                    PLAINTIFF 273

EXHIBIT 3 - PAGE 8

nationally recognized overnight courier, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.23. "<u>Percentage Interest</u>" means the weighted percentage interest of a Member which is based on the respective Capital Contributions made by each Member (as such Capital Contribution relates to the aggregate Capital Contributions of the Members and the date when the Capital Contributions were made) as set forth opposite such Member's name in Exhibit B attached hereto.

1.24. "<u>Person</u>" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.25. "<u>Profits and Losses</u>" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a).

1.26. "<u>Regulations</u>" ("<u>Reg</u>") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.27. "<u>Reserve</u>" means a reserve for capital replacement and working capital purposes, and any other purposes deemed reasonable by the Managers, including, without limitation, provision for contingent liabilities, to be created and funded in amounts in the reasonable discretion of the Managers.

1.28. "<u>Substituted Member</u>" is defined in Article VIII, Section 8.8 hereof.

1.29. "<u>Successor in Interest</u>" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.30. "<u>Transfer</u>" means, with respect to a Membership Interest, or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, or other disposition of a

EXHIBIT 3 - PAGE 9

Membership Interest or any element of such a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.31. "Triggering Event" is defined in Article VIII, Section 8.3 hereof.

1.32. "Vote" means a written consent or approval, a ballot cast at a meeting of the Members or the Managers, or a voice vote.

1.33. "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II: ARTICLES OF ORGANIZATION

2.1. Formation. Promptly following execution of this Agreement, the Members shall cause Articles of Organization, in the form attached to this Agreement as Exhibit A attached hereto, to be filed with the California Secretary of State.

2.2. Name. The name of the Company shall be ARISTA, LLC.

2.3. Address of Company. The principal executive office of the Company shall be at 335 Centennial Way, Suite 100, Tustin, California 92780, or such other place or places as may be determined by the Members from time to time.

2.4. Agent. The initial agent for service of process on the Company shall be Abdul S. Walji. A Majority of Members may from time to time change the Company's agent for service of process.

2.5. Purpose of Company. The Company will be formed for the purposes of engaging in any lawful act or activity for which a limited liability company may be organized under the Act.

2.6. Term. The term of existence of the Company shall commence on the effective date of filing of Articles of Organization with the California Secretary of State, and shall continue until December 31, 2013, unless sooner terminated by the provisions of this Agreement or as provided by law.

-5-

CONFIDENTIAL

PLAINTIFF 275

EXHIBIT 3 - PAGE 10

2.7.   <u>Names and Addresses of Members and Managers</u>. The names, addresses, and capital contributions of the Members, and names and addresses of the Managers, are set forth on Exhibit B attached hereto.

## ARTICLE III:   CAPITALIZATION

3.1.   <u>Initial Capital Contributions</u>. Each Member shall contribute to the capital of the Company as the Member's Capital Contribution the money and property specified in Exhibit B Agreement. The Fair Market Value of each item of contributed property as agreed between the Company and the Member contributing such property is set forth in Exhibit B. Unless otherwise agreed in writing by all Members, no Member shall be required to make additional Capital Contributions.

3.2.   <u>Failure to Make Capital Contributions</u>.  If a Member fails to make a required Capital Contribution within 30 days after the effective date of this Agreement, that Member's entire Membership Interest shall terminate and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorneys' fees caused by the failure to make such Capital Contribution.

3.3.   <u>Capital Account</u>. An individual Capital Account shall be maintained for each Member consisting of that Member's Capital Contribution: (a) increased by that Member's share of Profits;(b) decreased by that Member's share of Losses; © decreased by distributions made to such Members; and (d) adjusted as required in accordance with applicable provisions of the Code and Regulations.

3.4.   <u>Withdrawal of Capital</u>  Except as provided in this agreement, a Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property from the Company.

3.5.   <u>No Interest</u>.  No interest shall be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

3.6.   <u>Limited Liability</u>.  Except as otherwise provided in the Act or in this Agreement, a Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company.

-6-

CONFIDENTIAL

PLAINTIFF 276

EXHIBIT 3 - PAGE 11

3.7. <u>Priority of Members</u>. No Member shall have priority over any other Member with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

### ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. <u>Allocation of Taxable Income and Loss</u>. The Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to a Member in accordance with the Member's Percentage Interest.

4.2. <u>Special Allocations</u>. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company gross income and gain shall be specially allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in the Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible. Any special allocation under this Section 4.2 shall be taken into account in computing subsequent allocations of Profits and Losses so that the net amount of allocations of income and loss and all other items shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred. The provisions of this Section 4.2 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Reg Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations.

4.3. <u>Unrealized Appreciation and Unrealized Depreciation</u>. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses shall be allocated to the Members' Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so distributed shall be treated as a distribution to the Members to the extent of the Fair Market Value of the property less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.3, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's basis for such property.

-7-

CONFIDENTIAL                                    PLAINTIFF 277

**EXHIBIT 3 - PAGE 12**

5.3.  **Management Vested with Managers**.  Pursuant to
Articles of Organization, the management of the Company is vested
in the Managers.  No Member, acting solely in the capacity of a
Member, is an agent of the Company nor can any Member in such
capacity bind nor execute any instrument on behalf of the Company.

5.4.  **Admission of Additional Members**.  The Managers
may admit to the Company additional Members, from time to time,
subject to the following:

(a)  The Managers must consent to the admission;
provided, however, no Person may be admitted to the Company as a
Member if such admission would result in the Company being required
to register pursuant to the Investment Company Act of 1940, as
amended.

(b)  The additional Member shall make a Capital
Contribution in such amount and on such terms as the Managers
determine to be appropriate based upon the needs of the Company,
the net value of the Company's assets, the Company's financial
condition, and the benefits anticipated to be realized by the
additional Member.

(c)  No additional Member shall be admitted if the
effect of such admission would be to terminate the Company within
the meaning of Code Section 708(b).

5.5.  **Transactions with the Company**.  Subject to any
limitations set forth in this Agreement and with the prior approval
of the Managers after full disclosure of the Member's involvement,
a Member may lend money to and transact other business with the
Company. Subject to other applicable law, such Member has the same
rights and obligations with respect thereto as a Person who is not
a Member.

5.6.  **Remuneration to Members**.  Except as otherwise
authorized in this Agreement, no Member is entitled to remuneration
for acting in the Company business, subject to the entitlement of
Managers or Members winding up the affairs of the Company to
reasonable compensation.

5.7.  **Meetings**.  Except as otherwise provided herein,
meetings of Members shall be held and conducted in accordance with
Section 17104 of the Act.

5.8.  **Remuneration to Managers**.  Except as hereinafter
provided, no Manager is entitled to remuneration for services
rendered or goods provided to the Company.  Notwithstanding

CONFIDENTIAL                                      PLAINTIFF 279

**EXHIBIT 3 - PAGE 14**

5.3.  <u>Management Vested with Managers</u>.  Pursuant to Articles of Organization, the management of the Company is vested in the Managers.  No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

5.4.  <u>Admission of Additional Members</u>.  The Managers may admit to the Company additional Members, from time to time, subject to the following:

(a) The Managers must consent to the admission; provided, however, no Person may be admitted to the Company as a Member if such admission would result in the Company being required to register pursuant to the Investment Company Act of 1940, as amended.

(b) The additional Member shall make a Capital Contribution in such amount and on such terms as the Managers determine to be appropriate based upon the needs of the Company, the net value of the Company's assets, the Company's financial condition, and the benefits anticipated to be realized by the additional Member.

(c) No additional Member shall be admitted if the effect of such admission would be to terminate the Company within the meaning of Code Section 708(b).

5.5.  <u>Transactions with the Company</u>.  Subject to any limitations set forth in this Agreement and with the prior approval of the Managers after full disclosure of the Member's involvement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

5.6.  <u>Remuneration to Members</u>.  Except as otherwise authorized in this Agreement, no Member is entitled to remuneration for acting in the Company business, subject to the entitlement of Managers or Members winding up the affairs of the Company to reasonable compensation.

5.7.  <u>Meetings</u>.  Except as otherwise provided herein, meetings of Members shall be held and conducted in accordance with Section 17104 of the Act.

5.8.  <u>Remuneration to Managers</u>.  Except as hereinafter provided, no Manager is entitled to remuneration for services rendered or goods provided to the Company.  Notwithstanding

-9-

CONFIDENTIAL

PLAINTIFF 279

**EXHIBIT 3 - PAGE 14**

anything contained herein to the contrary, Managers may also serve as officers, employees, and independent contractors of the Company and shall be compensated by the Company for rendering those services. The compensation to be paid to a Manager who also renders services to the Company as an officer, employee, or independent contractor shall be determined by the Managers other than the Manager whose compensation is being determined. Managers shall receive only the following payments for their services as Managers:

(a) Notwithstanding anything contained herein to the contrary, it is acknowledged and agreed that: (I) Abdul S. Walji is a Manager and holds a beneficial interest in Calpension, Inc., an Initial Member; (ii) concurrent with the execution of this Agreement, Abdul S. Walji is entering into a consulting agreement (the "Consulting Agreement") with the Company pursuant to which Abdul S. Walji will provide services relating to the investment of assets of the Company and, in consideration for these services, Abdul S. Walji will receive the compensation described in the Consulting Agreement as an independent contractor; and (iii) the Members approve and consent to the terms and conditions contained in the Consulting Agreement. A copy of the Consulting Agreement is attached hereto as Exhibit C and made a part hereof.

(b)   The Company shall pay affiliates of the Managers for services rendered or goods provided to the Company to the extent that the Managers are not required to render such services or goods themselves without charge to the Company and that the fees paid to such affiliates do not exceed the fees that would be payable to an independent responsible third party that is willing to perform such services or provide such goods.

(c) The Company shall reimburse the Managers and their affiliates for the actual cost of goods and materials used for or by the Company. The Company shall also pay or reimburse the Managers for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare the Articles of Organization and this Agreement, and the reasonable costs incurred in traveling to meetings of the Managers. Except as otherwise provided herein, the Managers and their affiliates shall not be reimbursed by the Company for the following expenses: (I) salaries, compensation or fringe benefits of directors, officers, or employees of the Managers or their affiliates; (ii) overhead expenses of the Managers or their affiliates, including, without limitation, rent and general office expenses; and (iii) the cost of providing any service or goods for which the Managers or their affiliates are entitled to compensation under this Agreement.

(d) Notwithstanding anything contained herein to the contrary, all expenses incurred a Manager shall be approved by

-10-

PLAINTIFF 280

EXHIBIT 3 - PAGE 15

the Board of Managers of the Company prior to said Manager being reimbursed by for the expenses by the Company.

    5.9.   <u>Certificate of Membership Interest</u>.  (a) A Membership Interest may be represented by a certificate of membership.  The exact contents of a certificate of membership may be determined by action of the Managers but shall be issued substantially in conformity with the following requirements. The certificates of membership shall be respectively numbered serially, as they are issued, shall be impressed with the Company seal or a facsimile thereof, if any, and shall be signed by the Managers or officers of the Company.  Each certificate of membership shall state the name of the Company, the fact that the Company is organized under the laws of the State of California as a limited liability company, the name of the person to whom issued, the date of issue, and the Percentage Interests represented thereby.  A statement of the designations, preferences, qualifications, limitations, restrictions, and special or relative rights of the Membership Interest, if any, shall be set forth in full or summarized on the face or back of the certificates which the Company shall issue, or in lieu thereof the certificate may set forth that such a statement or summary will be furnished to any holder of the Membership Interests upon request without charge. Each certificate of membership shall be otherwise in such form as may be determined by the Managers.

        (b) All certificates of membership surrendered to the Company for transfer shall be canceled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interests shall have been surrendered and canceled, except as herein provided with respect to lost, stolen, or destroyed certificates.

        (c) Any Member claiming that his or her certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate.  Upon the giving of a satisfactory indemnity to the Company as reasonably as required by the Managers, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as were represented by the certificate alleged to be lost, stolen, or destroyed.

    ARTICLE VI:  MANAGEMENT AND CONTROL OF THE COMPANY

    6.1.   <u>Exclusive Management by Managers</u>.  The business, property and affairs of the Company shall be managed exclusively by the Managers. Except for situations in which the approval of the Members is expressly required by the Articles of Organization or this Agreement, the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control

-11-

**EXHIBIT 3 - PAGE 16**

the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

    6.2.   **Board of Managers**.  The Company shall have a Board of Managers consisting of one Manager. All Members agree to Vote and continue to Vote to elect Abdul S. Walji as a Manager. Initially and until this Agreement is amended to provide otherwise, Abdul S. Walji shall be the sole Manager. In the event Abdul S. Walji is unable or unwilling to serve as a Manager in any year for any reason whatsoever, then the Initial Members shall nominate another person to fill the vacancy so created and shall Vote to fill the vacancy with such nominee.

    6.3.   **Meetings of Managers**.  Meetings of the Managers may be called by any Manager upon four days notice by mail or 48 hours notice delivered personally or by telephone, telegraph or facsimile.  A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice or consents to holding the meeting upon approval of the minutes thereafter, whether before or after the meeting, or who attends the meeting without protesting, prior to its commencement, the lack of notice to such Manager. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting.  A majority of the Managers present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than 24 hours, notice of any adjournment shall be given prior to the time of the adjourned meeting to the Members who are not present at the time of the adjournment.  Meetings of the Managers may be held at any place within or without the State of California which has been designated in the notice of the meeting or at such place as may be approved by the Managers.  Managers may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Members participating in such meeting can hear one another.  Participation in a meeting in such manner constitutes a presence in person at such meeting.  A majority of the authorized number of Managers constitutes a quorum of the Managers for the transaction of business. Except to the extent that this Agreement expressly requires the approval of all Managers, every act or decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present is the act of the Managers.  A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of Managers, if any action taken is approved by at least a majority of the required quorum for such meeting. The provisions of this Section 6.3 apply also to committees of the Managers and actions taken by such committees.

-12-

CONFIDENTIAL

PLAINTIFF 282

EXHIBIT 3 - PAGE 17

6.4. <u>Powers of Managers</u>. (a) Without limiting the generality of Section 6.1, but subject to Section 6.4(b), ©, and (d) and to the express limitations set forth elsewhere in this Agreement, the Managers, by Vote pursuant to Section 6.3 hereof, shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in Section 17003 of the Act.

(b) Notwithstanding any other provisions of this Agreement, the Managers shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the unanimous Vote of all Managers:

(I) Acquire, purchase, renovate, improve, alter, rebuild, demolish, replace, and own real property and any other property or assets that the Managers determine is necessary or appropriate or in the interest of the business of the Company, and to acquire options for the purchase of any such property;

(ii) Sell, exchange, lease, or otherwise dispose of the real property and other property and assets owned by the Company, or any part thereof or any interest therein;

(iii) Borrow money from any party, including the Managers and their affiliates, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of or extend the time for the payment of any indebtedness or obligation of the Company, and secure such indebtedness by mortgage, deed of trust, pledge, security interest, or other lien on Company assets;

(iv) Guarantee the payment of money or the performance of any contract or obligation of any Person;

(v) Sue on, defend, or compromise any and all claims or liabilities in favor of or against the Company; submit any or all such claims or liabilities to arbitration; and confess a judgment against the Company in connection with any litigation in which the Company is involved; and,

(vi) Retain legal counsel, auditors, and other professionals in connection with the Company business and to pay therefor such remuneration as the Managers may determine.

(vii) Except for trade payables or trade receivables in the ordinary course of business, borrowing of money in excess of $5,000.00 individually or in the aggregate in any twelve (12) month period.

-13-

CONFIDENTIAL                                          PLAINTIFF 283

**EXHIBIT 3 - PAGE 18**

(viii) Sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions.

(ix) Merger or consolidation or other business combination with or into any entity.

(x) Establishment of different classes of Members.

(xi) Redemption from a Member of all or part of the shares evidencing his or her Membership Interest.

(xii) Transactions between the Company and one or more of the Managers or Members or one or more of any Manager's or Member's affiliates, or transactions in which one or more Managers or Members, or one or more of any Manager's or Member's affiliates, has a material financial interest.

(xiii) The lending of money by the Company to any Manager, Member, or officer.

(xiv) Any act which would make it impossible to carry on the ordinary business of the Company.

(xv) Confession of a judgment against the Company.

(xvi) Acquisition of any real or personal property by the Company which is to be held in the name of any Person other than the Company.

(xvii) Any material use of the Company's funds for expansion of the Company's plant; creation of a subsidiary or a new division; or, acquisition of any business, operation, or entity from any third party.

(xviii) Any other transaction described in this Agreement as requiring the Vote of the Members.

(c) Notwithstanding Sections 6.4(a) and (b) hereof, the following matters shall require the unanimous Vote of all Members:

(i) Transfer or other disposition of any licenses, or rights or interests therein, to conduct the business of the Company, including, without limitation, any licenses granted by any state and federal securities commission or self-regulatory organizations.

-14-

CONFIDENTIAL

PLAINTIFF 284

EXHIBIT 3 - PAGE 19

(ii) Continuation of the business of the Company after dissolution of the Company.

(iii) Except as otherwise provided herein, transfer of a Membership Interest and admission of the Assignee as a Member of the Company.

(iv) Admission of new Members.

(v) Amendment or restatement of the Articles of Organization or this Agreement.

(vi) Compromise of an obligation of a Member to make a Capital Contribution or return money or property paid or distributed in violation of the Act.

(vii) Subject to Section 6.2 hereof, election and removal of a Manager.

(viii) Adoption of an agreement of merger or consolidation or other business combination with or into any entity.

(ix) Approval of any action to recapitalize, liquidate and dissolve, or dispose of all or substantially all of the assets of the Company other than in the ordinary course of business.

(x) Any act which would make it impossible to carry on the ordinary business of the Company.

(xi) Confession of a judgment against the Company.

(xii) Acquisition of any real or personal property by the Company which is to be held in the name of any Person other than the Company.

(xiii) Any material use of the Company's funds for expansion of the Company's plant creation subsidiary or a new division or acquisition of any business, operation, or entity from any third party.

(xiv) Initiation of any initial public offering.

(xv) Cause the Company to voluntarily declare bankruptcy.

-15-

CONFIDENTIAL

PLAINTIFF 285

EXHIBIT 3 - PAGE 20

(xvi) Change the business purpose of the Company or cause the Company to engage in activities other than the business purpose of the Company set forth herein.

(d) In all matters other than 6.4© in which a Vote of the Members is required, a Vote of the Majority of Members shall be sufficient to authorize or approve such act.

6.5. <u>Members Have No Managerial Authority</u>. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles of Organization and except as expressly required by the Act. Unless expressly and duly authorized in writing to do so by the Managers, no Member shall have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, or to render it liable for any purpose.

6.6. <u>Performance of Duties; Liability of Managers</u>. The Managers shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

In performing their duties, the Managers shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Managers act in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

(a) One or more officers, employees or other agents of the Company whom the Managers reasonably believe to be reliable and competent in the matters presented;

(b) Any attorney, independent accountant, or other person as to matters which the Managers reasonably believe to be within such person's professional or expert competence: or

(c) A committee upon which he does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Managers reasonably believe to merit competence.

A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of

-16-

CONFIDENTIAL                    PLAINTIFF 286

**EXHIBIT 3 - PAGE 21**

fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Manager.

Under no circumstances will any director, officer, shareholder, member, manager, partner, employee, agent or Affiliate of any Manager have any personal responsibility for any liability or obligation of the Manager (whether on a theory of alter ego, piercing the corporate veil, or otherwise).

**6.7.** **Devotion of Time**. The Managers are not obligated to devote all of their time or business efforts to the affairs of the Company. The Managers shall devote whatever time, effort, and skill as they deem appropriate for the operation of the Company.

**6.8.** **Competing Activities**. (a) The Members and Managers and their officers, directors, shareholders, partners, members, managers, agents, employees and affiliates may engage or invest in, independently or with others, any business activity of any type or description, as those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Managers shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. Notwithstanding the foregoing, except for securities of the Company or those traded by the Company on behalf of a client of the Company, which securities may not be traded by the Managers in their individual capacities, the Members and Managers shall have the right to hold any investment opportunity or prospective economic advantage for their own account.

(b) Each Member agrees that he will not at any time while a Member, either directly or indirectly, disclose, communicate, divulge, furnish or otherwise make accessible or available, in whole or in part, to any person, firm, company, corporation, partnership, joint venture or any other entity, or use in any manner, other than in the faithful discharge and performance of his duties and responsibilities hereunder, any confidential information, material or matter relating to the business, or any other trade secrets, of the Company or any firm, company, corporation, partnership, joint venture or any other entity related to the Company obtained or acquired while a Member. Each Member and the Company specifically acknowledge and agree that any information concerning: (I) the business operations or methods of the Company; (ii) the customers or clients of the Company; (iii) the past, present or future research done by the Company respecting the business and customers of the Company; and (iv) any method

-17-

PLAINTIFF 287

EXHIBIT 3 - PAGE 22

and/or procedure relating to or pertaining to projects developed by the Company are of material importance and significance to the business of the Company. Each Member and the Company agree that: (A) the information described in the immediately preceding sentence is, to the maximum extent permitted by law, to be regarded as information or material which is of a confidential nature; and (B) trade secrets of the Company are confidential, non-public, proprietary, and owned by the Company, and shall be deemed to include any and all computer software and/or hardware, designs, devices, equipment, expertise, formulae, innovations, inventions, machinery, materials, methods, processes, and techniques (whether patentable or not) used by the Company in the conduct of its businesses, and all data, drawings, know-how, plans, written instructions, or any other form of information whatsoever relating or pertaining thereto or to any other aspect of the business of the Company, which are not in the "public domain" or not generally known throughout the industry of which the Company are a part.

(c) Each Member agrees that at such time as he ceases to be a Member, any and all materials containing confidential information including, without limitation, charts, computer printouts, descriptions, documents, drawings, graphs, instructions, materials contained in any stored data retrieval system, memoranda, notebooks, notes, photostats, programs, recordings, reports, software, specifications, spread sheets, studies, and any and all other sources of confidential information whatsoever, whether prepared by the Member or not, shall be left with, or returned to, the Company without any hesitancy or delay. Each Member further agrees that in the event of any such termination, he shall not, either directly or indirectly, copy, or cause to be copied, mimeographed, photocopied, recorded, replicated, reprinted, transcribed, translated, transliterated, transposed, or otherwise duplicated or reproduced using any method, process or technique whatsoever any of the confidential information to be left with, or returned to, the Company.

(d) Notwithstanding the foregoing and except as otherwise provided herein, each Member agrees that, other than for the exclusive benefit of the Company, he shall not, directly or indirectly (whether as an officer, director or employee of, owner of, partner of or in, participant of or in, consultant or advisor to or for, or the source of any financial interest whatsoever in, any firm, company, corporation, partnership, joint venture or any other entity whatsoever), while a Member and for a period of six months following the date he delivers notice of intention to withdraw (and, until he actually withdraws, said Member shall continue to enjoy all rights and interests, and be subject to all obligations of, a Member), attempt to engage or engage in any business activity or endeavor which is similar to any business activity or endeavor engaged in by the Company in the geographic area in which the Company does business during the time he is a Member. Each Member further agrees that, during said six-month period, he shall not contact any client of the Company; however,

CONFIDENTIAL       -18-       PLAINTIFF 288

**EXHIBIT 3 - PAGE 23**

after said six month period has elapsed, the former Member may contact and solicit any client of the Company who became a client of the Company as a direct result of the efforts of said former Member, as acknowledged by the Members. Notwithstanding the foregoing, for a period of one year following the withdraw of any Member from the Company, said Member shall not make any negative reference about the Company, its Members, Managers, officers, employees, or business and, at no time shall any Member make any defamatory statement concerning said persons or the business of the Company. Any amendment to the foregoing provisions of this Section 6.8(d) shall require the unanimous approval of the Members. Each Member and the Company acknowledges and agrees that the time period, scope and area covered by the foregoing restrictive covenant is reasonable, and that it is the specific intent of each Member and the Company that the restrictive covenant set forth herein shall be valid and enforceable to the fullest possible extent.

6.9. <u>Transactions Between the Company and Managers</u>. Notwithstanding that it may constitute a conflict of interest, the Managers may, and may cause their affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length.

6.10. <u>Acts of Managers as Conclusive Evidence of Authority</u>. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by all Managers, is not invalidated as to the Company by any lack of authority of the signing Managers in the absence of actual knowledge on the part of the other person that the signing Managers or Manager had no authority to execute the same.

6.11. <u>Appointments of Officers</u>.

(a) <u>Appointment</u>. The Managers may appoint officers at any time. The officers of the Company, if deemed necessary by the Managers, may include a chairperson, president, chief executive officer, secretary, and chief financial officer. The officers shall serve at the pleasure of the Managers, subject to all rights, if

-19-

PLAINTIFF 289

EXHIBIT 3 - PAGE 24

any, of an officer under any contract of employment. Any individual may hold any number of offices. No officer need be a resident of the State of California or citizen of the United States. If a Manager is not an individual, such Manager's officers may serve as officers of the Company if elected by the Members. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Managers.

(b) <u>Removal</u>. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Managers at any time.

<u>Resignation</u>. Any officer may resign at any time by giving written notice to the Managers. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

(d) <u>Filling of Vacancy</u>. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

(e) <u>Salaries of Officers</u>. The salaries of all officers and agents of the Company shall be fixed by a resolution of the Managers.

(f) <u>Duties and Powers of the Chairman</u>. The chairman, if such an officer be appointed, shall, if present, preside at meetings of the Members and the Managers, and exercise and perform such other powers and duties as may be from time to time assigned to him by the Managers or prescribed by this Agreement. If there is no president or chief executive officer, the chairman shall in addition be the chief executive officer of the Company and shall have the powers and duties prescribed in Section 6.11(g).

(g) <u>Duties and Powers of the Chief Executive Officer</u>. Subject to such supervisory powers, if any, as may be given by the Managers to the chairman or other officer who shall be designated as the president, the chief executive officer shall, subject to the control of the Managers, have general and active management of the business of the Company and shall see that all orders and resolutions of the Members and Managers are carried into

-20-

CONFIDENTIAL

PLAINTIFF 290

**EXHIBIT 3 - PAGE 25**

effect. He shall have the general powers and duties of management prescribed by the Managers or this Agreement.

(h) **Duties and Powers of the President**   The president shall perform the duties and exercise the powers as the Managers by resolution may from time to time prescribe.

(i) **Duties and Powers of the Secretary**   The secretary shall attend all meetings of the Managers and all meetings of the Members, and shall record all the proceedings of the meetings in a book to be kept for that purpose, and shall perform like duties for the standing committees when required. The secretary shall give, or cause to be given, notice of all meetings of the Members and shall perform such other duties as may be prescribed by the Managers. The secretary shall have custody of the seal and the secretary shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature. The Managers may give general authority to any other officer to affix the seal of Company and to attest the affixing by his or her signature.

The secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Company's transfer agent or registrar, as determined by resolution of the Managers, a register, or a duplicate register, showing the names of all Members and their addresses, their Percentage Interests, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation. The secretary shall also keep all documents described in Section 7.3 and such other documents as may be required under the Act. The Secretary shall perform such other duties and have such other authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The Secretary shall have the general duties, powers and responsibilities of a secretary of a corporation.

If the Managers choose to appoint an assistant secretary or assistant secretaries, the assistant secretaries, in the order of their seniority, in the absence, disability or inability to act of the secretary, shall perform the duties and exercise the powers of the secretary, and shall perform such other duties as the Managers may from time to time prescribe.

(j) **Duties and Powers of the Chief Financial Officer.**   The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, Membership Interests and Economic Interests. The books of account shall at all reasonable times be open to inspection by any Manager.

-21-

CONFIDENTIAL

PLAINTIFF 291

**EXHIBIT 3 - PAGE 26**

The chief financial officer shall have the custody of the funds and securities of the Company, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company, and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Managers.

The chief financial officer shall disburse the funds of the Company as may be ordered by the Managers, taking proper vouchers for such disbursements, and shall render to the president and the Managers, at their regular meetings, or when Members so require, at a meeting of the members an account of all his or her transactions as treasurer and of the financial condition of the Company.

The chief financial officer shall perform such other duties and shall have such other responsibility and authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The chief financial officer shall have the general duties, powers and responsibility of a chief financial officer of a corporation, and shall be the chief financial and accounting officer of the Company.

If the Managers choose to elect an assistant treasurer or assistant treasurers, the assistant treasurers in the order of their seniority shall, in the absence, disability or inability to act of the chief financial officer, perform the duties and exercise the powers of the chief financial officer, and shall perform such other duties as the Managers shall from time to time prescribe.

(k) <u>Acts of Officers and Conclusive Evidence of Authority</u>. Any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, or other instrument in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person, when signed by the chairman of the board, the president or any vice president and any secretary, any assistant secretary, the chief financial officer, or any assistant treasurer of the Company, is not invalidated as to the Company by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same.

6.12. <u>Limited Liability</u>. No person who is a Manager or officer or both a Manager and officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or officer or both a Manager and officer of the Company.

-22-

CONFIDENTIAL

PLAINTIFF 292

**EXHIBIT 3 - PAGE 27**

6.13.  <u>Annual Operating Budget</u>  The Managers shall prepare an annual budget for the operation of the Company for each fiscal year (the "Annual Operating Budget").  Within a reasonable time after execution of this Agreement, the Managers shall prepare a proposed Annual Operating Budget for the remainder of the fiscal year.  Thereafter, before the end of the current fiscal year, the Managers shall prepare a proposed Annual Operating Budget for the next succeeding fiscal year.

## ARTICLE VII:  ACCOUNTS AND RECORDS

7.1.  <u>Location of Books and Records</u>.  Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours. The costs of such inspection and copying shall be borne by the Member.

7.2.  <u>Annual Financial Statements; Fiscal Year End</u>. Financial books and records of the Company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the Company for federal income tax purposes.  A balance sheet and income statement of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31.

7.3.  <u>Contents of Books and Records</u>.  At all times during the term of existence of the Company, and beyond that term if a Majority of Members deem it necessary, the Members shall keep or cause to be kept the books of account referred to in Section 7.2, and the following:

(a)  A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b) A copy of the Articles of Organization, as amended;

-23-

CONFIDENTIAL                                    PLAINTIFF 293

**EXHIBIT 3 - PAGE 28**

(c)  Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d)  Executed counterparts of this Agreement, as amended;

(e)  Any powers of attorney under which the Articles of Organization or any amendments thereto were executed;

(f)  Financial statements of the Company for the six most recent fiscal years; and

(g)  Books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If a Majority of Members deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by a Majority of Members.

7.4.  **Tax Status**.  Each Member acknowledges that the Company is intended to be characterized as a partnership for Federal and California income tax purposes and will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code.

7.5.  **Tax Return Information**.  Within 90 days after the end of each taxable year of the Company the Company shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for such year.

7.6.  **Tax Elections**.  The Company shall make the following elections on the appropriate tax returns:

(a) To adopt the calendar year as the taxable year.

(b) Upon the written request of any Member, to elect to adjust the basis of the property of the Company pursuant to Section 754 of the Code; if a distribution as described in Section 754 of the Code occurs or if a transfer of a Membership Interest described in Section 743 of the Code occurs.

(c) To elect to amortize the organizational expenses of the Company and the start-up expenditures of the

-24-

CONFIDENTIAL

PLAINTIFF 294

EXHIBIT 3 - PAGE 29

Company under Section 195 of the Code over a period of 60 months as permitted by Section 709(b) of the Code.

(d) Any other election that the Members may deem appropriate and in the best interests of the Members. Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

7.7. **Tax Matters Partners**. The Members shall designate one Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. Any Member who is designated "tax matters partner" shall take any action as shall be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.

ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS

8.1. **Notice of Withdraw**. A Member may withdraw from the Company at any time by giving Notice of Withdrawal to all other Members at least 180 calendar days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with the transfer restrictions and option rights set forth below.

8.2. **No Transfer or Encumbrance of Membership Interest**. Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or hereafter acquired, unless (a) the other Members unanimously approve the transferee's admission to the Company as a Member upon such Transfer, and (b) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Code. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless such Encumbrance has been approved in writing by all the other Members. Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and

-25-

CONFIDENTIAL

PLAINTIFF 295

EXHIBIT 3 - PAGE 30

the Member's issue; provided that the Member retains a beneficial interest in the trust and all of the Voting Interest included in such Membership Interest. A transfer of a Member's entire beneficial interest in such trust or failure to retain such Voting Interest shall be deemed a Transfer of a Membership Interest.

8.3.  **Triggering Events**.  On the happening of any of the following events (Triggering Events) with respect to a Member, the Company and the other Members shall have the option to purchase all or any portion of the Membership Interest in the Company of such Member (Selling Member) at the price and on the terms provided in Section 8.7 of this Agreement:

(a)  the death or incapacity of a Member;

(b)  the bankruptcy of a Member;

(c)  the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity;

(d)  the withdrawal of a Member; or

(e)  except for the events stated in Section 8.4, the occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.4.  **Involuntary Transfer**. Notwithstanding any other provisions of this Agreement:

(a)  **Divorce**.  If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an Award), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth in Section 8.7 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the Award (the Expiration Date), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion thereof

-26-

CONFIDENTIAL

PLAINTIFF 296

EXHIBIT 3 - PAGE 31

pursuant to Section 8.5 of this Agreement; provided that the option period shall commence on the later of (I) the day following the Expiration Date, or (ii) the date of actual notice of the Award. Notwithstanding the foregoing, during said 180-day period after the Award, the Member's former spouse who has received an interest in said Member's Membership Interest shall not possess any Voting Interest or other voting rights in respect of his or her Membership Interest including, without limitation, any right to designate or nominate a person to fill any vacancy described under Section 6.2 hereof, which vacancy shall be filled by the Members other than said former spouse.

(b) **Death.** If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (I) that Member, or (ii) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.7 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.5 of this Agreement; provided that the option period shall commence on the later of (I) the day following the Expiration Date, or (ii) the date of actual notice of the death. Notwithstanding the foregoing, during said 180-day period, and the 60 days immediately following said 180-day period if the Member has failed to exercise his or her rights to purchase of the Membership Interest from the Transferee, said Transferee shall not possess any Voting Interest or other voting rights in respect of his, her or its Membership Interest including, without limitation, any right to designate or nominate a person to fill any vacancy described under Section 6.2 hereof, which vacancy shall be filled by the Members other than said Transferee.

8.5. **Right of Refusal.** On the receipt of Notice by the other Members as contemplated by Section 8.1, and on receipt of actual notice of any Triggering Event, the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.7, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms provided in Section 8.7, and the other Members, pro rata in accordance with their prior

-27-

CONFIDENTIAL                                    PLAINTIFF 297

**EXHIBIT 3 - PAGE 32**

Membership Interests in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase. The transferee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

8.6. <u>No Voting Interest</u>. No Member shall participate in any Vote or decision in any matter pertaining to the disposition of that Member's Membership Interest in the Company under this Agreement.

8.7. <u>Fair Market Value/Appraisers Valuation</u>. The purchase price of the Membership Interest that is the subject of an option under this Agreement shall be the Fair Market Value of such Membership Interest as determined under this Section 8.7. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the Fair Market Value. If the parties are unable to so agree within 30 days of the date on which the option is first exercisable (the Option Date), PriceWaterhouseCoopers, LLP ("PWC") or, in the event PWC is unwilling to serve as an appraiser or there is a conflict of interest between PWC and a Member or one of its affiliates other than by reason of audit services provided by PWC, Ernst and Young, shall determine the Fair Market Value of the Membership Interest in writing and submit its report to all the parties. Each purchasing party and the Company shall share equally the cost of the appraisal prepared by PWC, or Ernst & Young, as the case may be. The option purchase price as so determined shall be payable in cash.

8.8. <u>Substitute Member Admission</u>. Except as expressly permitted under Section 8.2, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (Substituted Member) only (1) on the unanimous Vote of the other Members in favor of the prospective transferee's admission as a Member, and (2) on such prospective transferee's executing a counterpart of this Agreement as a party hereto. Any prospective transferee of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.

-28-

CONFIDENTIAL                                           PLAINTIFF 298

**EXHIBIT 3 - PAGE 33**

8.9. <u>Substitute Member Agreement</u>. Any person admitted to the Company as a Substituted Member shall be subject to all provisions of this Agreement.

8.10. <u>Terms</u>. The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended, in reliance upon exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of Membership Interests to Members under the California Corporate Securities Law of 1968, as amended, also in reliance upon an exemption from the requirement that a permit for issuance of securities be procured. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred or Encumbered unless registered or qualified under applicable state and federal securities law or unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1. <u>Dissolution</u>. The Company shall be dissolved on the first to occur of the following events:

(a) The death, incapacity, or withdrawal of a Member; or the bankruptcy or corporate dissolution of a Member; provided, however, that the remaining Members may, by the Vote of a Majority of Members within 90 days of the happening of that event, Vote to continue the Company, in which case the Company shall not dissolve. If the remaining Members fail to so Vote, the remaining Members shall wind up the Company. For purposes of this Section 9.1(a), in determining a Majority of Members, the Percentage Interest of the Member who has died, become incapacitated, withdrawn, or who has become bankrupt or dissolved shall not be taken into account.

(b) The expiration of the term of existence of the Company.

(c) The written agreement of all Members to dissolve the Company.

-29-

CONFIDENTIAL                                   PLAINTIFF 299

**EXHIBIT 3 - PAGE 34**

(d)   The sale or other disposition of substantially all of the Company assets.

(e)   Entry of a decree of judicial dissolution pursuant to California Corporations Code section 17351.

9.2.   <u>Notice of Commencement</u>   On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Members who have not wrongfully dissolved the Company shall wind up the affairs of the Company. The Persons winding up the affairs of the Company shall give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a)   To pay the expenses of liquidation.

(b)   To repay outstanding loans to Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's respective loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid on those loans. Such repayment shall first be credited to unpaid principal due and the remainder shall be credited to accrued and unpaid interest.

(c)   Among the Members in accordance with the provisions of Article IV, Section 4.7.

9.3.   <u>Return of Member Investment</u>.  Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of any Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement.

### ARTICLE X: ARBITRATION

10.1.   <u>Arbitration</u>.   Any action to enforce or interpret this Agreement or to resolve disputes between the Members or by or against any Member shall be settled by arbitration in accordance with the rules of the American Arbitration Association with the fullest rights to discovery by the parties permitted thereby.

-30-

CONFIDENTIAL

PLAINTIFF 300

EXHIBIT 3 - PAGE 35

Arbitration shall be the exclusive dispute resolution process in the State of California, but arbitration shall be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties; provided, whoever, no further action regarding the arbitration shall take place during the 30-day period following delivery of the demand for arbitration for the express purpose of giving the Members and the Company an opportunity to resolve any such dispute prior to commencing arbitration pursuant to this Section 10.1. Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at Orange County, California. The substantive law of the State of California shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof. Notwithstanding anything contained herein to the contrary, any person who has a dispute with the Company giving rise to an arbitration or other proceeding shall not have the right to vote or otherwise participate in the selection and retention of counsel that will represent the Company in the arbitration or other proceeding.

## ARTICLE XI: INDEMNIFICATION AND INSURANCE

11.1. <u>Indemnification of Agents</u>. The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, Manager, officer, employee or other agency of the Company or that, being or having been such a Member, Manager, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

11.2. <u>Payment of Expenses in Advance</u>. Expenses incurred by a Manager or officer of the Company in connection with a Proceeding, as hereinafter defined, shall be paid by the Company in advance of the final disposition of such Proceeding upon receipt of a written undertaking by or on behalf of such Manager or officer

-31-

to repay such amount if it shall ultimately by determined that such Manager or officer is not entitled to be indemnified by the Company. For purposes of this Section 11.2, the term "Expenses" shall include, without limitation, reasonable attorneys' fees; disbursements and retainers; court costs; transcript costs; fees of accountants, experts and witnesses; travel expenses; duplicating costs; printing and binding costs; telephone charges; postage; delivery service fees; and all other expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating or being or preparing to be a witness or other participant in a Proceeding. For purposes of this Section 11.2, the term "Proceeding" includes any action, suit, arbitration, alternative dispute resolution mechanism, investigation, administrative hearing, or other proceeding, whether civil, criminal, administrative or investigative in nature, except a proceeding initiated by a Person to enforce his, her, or its rights under this Agreement.

11.3. <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.1 or under applicable law.

### ARTICLE XII: INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managers, the other Members, and the Company as follows:

12.1. <u>Investment Intent</u>. He is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest. No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

12.2. <u>Residency</u>. He a resident of the State of California or, upon presenting a subscription agreement to the Company in connection with the purchase of a Membership Interest, he has disclosed the state in which he is a legal resident.

12.3. <u>Economic Risk</u>. He is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.

-32-

CONFIDENTIAL

PLAINTIFF 302

**EXHIBIT 3 - PAGE 37**

**12.4.** <u>No Registration of Membership Interest</u>. He acknowledges that his or her Membership Interest has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or qualified under the California Corporate Securities Law of 1968, as amended, or any other applicable blue sky laws in reliance, in part, on his or her representations, warranties, and agreements herein.

**12.5.** <u>Membership Interest in Restricted Security</u>. He understands that the Membership Interest is a "restricted security" under the Securities Act in that the Membership Interest will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interest must be held indefinitely. In this connection, he understands the resale limitations imposed by the Securities Act and is familiar with Rule 144 promulgated under the Securities Act ("SEC Rule 144"), as presently in effect, and the conditions which must be met in order for that Rule to be available for resale of "restricted securities," including the requirement that the securities must be held for at least one years after purchase thereof from the Company prior to resale (two years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. It understands that the Company has not made such information available to the public and has no present plans to do so.

**12.6.** <u>No Obligation to Register</u>. He represents, warrants, and agrees that the Company and the Managers are under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist it in complying with any exemption from registration and qualification.

**12.7.** <u>No Disposition in Violation of Law</u>. Without limiting the representations set forth above, and without limiting Article VII of this Agreement, it will not make any disposition of all or any part of the Membership Interest which will result in the violation by it or by the Company of the Securities Act, the California Corporate Securities Law of 1968, or any other applicable securities laws. Without limiting the foregoing, he agrees not to make any disposition of all or any part of the Membership Interest unless and until:

(a) There is in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration

-33-

PLAINTIFF 303

**EXHIBIT 3 - PAGE 38**

statement and any applicable requirements of state securities laws; or

(b) He has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Company, it has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

(c) In the case of any disposition of all or any part of the Membership Interest pursuant to SEC Rule 144, in addition to the matters set forth in Section 12.11(b), he shall promptly forward to the Company a copy of any Form 144 filed with the U.S. Securities and Exchange Commission with respect to such disposition and a letter from the executing broker satisfactory to the Company evidencing compliance with SEC Rule 144. If SEC Rule 144 is amended or if the SEC's interpretations thereof in effect at the time of any such disposition have changed from its present interpretations thereof, it shall provide the Company with such additional documents as the Company may reasonably require.

12.8. **Legends.** He understands that the certificates (if any) evidencing the Membership Interest may bear one or all of the following legends:

(a) THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

(b) Any legend required by applicable state securities laws.

12.9. **Investment Risk.** He acknowledges that the Membership Interest is a speculative investment which involves a

CONFIDENTIAL                    -34-                    PLAINTIFF 304

**EXHIBIT 3 - PAGE 39**

substantial degree of risk of loss by it of its entire investment in the Company, that he understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.

12.10. **Investment Experience**. He is an experienced investor in unregistered and restricted securities of limited liability companies or limited partnerships that are speculative and high-risk ventures.

12.11. **Restrictions on Transferability**. He acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop and, accordingly, it may not be possible for it to liquidate its investment in the Company.

12.12. **Information Reviewed**. He has received and reviewed all information it considers necessary or appropriate for deciding whether to purchase the Membership Interest. It has had an opportunity to ask questions and receive answers from the other Members who are forming the Company regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) which it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to it.

12.13. **No Representations by Company**. Neither any Manager, any agent or employee of the Company or of any Manager, or any other Person has at any time expressly or implicitly represented, guaranteed, or warranted to him that he may freely transfer the Membership Interest, that a percentage of profit and/or amount or type of consideration will be realized as a result of an investment in the Membership Interest, that past performance or experience on the part of the Managers or their affiliates or any other person in any way indicates the predictable results of the ownership of the Membership Interest or of the overall Company business, that any cash distributions from Company operations or otherwise will be made to the Members by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Company.

-35-

CONFIDENTIAL

**12.14.** <u>Consultation with Professional Advisor</u>.  He has been advised to consult with his own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent it considers it necessary.

**12.15.** <u>No Assurance of Tax Benefits</u>.  He acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

**12.16.** <u>Compliance with Other Instruments</u>.  The Member's authorizations, execution, delivery and performance of this Agreement does not conflict with any other agreement or arrangement to which such Member is a party or part of and by which he is bound.

### ARTICLE XIII: GENERAL PROVISIONS

**13.1.** <u>Counsel to the Company</u>.  Counsel to the Company may also be counsel to a Member or any affiliate of a Member or Manager.  The Managers may execute on behalf of the Company any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction.

**13.2.** <u>Complete Agreement</u>.  This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

**13.3.** <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**13.4.** <u>Choice of Law</u>.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or

-36-

CONFIDENTIAL

PLAINTIFF 306

**EXHIBIT 3 - PAGE 41**

unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

13.5. **Binding Effect**. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted and assigns.

13.6. **Pronouns; Statutory References**. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Regulations, the Act, Corporations Code, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

13.7. **Further Assurances**. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

13.8. **No Limitation of Members' Businesses**. Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

13.9. **Absence of Agency**. Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

13.10. **Authority and Capacity of Members**. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

13.11. **Headings**. The article, Section, and paragraph titles and headings contained in this Agreement are inserted as a matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

13.12. **Amendment**. This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members.

CONFIDENTIAL

PLAINTIFF 307

**EXHIBIT 3 - PAGE 42**

13.13. **Time of the Essence**. Time is of the essence of every provision of this Agreement that specifies a time for performance.

13.14. **Benefit of the Parties**. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

13.15. **Intention to be a Limited Liability Company**. The Members intend the Company to be a limited liability company under the Act. No member shall take any action inconsistent with the express intent of the parties to this Agreement.

13.16. **Interpretation**. In the event of any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by, or at the request of, a particular Member or its counsel.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

Attest:                          Calpension, Inc.


_____          By:_____
                                    Abdul S. Walji, President

CONFIDENTIAL                          PLAINTIFF 308

EXHIBIT 3 - PAGE 43

# ARTICLES OF ORGANIZATION

EXHIBIT A

CONFIDENTIAL

PLAINTIFF 309

EXHIBIT 3 - PAGE 44

2 0 1 0 0 6 0 1 0 1 7 1

| LLC-1 | File # _____

**State of California**
**Secretary of State**

**LIMITED LIABILITY COMPANY**
**ARTICLES OF ORGANIZATION**

A $70.00 filing fee must accompany this form.
**IMPORTANT – Read instructions before completing this form.**

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

**FEB 2 5 2010**

This Space For Filing Use Only

ENTITY NAME (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

**1. NAME OF LIMITED LIABILITY COMPANY**

ARISTA, LLC

PURPOSE (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

INITIAL AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and item 3 must be completed (leave item 4 blank).

**3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS**

Abdul S. Walji

| 4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 335 Centennial Way, Suite 100, Tustin. | | CA | 92780 |

MANAGEMENT (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

[ ] ONE MANAGER

[✓] MORE THAN ONE MANAGER

[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

ADDITIONAL INFORMATION

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

EXECUTION

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

February 24, 2010
DATE

_____
SIGNATURE OF ORGANIZER

Abdul S. Walji
TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)

APPROVED BY SECRETARY OF STATE

CONFIDENTIAL

PLAINTIFF 310

**EXHIBIT 3 - PAGE 45**



# State of California
## Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___*l*___ page(s) is a full, true and correct copy of the original record in the custody of this office.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

MAR 1 1 2010

*[signature: Debra Bowen]*

**DEBRA BOWEN**
Secretary of State

Sec/State Form CE-109 (REV 01/2009)
CONFIDENTIAL

OSP 09 113643
PLAINTIFF 311

**EXHIBIT 3 - PAGE 46**

NAMES, ADDRESSES AND CAPITAL CONTRIBUTIONS
OF MEMBERS, AND NAMES AND ADDRESSES OF MANAGERS,
AS OF FEBRUARY 25, 2010

| Members and Managers Names and Addresses | Percentage Interests | Capital Contributions |
|---|---|---|
| **Member:** | | |
| Calpension, Inc. 23191 La Cadena Drive, #104 Laguna Hills, California 92653 | | $5,000.00 |

**Sole Manager:**

Abdul S. Walji
335 Centennial Way, Suite 100
Tustin, California 92780

<u>EXHIBIT B</u>

CONFIDENTIAL                                                          PLAINTIFF 312

**EXHIBIT 3 - PAGE 47**

# CONSULTING AGREEMENT

[Attached as Exhibit "B" to Confidential Private Placement Memorandum]

EXHIBIT C

CONFIDENTIAL

PLAINTIFF 313

**EXHIBIT 3 - PAGE 48**

# CONSULTING AGREEMENT

# EXHIBIT "B"

CONFIDENTIAL                    PLAINTIFF 314

**EXHIBIT 3 - PAGE 49**

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("Agreement") is entered into this ___ day of _____ 2010 by and between ARISTA, LLC, a California limited liability company (the "Company"), and Abdul S. Wilji ("Consultant").

### Preliminary Statement

The Company is in the process of raising capital from the offer and sale of units ("Units") of membership interests in the Company. After the payment of certain expenses incurred in connection with the formation and organization of the Company and its operations, and establishment of a reserve for payment of certain expenses to be incurred by the Company, the Company intends to invest the remainder of the funds raised from the sale of the Units ("Investment Funds") to yield a return for the benefit of the members of the Company. In connection therewith, the Company desires to retain the services of Consultant to invest such Investment Funds, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties hereto, intending to be legally bound, agree as follows:

1. <u>Services and Consulting Fee.</u> (a) From time to time after the date of this Agreement, the Company shall transfer Investment Funds to an account designated by Consultant, which account shall be owned and controlled exclusively by Consultant, subject to inspection and verification as provided in paragraph 1(d) hereof. Consultant shall invest said funds in the investment vehicles as Consultant shall in his sole discretion determine are in the best interests of the Company, including, without limitation, in the investments and manner described in Exhibit A attached hereto and made a part hereof. At the request of the Company, Consultant shall distribute the income and other returns from the investments to the members of the Company, which distributions shall be made at least once each year; and, liquidate the Investment Funds prior to the end of three years following the date of this Agreement and distribute said funds to the members of the Company.

(b) In consideration for his services hereunder, the Company agrees to pay Consultant a fee (the "Consulting Fee") in the form of cash and an option or right to purchase Units, as described in paragraph 1(c) below. The amount of the Consulting Fee payable in cash shall be the product of 75.0% times a number equal to: (i) 90.0% of the realized cash gain from investments (net of commissions, fees and expenses paid to third parties); less (ii) operating expenses of the Company incurred during the same period of time for which the Consulting Fee is being paid. The Consulting Fee shall be paid every six months in the form of a company check.

(c) During each six-month period following the date of this Agreement, Consultant shall have the right to purchase up to five percent of the Units outstanding (which five percent number shall not include Units issued and sold to Consultant); provided, however, Consultant shall not have the right to purchase more than 30.0% of the outstanding Units (which 30.0% number shall not include Units issued and sold to Consultant). The purchase price paid by Consultant for each Unit shall be equal to

CONFIDENTIAL

PLAINTIFF 315

**EXHIBIT 3 - PAGE 50**

$25,000, payable in the form of a personal check. If Consultant does not exercise his right to purchase Units during any six-month period, the right to purchase Units shall continue and cumulate with the right to purchase Units in any subsequent six-month period. Consultant's right to purchase Units pursuant to this Agreement shall terminate on the third anniversary of the date of this Agreement.

(d) Within the first ten days of each month, Consultant shall provide the Company with a written accounting of all funds transferred by the Company to Consultant for investment, including a description of every investment and use of the Investment Funds, account numbers, serial numbers, location of each investment, dates of investment, dates of maturity, income and loss realized from each investment, and all other available information relating to each investment. If requested by the Company, Consultant shall provide such information more frequently and shall make all of books and records relating to the investments available for inspection and copying by representatives of the Company during regular business hours.

2. **Term:** The term of this Agreement shall begin on the date hereof and shall terminate on December 31, 2013, subject, however, to the right of either party to terminate this Agreement prior to December 31, 2013 by delivering notice of intent to terminate this Agreement upon 120-days prior written notice to the other.

3. **Arbitration.** Except with respect to equitable remedies, including, without limitation, injunction relief, all claims, demands, disputes, controversies, differences or misunderstandings arising out of or relating to this Agreement, or the failure or refusal to perform the whole or any part thereof, shall be settled by arbitration before the American Arbitration Association in accordance with its Commercial Rules of Arbitration. The arbitration shall take place in Orange County, California before one arbitrator. The parties hereto, and each of them, hereby submit themselves to the jurisdiction of the courts of the State of California in any proceeding for the enforcement of the award rendered by the arbitrator, and agree that judgment upon such award may be entered in any court, in or out of the State of California, having jurisdiction thereof. The arbitrator shall rule in accordance with the laws of the State of California as if he or she was a judge in a court of original jurisdiction and he or she shall render a written opinion with findings of fact and conclusions of law. The parties to the proceeding shall have reasonable rights of discovery in accordance with the civil rules of federal procedure.

4. **Preliminary Statement.** The Preliminary Statement is incorporated herein by this reference and made a part hereof.

5. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes any and all prior agreements, whether written or oral, with respect to the subject matter hereof.

6. **Choice of Law.** (a) The parties acknowledge and agree that (i) this Agreement was negotiated and entered into in the State of California; and (ii) this Agreement shall be governed by, and construed and enforced in accordance with, the

2

PLAINTIFF 316

EXHIBIT 3 - PAGE 51

internal laws of the State of California, without regard to any principles of conflicts of laws.

(b) Each party hereto consents and submits to the exclusive jurisdiction of all federal and state courts in the county of Orange, State of California, United States for purposes of all legal proceedings arising out of or relating to this Agreement of the transactions contemplated hereby. Each party agrees that such courts shall have jurisdiction for all legal proceedings arising out of or relating to this Agreement. Each party irrevocably consents to the service of process out of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the respective party at his or its address for notices pursuant to paragraph 8 in accordance with the rules of the court.

7. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, personal representative, heirs, and permitted assigns.

8. **Notices.** All notices, consents, or other communications required or permitted hereunder shall be in writing and shall be sufficiently given if delivered personally or by facsimile, or by overnight courier, addressed as follows:

(a) **If to the Company:**

ARISTA, LLC
335 Centennial Way, Suite 100
Tustin, California 92780
Attention: President

(b) **If to Consultant:**

Abdul S. Walji
335 Centennial Way, Suite 100
Tustin, California 92780

Any party hereto may specify in writing a different address for such purposes by notice to the other party. Notices shall be deemed to have been delivered upon the earlier of actual receipt or, the second business day following the day notice is given by overnight courier.

9. **Severability.** If any term or condition of this Agreement should be held invalid in any respect by a court, arbitrator or tribunal of competent jurisdiction, such invalidity shall not affect the validity of any other term or condition hereof. The parties hereto acknowledge that they would have executed this Agreement with any such invalid term or condition excluded.

10. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same Agreement.

3

CONFIDENTIAL

PLAINTIFF 317

**EXHIBIT 3 - PAGE 52**

**11.** <u>Headings.</u> The headings set forth in this Agreement are for convenience only and do not qualify or affect the terms or conditions hereof.

**12.** <u>Time of Essence.</u> Time is of the essence for the performance of each and every covenant and the satisfaction of each and every condition of this Agreement.

**13.** <u>Amendments.</u> No amendment, modification or waiver of any term or condition of this Agreement shall be valid or of any force or effect, unless made by written instrument signed by the parties hereto, specifying the exact nature of such amendment, modification or waiver. Any waiver by either party of any provision of this Agreement shall not imply a subsequent waiver of that or any other provision.

**14.** <u>Attorneys' Fees and Expenses.</u> In any action between the parties to enforce any of the terms of this Agreement or any action pertaining to this Agreement, the prevailing party shall be entitled to recover expenses, including, without limitation, reasonable attorneys' fees, and expenses and costs of suit and any appeals.

**15.** <u>Assignment.</u> The rights and obligations of the Company under this Agreement shall not be assignable without the express consent of Consultant, which consent may not be unreasonably withheld. The rights and obligation of Consultant under this Agreement shall not be assignable without the express consent of the Company, which consent may be unreasonably withheld.

**16.** <u>Independent Contractor.</u> Each party is an independent contractor in relation to the other party with respect to all matters arising under this Agreement. Nothing herein shall be deemed to establish a partnership, joint venture, or association relationship between the parties. Notwithstanding anything contained herein to the contrary, each party remains responsible, and will indemnify and hold harmless the other party from the withholding and payment of all Federal, state and local personal income taxes whatsoever.

**17.** <u>Preparation of Agreement.</u> The parties hereto acknowledge that, although counsel for the Company prepared the initial draft of this Agreement, each such party hereto negotiated the terms of the transaction described herein without the assistance of such counsel. Each such party had the opportunity, and was encouraged, to be represented by separate and independent legal counsel and other professional advisors in connection with the negotiation of the terms of the transaction described herein. Absolutely no negative inference is to be drawn from the fact that this Agreement or any other document related hereto was prepared by counsel for Nationwide.

**18.** <u>Survival.</u> All of the representations, warranties and covenants of the parties contained herein shall survive the termination of this Agreement.

4

PLAINTIFF 318

EXHIBIT 3 - PAGE 53

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Agreement as of the day and year first above written.

**Company:**

Attest:                                      ARISTA, LLC


_____          By:_____
Print name:_____          Abdul S. Walji, President


**Consultant:**

Witness:


_____          _____
                                             Abdul S. Wali

5

CONFIDENTIAL                                      PLAINTIFF 319

**EXHIBIT 3 - PAGE 54**

## EXHIBIT A

Consultant shall invest and reinvest the Investment Funds without distinction between incomes and principal in one or more of the following ways, as Consultant shall from time to time determine:

(a) Consultant may invest the Investment Funds or any portion thereof in obligations issued or guaranteed by the United States of America, Japan, Britain, European Union, Australia, Canada or of any instrumentality thereof, or in other bonds, notes, debentures, mortgages, preferred or common stocks, options to buy or sell stocks or other securities, mutual fund shares, limited partnership interests, commodities, real estate or any interest therein, or in such other property, real or personal, foreign and domestic.

(b) Consultant may cause the Investment Funds or any portion thereof to be invested in a common fund established and maintained by a national or other bank regulated by the Federal Deposit Insurance Corporation, for the collective investment of fiduciary funds, even though the bank is acting as the investment manager, provided such common investment fund is a qualified investment fund under the applicable sections of the Internal Revenue Code of 1986, as amended (the"Code"), or corresponding provisions of future tax laws, and is exempt from income tax under the applicable sections of the Code. In the event any of the Investment Funds are invested in such a common investment fund, the declaration of company creating such common investment fund, as it may be amended from time to time, shall be incorporated by reference and made a part hereof. Further, all or any portion of the assets subject to this Agreement may be invested in any collective investment fund maintained exclusively for the investment of assets of (i) exempt, qualified employee benefit plans; and (ii) collective investment funds consisting exclusively of assets of such qualified plan. The assets so invested shall be subject to all the provisions of the instrument establishing such collective investment fund; as such instrument may be amended from time to time. Such instrument, as amended from time to time, is hereby incorporated and made a part of this Agreement and shall control notwithstanding any contrary provision of this Agreement.

(c) Consultant may deposit any portion of the Investment Funds in savings accounts in federally insured banks or savings and loan associations or invest in certificates of deposit issued by any such bank or savings and loan association. Consultant may retain, without liability for interest, any portion of the Investment Funds in cash balances pending investment thereof or payment of expenses.

(d) Consultant may buy and sell put and call options, covered or uncovered, and engage in spreads, straddles, ratio writing and other forms of options trading, including, without limitation, sales of options against convertible bonds, and sales of financial,

6

equities and commodities futures contracts, and trade in and maintain a brokerage account on a cash or margin basis.

(e) Consultant shall vote any stock, bonds, or other securities of any corporation or other issuer; consent to or request any action on the part of any such corporation or other issuer; give general or special proxies or powers of attorney, with or without power of substitution; participate in any reorganization, recapitalization, consolidation, merger, or similar transaction with respect to such securities; deposit such stocks or other securities with any protective or like committee, or with the Company, or with the depositories designated thereby; exercise any subscription rights and conversion privileges or other options and to make any payments incidental thereto; and, generally, do all such acts, execute all such instruments, take all such proceedings and exercise all such rights, powers, and privileges with respect to the securities or property constituting the Investment Funds.

(f) Consultant shall make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers granted hereby.

(g) Consultant shall register any investment held in the name of the Company or in the name of a nominee for the benefit of the Company or hold any investment in bearer form, provided that the books and records of the Company shall at all times show that all such investments are part of the Company.

(h) Consultant may borrow money for purposes of the Company in such amounts and upon such terms and conditions as the Company deems appropriate.

(i) Consultant may commingle the Investment Funds with the assets of other similar companies that are exempt from income tax provided that the books and records of the Company shall at all times show the portion of the commingled assets that are part of the Company.

(j) Consultant may do all acts whether or not expressly authorized that the Company may deem necessary or proper for the protection of the Investment Funds held hereunder.

7

CONFIDENTIAL

PLAINTIFF 321

**EXHIBIT 3 - PAGE 56**

Confidential Private Placement Memorandum        ARISTA, LLC

# ARISTA, LLC

## INTERNALLY PREPARED AND UNAUDITED BALANCE SHEET, DATED MARCH 1, 2010

## EXHIBIT "C"

CONFIDENTIAL

PLAINTIFF 322

**EXHIBIT 3 - PAGE 57**

# ARISTA, LLC

## Balance Sheet[1]
### As of March 1, 2010

### Assets:

| | | |
|---|---|---|
| Cash | $ 5,000.00 | |
| Total Assets | | $5,000.00 |

### Liabilities and Equity:

| | | |
|---|---|---|
| Total liabilities | $10,000.00 | |
| Equity | | |
| Capital Contributions – Member | 5,000.00 | |
| Organizational expenses | (10,000.00) | |
| Total Equity | (5,000.00) | |
| Total Liabilities and Equity | | $5,000.00 |

---

[1] The Balance Sheet has been prepared internally and is unaudited.

CONFIDENTIAL                                         PLAINTIFF 323

**EXHIBIT 3 - PAGE 58**

Confidential Private Placement Memorandum         ARISTA, LLC

# SUBSCRIPTION DOCUMENTS

# EXHIBIT "D"

CONFIDENTIAL            PLAINTIFF 324

**EXHIBIT 3 - PAGE 59**

Name of Offeree_____     Copy No._____

# SUBSCRIPTION BOOKLET

## ARISTA, LLC

a California limited liability company

$25,000,000

1,000 UNITS OF LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST
AT $25,000 EACH

CONFIDENTIAL

PLAINTIFF 325

EXHIBIT 3 - PAGE 60

CONFIDENTIAL

ARISTA, LLC

---

SUBSCRIPTION
BOOKLET

---

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE INTERESTS AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE INTERESTS BEING OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

March 1, 2010

PLAINTIFF 326

EXHIBIT 3 - PAGE 61

**ARISTA, LLC**

This booklet contains documents which must be read, executed and returned if you wish to invest in ARISTA, LLC (the "Company"). You should consult with an attorney, accountant, investment advisor or other advisor regarding an investment in the Company and its suitability for you.

If you decide to invest, please fill out, sign and return the documents pertinent to you, as listed under each of the headings below.

For *individuals* the documents to be returned are:

1. The execution page of the Subscription Agreement, which includes a power of attorney in section 2 and which must be notarized (page 18)

2. The Suitability Statement for individuals (page 14)

3. The execution page of the Operating Agreement - two copies (page 18)

4. Internal Revenue Service Form W-9 (for U.S. persons) or Internal Revenue Service Form W-8 Ben (or other applicable Form W-8) (for non-U.S. persons)

For *entities* the documents to be returned are:

1. The execution page of the Subscription Agreement, which includes a power of attorney in section 2 and which must be notarized (page 18)

2. The Suitability Statement for non-individuals (pages 15-16)

3. The execution page of the Operating Agreement - two copies (page 18)

4. Internal Revenue Service Form W-9 (for U.S. persons) or Internal Revenue Service Form W-8 Ben (or other applicable Form W-8) (for non-U.S. persons)

**What this Booklet Contains:**

1. A Subscription Agreement and Suitability Statements

The Subscription Agreement is the document by which you agree to subscribe for and purchase your membership interests in the Company. It includes a power of attorney granted to President of the Company, in section 2. By signing this Agreement you will be granting the power of attorney contained therein.

2

CONFIDENTIAL

PLAINTIFF 327

**EXHIBIT 3 - PAGE 62**

The Suitability Statements, which are in section 12 of the Subscription Agreement and therefore are part of that agreement, are important and one must be completed by each investor. Please read this section carefully.

*Individuals* should initial their answer to each of the questions set out on page 14 and also fill out and sign the execution page to the Subscription Agreement on pages 18 – 21.

*Entities* should initial their answer to each of the questions in the Suitability Statement set out on pages 15 – 17 and also fill out and sign the execution page to the Subscription Agreement on pages 18 – 21.

2. A copy of the Operating Agreement

Investors must sign two copies of the Operating Agreement signature page. For convenience, two copies are included as part of this booklet. The form of Operating Agreement is contained in its entirety as Exhibit __ of this booklet. There is no need to return that document to the President of the Company.

3. Copies of Internal Revenue Service Forms W-9 and W-8 Ben with instructions.

Copies of these forms have been provided for your convenience. Please consult your tax advisor regarding which form (including a different Form W-8) is appropriate for you. Additional forms are available from the Internal Revenue Service website at www.irs.gov.

Please call the President if you have any questions.

3

PLAINTIFF 328

EXHIBIT 3 - PAGE 63

ARISTA, LLC

SUBSCRIPTION AGREEMENT

To the Undersigned Purchaser:

ARISTA, LLC, a California limited liability company (the "Company"), hereby agrees with you (in the case of a subscription for the account of one or more entities, "you" or "your" shall refer to the representative making the investment decision and executing this Agreement, or the entity, or both, as appropriate) as follows:

1. Sale and Purchase of Membership Interest.

The Company has been formed under the laws of the State of California and is governed by the Operating Agreement in substantially the form attached hereto as Exhibit A, as the same may be modified in accordance with the terms of any amendment thereto (the "Operating Agreement"). Capitalized terms used herein without definition have the meanings set forth in the Operating Agreement.

Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the respective parties contained herein:

(a) the Company agrees to sell to you, and you irrevocably subscribe for and agree to purchase from the Company, an interest as a member in the Company (a "Membership Interest"); and

(b) the Company agrees that you shall be admitted as a Member, upon the terms and conditions, and in consideration of your agreement to be bound by the terms and provisions of the Operating Agreement and this Agreement, with a capital commitment in the amount equal to the amount set forth opposite your signature at the end of this Agreement (your "Capital Commitment").

Subject to the terms and conditions hereof and of the Operating Agreement, your obligation to subscribe and pay for your Membership Interest shall be complete and binding upon the execution and delivery of this Agreement. Your Capital Commitment, unless otherwise agreed, shall be payable in a lump sum and returned with this Subscription Agreement.

2. Power of Attorney.

You hereby irrevocably constitute and appoint the President of the Company (and any substitute or successor President of the Company) your true and lawful attorney in your name, place and stead, (a) to receive and pay over to the Company on your behalf, to the extent set

4

CONFIDENTIAL

PLAINTIFF 329

**EXHIBIT 3 - PAGE 64**

forth in this Agreement, all funds received hereunder, (b) to complete or correct, on your behalf, all documents to be executed by you in connection with your subscription for Membership Interests, including, without limitation, filling in or amending amounts, dates, and other pertinent information, and (c) to execute, acknowledge, swear to and file: (i) any counterparts of the Operating Agreement to be entered into pursuant to this Agreement and any amendments to which you are a signatory, (ii) any amendments to any such amendments (as provided in the Operating Agreement), (iii) any agreements or other documents relating to the obligations of the Company, as limited and defined in the Operating Agreement, (iv) any certificates of membership interest required by law and all amendments thereto, (v) all certificates and other instruments necessary to qualify, or continue the qualification of, the Company in the states where it may be doing business and to preserve the limited liability status of the Company in the jurisdictions in which the Company may acquire investments, (vi) any certificates or other instruments which may be required to effectuate any change in the membership of the Company, (vii) all assignments, conveyances or other instruments or documents necessary to effect the dissolution of the Company, and (viii) all other filings with agencies of the federal government, of any state or local government, or of any other jurisdiction, which the President of the Company considers necessary or desirable to carry out the purposes of this Agreement, the Operating Agreement and the business of the Company. This power of attorney shall be deemed coupled with an interest, shall be irrevocable and shall survive the transfer of your Membership Interest.

3. Other Subscriptions.

The Company has entered into separate but substantially identical subscription agreements (the "Other Subscription Agreements" and, together with this Agreement, the "Subscription Agreements") with other purchasers (the "Other Purchasers"), providing for the sale to the Other Purchasers of Membership Interests and the admission of the Other Purchasers as Members. This Agreement and the Other Subscription Agreements are separate agreements, and the sales of Membership Interests to you and the Other Purchasers are to be separate sales.

4. Closing.

The closing (the "Closing") of the sale to you, and the subscription for and purchase by you, of a Membership Interest, and your admission as a Member, shall take place on or before December 31, 2010, or on such other date and at such other time as the President shall designate upon not less than two Business Days' prior written notice to you (the "Closing Date"). At the Closing, and upon satisfaction of the conditions set out in sections 5 and 6 of this Agreement, the President will list you as a Member on Schedule A of the Operating Agreement.

5. Conditions Precedent to Your Obligations.

5.1 The Conditions Precedent. Your obligation to subscribe for your Membership Interest and be admitted as a Member at the Closing is subject to the fulfillment (or waiver by you), prior to or at the time of the Closing, of the following conditions:

CONFIDENTIAL

PLAINTIFF 330

**EXHIBIT 3 - PAGE 65**

(a) Operating Agreement. The Operating Agreement shall have been duly authorized, executed and delivered by or on behalf of the Company and the Operating Agreement shall be in full force and effect.

(b) Representations and Warranties. The representations and warranties of the Company contained in section 7 of this Agreement shall be true and correct in all material respects when made and at the time of the Closing, except as affected by the consummation of the transactions contemplated by this Agreement or the Operating Agreement.

(c) Performance. The Company shall have duly performed and complied in all material respects with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing.

(d) Legal Investment. On the Closing Date, your subscription hereunder shall be permitted by the laws and regulations applicable to you.

5.2 Nonfulfillment of Conditions. If, at the Closing, any of the conditions specified in section 5.1 shall not have been fulfilled, you shall, at your election, be relieved of all further obligations under this Agreement and the Operating Agreement, without thereby waiving any other rights you may have by reason of such nonfulfillment. If you elect to be relieved of your obligations under this Agreement pursuant to the foregoing sentence, the Operating Agreement shall be null and void as to you and the power of attorney contained herein shall be used only to carry out and effect the actions required by this sentence, and the Company shall promptly take, or cause to be taken, all steps necessary to nullify the Operating Agreement as to you.

6. Conditions Precedent to the Company's Obligations.

6.1 The Conditions Precedent. The obligations of the Company to issue to you the Membership Interest and to admit you as a Member at the Closing shall be subject to the fulfillment (or waiver by the Company) prior to or at the time of the Closing, of the following conditions:

(a) Operating Agreement. Any filing with respect to the formation of the Company required by the laws of the State of California shall have been duly filed in such place or places as are required by such laws. A counterpart of the Operating Agreement shall have been duly authorized, executed and delivered by or on behalf of you and each of such Other Purchasers. The Operating Agreement shall be in full force and effect.

(b) Representations and Warranties. The representations and warranties made by you in section 8 shall be true and correct when made and at the time of the Closing.

(c) Performance. You shall have duly performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by you prior to or at the time of the Closing.

6

CONFIDENTIAL

PLAINTIFF 331

**EXHIBIT 3 - PAGE 66**

6.2 Nonfulfillment of Conditions. If, at the Closing, any of the conditions specified in section 6.1 shall not have been fulfilled, the Company shall at its election be relieved of all further obligations under this Agreement and the Operating Agreement, without thereby waiving any other rights it may have by reason of such nonfulfillment. If the Company elects to be relieved of its obligations under this Agreement pursuant to the foregoing sentence, the Operating Agreement shall be null and void as to you and the power of attorney contained herein shall be used only to carry out and effect the actions required by this sentence, and the Company shall promptly take, or cause to be taken, all steps necessary to nullify the Operating Agreement as to you.

7. Representations and Warranties of the Company.

7.1 The Representations and Warranties. The Company represents and warrants that:

(a) Formation and Standing. The Company is duly formed and validly existing as a limited liability company under the laws of the State of California and, subject to applicable law, has all requisite power and authority to carry on its business as now conducted and as proposed to be conducted as described in the Confidential Private Placement Memorandum relating to the private offering of Membership Interests by the Company (together with any amendments and supplements thereto, the "Offering Memorandum").

(b) Authorization of Agreement. The execution and delivery of this Agreement has been authorized by all necessary action on behalf of the Company and this Agreement is a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms. The execution and delivery by the President of the Operating Agreement has been authorized by all necessary action on behalf of the Company and the Operating Agreement is a legal, valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

(c) Company Liabilities; Litigation. Prior to the date hereof, the Company has not incurred any material liabilities other than liabilities in respect of Organizational Expenses. There is no action, proceeding or investigation pending or, to the knowledge of the Company, threatened against the Company.

7.2 Survival of Representations and Warranties. All representations and warranties made by the Company in section 7.1 shall survive the execution and delivery of this Agreement, any investigation at any time made by you or on your behalf and the issue and sale of Membership Interests.

8. Representations and Warranties of the Purchaser.

8.1 The Representations and Warranties. You represent and warrant to the Company and each other Person who is, or in the future becomes, a Member that each of the following statements is true and correct as of the Closing Date:

7

CONFIDENTIAL

PLAINTIFF 332

EXHIBIT 3 - PAGE 67

(a) Accuracy of Information. All of the information provided by you pursuant to section 12 and the Suitability Statements is true, correct and complete in all respects. Any other information you have provided to the Company about you is correct and complete as of the date of this Agreement.

(b) Offering Memorandum; Advice. You have either consulted your own investment adviser, attorney or accountant about the investment and proposed purchase of a Membership Interest and its suitability to you, or chosen not to do so, despite the recommendation of that course of action by the Company. Any special acknowledgment set forth below with respect to any statement contained in the Offering Memorandum shall not be deemed to limit the generality of this representation and warranty.

(c) You have received a copy of the Offering Memorandum and the forms of the Operating Agreement and you understand the risks of, and other considerations relating to, a purchase of a Membership Interest, including the risks set forth under the caption "Risk Factors" in the Offering Memorandum. You have been given access to, and prior to the execution of this Agreement you were provided with an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the terms and conditions of the offering of Membership Interests, and to obtain any other information which you and your investment representative and professional advisors requested with respect to the Company and your investment in the Company in order to evaluate your investment and verify the accuracy of all information furnished to you regarding the Company. All such questions, if asked, were answered satisfactorily and all information or documents provided were found to be satisfactory.

(d) Representation of Investment Experience and Ability to Bear Risk. You (i) are knowledgeable and experienced with respect to the financial, tax and business aspects of the ownership of a Membership Interest and of the business contemplated by the Company and are capable of evaluating the risks and merits of purchasing a Membership Interest and, in making a decision to proceed with this investment, have not relied upon any representations, warranties or agreements, other than those set forth in this Agreement, the Offering Memorandum and the Operating Agreement, if any, and (ii) can bear the economic risk of an investment in the Company for an indefinite period of time, and can afford to suffer the complete loss thereof.

(e) Accredited Investor. You are an accredited investor within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act. If you are an individual, you are an accredited investor by reason of the fact you are:

(i) a natural person and your individual net worth, or joint net worth with your spouse, at the time of this purchase exceeds $1,000,000 or a natural person who had an individual income in excess of $200,000 in each of the two previous years, or joint income with your spouse in excess of $300,000 in each of those years, and reasonably expect to reach the same income level in the current year. Further, you have adequate means of providing all your current and foreseeable needs and personal contingencies and have no need for liquidity in this investment;

8

EXHIBIT 3 - PAGE 68

(ii) an entity of which all of the equity owners are accredited individual investors as defined above.

(f) Suitability. You have evaluated the risks involved in investing in the Membership Interests and have determined that the Membership Interests are a suitable investment for you. Specifically, the aggregate amount of the investments you have in, and your commitments to, all similar investments that are illiquid is reasonable in relation to your net worth, both before and after the subscription for and purchase of the Membership Interests pursuant to this Agreement.

(g) Transfers and Transferability. You understand and acknowledge that the Membership Interests have not been registered under the Securities Act or any state securities laws and are being offered and sold in reliance upon exemptions provided in the Securities Act and state securities laws for transactions not involving any public offering and, therefore, cannot be resold or transferred unless they are subsequently registered under the Securities Act and such applicable state securities laws or unless an exemption from such registration is available. You also understand that the Company does not have any obligation or intention to register the Membership Interests for sale under the Securities Act, any state securities laws or of supplying the information which may be necessary to enable you to sell Membership Interests; and that you have no right to require the registration of the Membership Interests under the Securities Act, any state securities laws or other applicable securities regulations. You also understand that sales or transfers of Membership Interests are further restricted by the provisions of the Operating Agreement.

You represent and warrant further that you have no contract, understanding, agreement or arrangement with any person to sell or transfer or pledge to such person or anyone else any of the Membership Interests for which you hereby subscribe (in whole or in part); and you represent and warrant that you have no present plans to enter into any such contract, undertaking, agreement or arrangement.

You understand that the Membership Interests cannot be sold or transferred without the prior written consent of the Company, which consent may be withheld in its sole and absolute discretion and which consent will be withheld if any such transfer could cause the Company to become subject to regulation under federal law as an investment company or would subject the Company to adverse tax consequences.

You understand that there is no public market for the Membership Interests; any disposition of the Membership Interests may result in unfavorable tax consequences to you.

You are aware and acknowledge that, because of the substantial restrictions on the transferability of the Membership Interests, it may not be possible for you to liquidate your investment in the Company readily, even in the case of an emergency.

9

PLAINTIFF 334

EXHIBIT 3 - PAGE 69

(h) Residence. You maintain your domicile at the address shown in the signature page of this Subscription Agreement and you are not merely transient or temporarily resident there.

(i) Awareness of Risks; Taxes. You represent and warrant that you are aware (1) that the Company has no operating history; (2) that the Membership Interests involve a substantial degree of risk of loss of your entire investment and that there is no assurance of any income from your investment; and (3) that any federal and/or state income tax benefits which may be available to you may be lost through the adoption of new laws or regulations, to changes to existing laws and regulations and to changes in the interpretation of existing laws and regulations. You further represent that you are relying solely on your own conclusions or the advice of your own counsel or investment representative with respect to tax aspects of any investment in the Company.

(j) Capacity to Contract. If you are an individual, you represent that you are over 21 years of age and have the capacity to execute, deliver and perform this Subscription Agreement and the Operating Agreement.

(k) Power, Authority; Valid Agreement. (i) You have all requisite power and authority to execute, deliver and perform your obligations under this Agreement and the Operating Agreement and to subscribe for and purchase or otherwise acquire your Membership Interests; (ii) your execution of this Agreement and the Operating Agreement has been authorized by all necessary corporate or other action on your behalf; and (iii) this Agreement and the Operating Agreement are each valid, binding and enforceable against you in accordance with their respective terms.

(l) No Conflict; No Violation. The execution and delivery of this Agreement and the Operating Agreement by you and the performance of your duties and obligations hereunder and thereunder (i) do not and will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under (A) any charter, by-laws, trust agreement, partnership agreement or other governing instrument applicable to you, (B) (1) any indenture, mortgage, deed of trust, credit agreement, note or other evidence of indebtedness, or any lease or other agreement or understanding, or (2) any license, permit, franchise or certificate, in either case to which you or any of your Affiliates is a party or by which you or any of them is bound or to which your or any of their properties are subject; (ii) do not require any authorization or approval under or pursuant to any of the foregoing; or (iii) do not violate any statute, regulation, law, order, writ, injunction or decree to which you or any of your Affiliates is subject.

(m) No Default. You are not (i) in default (nor has any event occurred which with notice, lapse of time, or both, would constitute a default) in the performance of any obligation, agreement or condition contained in (A) this Agreement or the Operating Agreement, (B) any provision of any charter, by-laws, trust agreement, partnership agreement or other governing instrument applicable to you, (C) (1) any indenture, mortgage, deed of trust, credit agreement, note or other evidence of indebtedness or any lease or other agreement or understanding, or (2) any license, permit, franchise or certificate, in either case to which you or any of your Affiliates

10

CONFIDENTIAL

PLAINTIFF 335

EXHIBIT 3 - PAGE 70

is a party or by which you or any of them is bound or to which your or any of their properties are subject, or (ii) in violation of any statute, regulation, law, order, writ, injunction, judgment or decree applicable to you or any of your Affiliates.

(n) No Litigation. There is no litigation, investigation or other proceeding pending or, to your knowledge, threatened against you or any of your Affiliates which, if adversely determined, would adversely affect your business or financial condition or your ability to perform your obligations under this Agreement or the Operating Agreement.

(o) Consents. No consent, approval or authorization of, or filing, registration or qualification with, any court or Governmental Authority on your part is required for the execution and delivery of this Agreement or the Operating Agreement by you or the performance of your obligations and duties hereunder or thereunder.

8.2 Survival of Representations and Warranties. All representations and warranties made by you in section 8.1 of this Agreement shall survive the execution and delivery of this Agreement, as well as any investigation at any time made by or on behalf of the Company and the issue and sale of Membership Interests.

8.3 Reliance. You acknowledge that your representations, warranties, acknowledgments and agreements in this Agreement will be relied upon by the Company in determining your suitability as a purchaser of Membership Interests.

8.4 Further Assurances. You agree to provide, if requested, any additional information that may be requested or required to determine your eligibility to purchase the Membership Interests.

8.5 Indemnification. You hereby agree to indemnify the Company and any Affiliates and to hold each of them harmless from and against any loss, damage, liability, cost or expense, including reasonable attorney's fees (collectively, a "Loss") due to or arising out of a breach or representation, warranty or agreement by you, whether contained in this Subscription Agreement (including the Suitability Statements) or any other document provided by you to the Company in connection with your investment in the Membership Interests. You hereby agree to indemnify the Company and any Affiliates and to hold them harmless against all Loss arising out of the sale or distribution of the Membership Interests by you in violation of the Securities Act or other applicable law or any misrepresentation or breach by you with respect to the matters set forth in this Agreement. The indemnification obligations provided herein shall survive the execution and delivery of this Agreement, any investigation at any time made by the Company and the issue and sale of Membership Interests and shall be in addition to any liability you may otherwise have. Notwithstanding any provision of this Agreement, you do not waive any right granted to you under any applicable state securities law.

11

PLAINTIFF 336

EXHIBIT 3 - PAGE 71

9. Certain Agreements and Acknowledgments of the Purchaser.

9.1 Agreements. You understand, agree and acknowledge that:

(a) Acceptance. Your subscription for Membership Interests contained in this Agreement may be accepted or rejected, in whole or in part, by the Company in its sole and absolute discretion. No subscription shall be accepted or deemed to be accepted until you have been admitted as a Member on the Closing Date; such admission shall be deemed an acceptance of this Agreement by the Company for all purposes.

(b) Irrevocability. Except as provided in section 5.2 and under applicable state securities laws, this subscription is and shall be irrevocable, except that you shall have no obligations hereunder if this subscription is rejected for any reason, or if this offering is cancelled for any reason.

(c) No Recommendation. No foreign, federal, or state authority has made a finding or determination as to the fairness for investment of the Membership Interests and no foreign, federal or state authority has recommended or endorsed or will recommend or endorse this offering.

(d) No Disposal. You will not, directly or indirectly, assign, transfer, offer, sell, pledge, hypothecate or otherwise dispose of all or any part of your Membership Interest (or solicit any offers to buy, purchase or otherwise acquire or take a pledge of all or any part of the Membership Interest) except in accordance with the registration provisions of the Securities Act or an exemption from such registration provisions, with any applicable state or other securities laws and with the terms of the Operating Agreement.

(e) Update Information. If there should be any change in the information provided by you to the Company (whether pursuant to this Agreement or otherwise) prior to your purchase of any Membership Interests, you will immediately furnish such revised or corrected information to the Company.

10. General Contractual Matters.

10.1 Amendments and Waivers. This Agreement may be amended and the observance of any provision hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of you and the Company.

10.2 Assignment. You agree that neither this Agreement nor any rights which may accrue to you hereunder may be transferred or assigned.

10.3 Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given to any party when delivered by hand, when delivered by fax, or when mailed, first-class postage prepaid, (a) if to you, to you at the

12

CONFIDENTIAL

PLAINTIFF 337

EXHIBIT 3 - PAGE 72

address or telecopy number set forth below your signature, or to such other address or telecopy number as you shall have furnished to the Company in writing, and (b) if to the Company, to it c/o 335 Centennial Way, Suite 100, Tustin, California 92780, or to such other address or addresses, or telecopy number or numbers, as the Company shall have furnished to you in writing, provided that any notice to the Company shall be effective only if and when received by the Company.

10.4 GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS (EXCEPT INSOFAR AS AFFECTED BY THE SECURITIES OR "BLUE SKY" LAWS OF THE STATE OR SIMILAR JURISDICTION IN WHICH THE OFFERING DESCRIBED HEREIN HAS BEEN MADE TO YOU).

10.5 Descriptive Headings. The descriptive headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provision of this Agreement.

10.6 Entire Agreement. This Agreement contains the entire agreement of the parties with respect to the subject matter of this Agreement, and there are no representations, covenants or other agreements except as stated or referred to herein.

10.7 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

10.8 Joint and Several Obligations. If you consist of more than one Person, this Agreement shall consist of the joint and several obligations of all such Persons.

11. Circular 230 Notice. To ensure compliance with Treasury Department Circular 230, you are hereby notified that:

(a) any discussion of Federal tax issues in the Subscription Agreement and the Offering Memorandum is not intended or written to be used, and cannot be used, by a Member for the purpose of avoiding penalties that may be imposed on such Member under the Code;

(b) any such discussion is written to support the promotion or marketing of the transactions or matters addressed in this Agreement; and

(c) each Member should seek advice based on its particular circumstances from and independent advisor.

13

PLAINTIFF 338

EXHIBIT 3 - PAGE 73

12. Suitability Statements.

The truth, correctness and completeness of the following information supplied by you are warranted pursuant to section 8.1(a) above:

If you are in agreement with the foregoing, please sign the enclosed counterparts of this Agreement and return such counterparts of this Agreement to the President of the Company.

ARISTA, LLC

By:_____
   Abdul Walji
   President

*INVESTOR QUESTIONNAIRE FOR INDIVIDUALS*

INDIVIDUALS: Please complete Parts I, II and III of this Questionnaire

I. Verification of Status as "Accredited Investor" under Regulation D

The Investor represents and warrants that he/she is an "accredited investor" within the meaning of Regulation D under the Securities Act and has initialed the applicable statements below pursuant to which the Investor so qualifies.

1.    True  False    The Investor is a natural person whose net worth, taken together with the net worth of such person's spouse, exceeds $1,000,000. Net worth for this purpose means total assets (including residence, personal property and other assets) in excess of total liabilities.

2.    True  False    The Investor is a natural person who had an individual income in excess of $200,000 in each of the two previous years, or joint income with such person's spouse in excess of $300,000 in each of those years, and who reasonably expects to reach the same income level in the current year.

3.    True  False    The Investor is a director or executive officer of the Company.

4.    True  False    The Investor has such knowledge and experience in financial and business matters that he/she is capable of evaluating the merits and risks of investing in the Membership Interests.

14

CONFIDENTIAL

PLAINTIFF 339

**EXHIBIT 3 - PAGE 74**

Disclosure of Foreign Citizenship.

1.      True  False      The Investor is a citizen of a country other than the United States (a "Foreign Citizen").

2.      True  False      If the answer to the preceding question is true, specify the country of which Country the Investor is a citizen.

*INVESTOR QUESTIONNAIRE FOR ENTITIES*

ENTITIES (non-individuals):  Please complete Parts I, II and III of this Questionnaire

I. Verification of Status as "Accredited Investor" under Regulation D

The Investor represents and warrants that it is an "accredited investor" within the meaning of Regulation D under the Securities Act and has initialed the applicable statements below pursuant to which the Investor so qualifies.

PLEASE INITIAL APPLICABLE STATEMENTS BELOW.

1.      True  False      The Investor has total assets in excess of $5,000,000, AND was not formed for the specific purpose of acquiring the securities offered, AND is any of the following:

        a corporation;

        a partnership;

        a Massachusetts or similar business trust; OR

        an organization described in Section 501(c)(3) of the Internal Revenue Code.

2.      True  False      The Investor is any of the following:

        a bank, or any savings and loan association or other institution acting in its individual or fiduciary capacity;

        a broker or dealer;

        an insurance company;

        an investment company or a business development company under the Investment Company Act of 1940, as amended;

CONFIDENTIAL

PLAINTIFF 340

EXHIBIT 3 - PAGE 75

a private business development company under the Investment Advisers Act of 1940;

a Small Business Investment Company licensed by the U.S. Small Business Administration; OR

an employee benefit plan whose investment decision is being made by a plan fiduciary, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan whose total assets are in excess of $5,000,000 or a self-directed employee benefit plan whose investment decisions are made solely by persons that are accredited investors; or

a plan established and maintained by a state of the United States, its political subdivisions, or any agency or instrumentality of a state of the United States or its political subdivisions, for the benefit of its employees that has total assets in excess of $5,000,000.

3.    True  False    The Investor is a trust, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000 and whose purchase is directed by a sophisticated person.

4.    True  False    The Investor is an entity as to which all the equity owners are accredited investors. If only statement (4) has been initialed "True" (i.e., 1, 2, and 3 have each been initialed "False"), please have each equity owner fill out the Investor Questionnaire for Individuals or this Investor Questionnaire for Entities, as applicable. Please feel free to make copies of these pages for each equity owner.

Disclosure of Foreign Ownership.

1.    True  False    You are an entity organized under the laws of a jurisdiction other than those of the United States or any state, territory or possession of the United States (a "Foreign Entity").

2.    True  False    You are a government other than the government of the United States or of any state, territory or possession of the United States (a "Foreign Government")

3.    True  False    You are a corporation of which, in the aggregate, more than one-fourth of the capital stock is owned of record or voted by Foreign Citizens, Foreign Entities, Foreign Corporations (as defined below) or Foreign Partnerships (as defined below) (a "Foreign Corporation").

4.    True  False    You are a general or limited partnership of which any general or limited partner is a Foreign Citizen, Foreign Entity, Foreign Government, Foreign Corporation or Foreign Partnership (as defined below) (a "Foreign Partnership").

16

CONFIDENTIAL                                           PLAINTIFF 341

**EXHIBIT 3 - PAGE 76**

5.    True  False    You are a representative of, or entity controlled by, any of the entities listed in items 1 through 4 above.

What is the percentage of:

your aggregate capital commitment that will be contributed directly or indirectly by any person or entity listed in items 1 through 5 above? _____%

for a pension fund, your non-U.S. beneficiaries? _____%

for a corporation, your direct and indirect foreign ownership _____%

for a trust, your foreign beneficial interest? _____%

for a partnership or limited liability company, your direct and indirect foreign ownership? _____%

If you are in agreement with the foregoing, please sign the enclosed counterpart of this Agreement and return such counterpart to the President of the Company.

[Member's Signature Page Follows]

17

OPERATING AGREEMENT
EXECUTION PAGE FOR ARISTA, LLC

MEMBER *Lorean Fragier*

NAME OF MEMBER: LOREAN FRAGIER

ADDRESS: 718 S. 7TH UNIT #1100 SPRINGFIELD, IL 62703

TELEPHONE NO: 217-788-2510

TELECOPY NO:

EMAIL: ~~lj3021@att.com~~ *lorleeiza.sbcglobal.com*

TAX ID:     REDACTED


SIGNATURE OF MEMBER:

*Lorean Fragier*

BY: _____

Print name: LOREAN FRAGIER
Print title: _____


The foregoing Subscription Agreement is
hereby agreed to by the undersigned as of
the 20 day of October , 2010

LOREAN FRAGIER
Subscriber Name (Please print)

718 S 7TH UNIT # 1100
Residence or Office Address

SPRINGFIELD, IL 62703
City, State, Zip Code

Fill in Mailing Address only
if different from Residence
Address:

SAME
Mailing Address

_____

_____

18

CONFIDENTIAL                                PLAINTIFF 381

**EXHIBIT 3 - PAGE 78**

State in which Subscription
Agreement signed if other
than state of residence or
office:

_____

_____                    _____
Signature of Authorized                    Signature of Subscriber
Representative (if not an
individual)

_____                    _____
Legal Form of Entity                       Jurisdiction of Organization

TOTAL CAPITAL CONTRIBUTION:    $ 300,000.⁰⁰

Date of execution by Subscriber: 10/26/2010

## REDACTED

Social Security or Taxpayer

I.D. No. [Must be completed]

State of ~~California~~ I.L.
County of Sangamon

Subscribed and sworn to (or affirmed) before me ~~on this~~ 22 day of October 2010 by
Lorean Frazier's ILDL, proved to me on ~~the~~ basis of satisfactory evidence to be the
person(s) who appeared before me.

(SEAL)   OFFICIAL SEAL
         KIRSTEN M HOLLER
         NOTARY PUBLIC - STATE OF ILLINOIS
         MY COMMISSION EXPIRES:04/16/14

Signature  Kirsten M. Holler

19

CONFIDENTIAL

PLAINTIFF 382

EXHIBIT 3 - PAGE 79

E X H I B I T   4

Case 2:15-cv-09304-GW-DTB   Document 26   Filed 05/12/16   Page 1 of 5   Page ID #:657

1  MARY T. CONNELLY (DC Bar No. 441153)
   mconnelly@cftc.gov
2  United States Commodity Futures Trading Commission
   1155 21st Street, N.W.
3  Washington, D.C. 20581
   Tel: (202) 418-5866
4  Fax: (202) 418-5567
   Attorney for Federal Respondent United States
5  Commodity Futures Trading Commission

6  KENT A. KAWAKAMI (Cal. Bar No. 149803)
   kent.kawakami@usdoj.gov
7  Assistant United States Attorney
   United States Attorney's Office
8  300 N. Los Angeles Street, Room 7516
   Los Angeles, California 90012
9  Tel: (213) 894-4858
   Fax: (213) 894-2380
10 Local Counsel

11              UNITED STATES DISTRICT COURT
12         FOR THE CENTRAL DISTRICT OF CALIFORNIA
13                    WESTERN DIVISION
14
15 ARISTA LLC, and ABDUL WALJI,        No. CV 15-9304 GW (DTBx)

16           Petitioners,              **OPPOSITION OF RESPONDENT**
                                       **UNITED STATES COMMODITY**
17           v.                        **FUTURES TRADING COMMISSION**
                                       **TO THE EMERGENCY MOTION TO**
18 ROBERT ROODE, *et al.,*             **PRODUCE DOCUMENTS, APPOINT**
                                       **A MASTER, AND HOLD AN**
19           Defendants.              **EVIDENTIARY HEARING**
20                                     Date:     May 23, 2016
21                                     Time:     8:30 am
                                       Location: Courtroom of Honorable George
                                                 H.Wu
22     Respondent United States Commodity Futures Trading Commission (CFTC), by

23 undersigned counsel, opposes Petitioner Abdul Walji's "emergency motion to produce

24 documents, appoint a master, and [hold an] evidentiary hearing."

25
26                            Background
27
28     The motion is the latest in a series of frivolous filings made in this case and in a

                                      1

1    parallel action of which this case is redundant originally before the United States District

2    Court for the Southern District of New York and now before the United States Court of

3
     Appeals for the Second Circuit.  In these parallel cases, Walji seeks to collaterally attack
4

5    a 2013 final consent order in a CFTC civil fraud enforcement action.  As also detailed in

6    the CFTC's opposition to the petition to compel arbitration, ECF No. 17 at 2-5, the

7
     history, at a high level, is as follows:
8

9        1.  Southern District of New York

10
         In 2012, the CFTC, acting under its statutory enforcement authority, brought a
11

12   civil enforcement action against the petitioners and another person, alleging violations of

13   the Commodity Exchange Act and its regulations.  *CFTC v. Arista, et al.*, No. 12-CV-

14
     9043 (S.D.N.Y.).  The CFTC's enforcement action was resolved in 2013 by the parties'
15

16   agreement to the entry of a "Consent Order for Permanent Injunction, Civil Monetary

17   Penalty and Other Equitable Relief Against Arista LLC, Abdul Sultan Walji a/k/a Abdul

18
     Sultan Valji, and Reniero Francisco" on December 3, 2013.  Opp. Pet. Compel, ECF No.
19

20   17, Ex. 2.

21       Two years later, contemporaneously with the petition to compel arbitration filed in

22
     this Court, Walji filed a motion to "stay" the closed CFTC civil enforcement action in
23

24   the Southern District of New York, invoking the Federal Arbitration Act in that matter as

25   well.  *CFTC v. Arista, et al.*, No. 12-CV-9043, ECF Nos. 78 (motion); 84 (dismissal

26
     order).  The district court dismissed the motion.  ECF No. 84 (Ex. 1 to opposition to
27

28   compel arbitration (ECF 17).

Case 2:15-cv-09304-GW-DTB   Document 26   Filed 05/12/16   Page 3 of 5   Page ID #:659

2.  Second Circuit

Walji appealed the dismissal of his motion to "stay" the closed enforcement action to the United States Court of Appeals for the Second Circuit, where it is pending. *CFTC v. Arista LLC, et al.*, No. 16-476 (2d Cir.).  Since filing his notice of appeal, Walji has filed motions in that Court to strike the appearances of CFTC counsel, to remand the case to the district court to consider additional evidence as to its jurisdiction, and supplement the motion to remand.  ECF Nos. 23, 24, 42 (motions); 35, 39 (oppositions).

3.  This Court

In this Court, Walji has followed his petition to compel arbitration with a motion to strike the CFTC's opposition to the petition to compel arbitration because of purportedly defective service, ECF Nos. 20 (motion); 21 (opposition), and the instant "emergency motion to produce documents, appoint a master, and [hold an] evidentiary hearing." ECF No. 23.[1]

---

[1] Walji has taken the same tack following his 2013 guilty plea to related criminal fraud charges. *United States v. Walji*, No. 13-CR-0217 (S.D.N.Y.), ECF Nos. 69 (judgment), 76 and 122 (amended judgments modifying restitution).  Walji filed an unsuccessful 28 U.S.C. § 2255 petition challenging his sentence, *United States v. Walji*, No. 13-CR-0217 (S.D.N.Y.), ECF No. 143 (mem. op. and order denying motion), unsuccessfully appealed its denial to the Second Circuit, and filed a petition for a writ of certiorari to the United States Supreme Court. *United States v. Walji*, No. 13-CR-0217 (S.D.N.Y.), ECF No. 143 (mem. op. and order denying motion): *Walji v. United States*, No. 15-2521 (2d Cir. Jan. 5, 2016) (order denying motion for certificate of appealability and dismissing appeal); *Walji v. United States,* No. 15-8824 (S. Ct.) (pending petition for writ of certiorari docketed April 5, 2016).

## Argument

In its opposition to Walji's petition in this Court to compel arbitration of claims arising under the CFTC's long-closed enforcement action, the CFTC showed that the petition is baseless because the CFTC is not a party to any arbitration agreements with Walji, and as a matter of black letter law, arbitration cannot be compelled as to a party that has not consented to arbitrate.  ECF No. 17 at 5-8.  The CFTC also pointed out that, even assuming *arguendo* that arbitration clauses in agreements with Walji's defrauded investors could ever be applied to the CFTC, the consent order in the enforcement action superseded and waived any purported right to compel arbitration of the complaint's allegations or the consent order's findings.  *Id.* at 8-9 n. 3.

Ignoring the CFTC's primary argument that arbitration cannot as a matter of law be compelled as to a party that has not agreed to do so, Walji claims that neither he nor his company, Arista, agreed to the consent order resolving the CFTC's enforcement action.  He requests that the Court or a special master compel the CFTC to produce the "original, signed" consent order and hold evidentiary hearings as necessary to ensure that the consent order is "authentic."  ECF No. 23 at 9-10.

Walji may have forgotten that he and Arista consented to the consent order, but the record indisputably establishes that the district court in the Southern District of New York entered it, and the order is final, valid, and enforceable.  First, that the consent order is not signed by Walji does not suggest that it is inauthentic. The consent order is a court order, signed by the court, that incorporates the parties' agreement.  No. 12-cv-

4

1  9043, ECF No. 77 at 40.  Second, Walji and Arista were represented at all times in the

2  enforcement action, including entry of the consent order, by counsel and have never, in

3
4  the over two years since its entry, denied counsel's authority to represent them or to

5  agree to the entry of the consent order on their behalf.  No. 12-cv-9043, ECF Nos. 18-21

6  (notices of appearance); 72, 75 (counsel's letters to court concerning consent to a

7
8  consent order).  Nor have they ever disputed the provisions in the order stating that the

9  defendants read, agreed to and consented to the entry of the order.  ECF No. 77 at 2.

10  Walji's request that the court order the CFTC to produce the consent order that he
11
12  "signed" or appoint a master under Fed. R. Civ. P. 53 to conduct an evidentiary hearing

13  on the authenticity of the consent order is baseless[2] and should be denied.[3]

14              Dated: May 12, 2016                        Respectfully submitted,
15
16                                                         By: /s/Mary T. Connelly

17                                                         Mary T. Connelly
                                                           Attorney for Respondent United
18                                                         States Commodity Futures Trading
                                                           Commission
19

20

21

22

23      [2] Just as there is no basis for the Court to compel the CFTC to produce the
    "signed" consent order, so is there no basis for the Court to appoint a master under R. 53
24  to conduct an evidentiary hearing to collaterally attack a final order in a long closed civil
    enforcement action in another court.
25
26      [3] Walji's suspicions about the withdrawal of CFTC counsel and substitution of new
    counsel in the enforcement action and appeal are not cognizable.  Nor is his claim that
27  the CFTC committed fraud by proceeding with securities claims against Walji when it
    lacked jurisdiction to do so  ECF No. 23 at 3-6; see also No. 12-CV-9043, ECF Nos. 35,
28  39 (CFTC oppositions to same arguments in Walji motions to strike and to remand),

E X H I B I T  8

BEFORE THE
NATIONAL FUTURES ASSOCIATION

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| ARISTA LLC | ) |
| (NFA ID #429124) | ) |
| | ) NFA Case No. 12-MRA-003 |
| and | ) |
| | ) |
| ABDUL SULTAN WALJI | ) |
| (NFA ID #429261) | ) |

NOTICE OF MEMBER RESPONSIBILITY ACTION
AND ASSOCIATE RESPONSIBILITY ACTION
UNDER NFA COMPLIANCE RULE 3-15

National Futures Association ("NFA") hereby gives notice to Arista LLC ("Arista"), a registered commodity pool operator ("CPO") and an NFA Member, and Abdul Sultan Walji ("Walji"), a/k/a Abdul Valji, an associated person ("AP") and listed principal of Arista, and an NFA Associate, that, pursuant to NFA Compliance Rule 3-15, the President of NFA, with the concurrence of NFA's Executive Committee, has taken a Member Responsibility Action ("MRA") against Arista and an Associate Responsibility Action ("ARA") against Walji, whereby:

1.  Arista, Walji, and any person acting on Arista's behalf are prohibited from soliciting or accepting any funds from customers or investors, soliciting investments for any commodity pools or other investment vehicles, or placing any trades for themselves or on behalf of customers, commodity pools, or investors except liquidation or risk reducing trades;

2.  Arista, Walji, and any person acting on Arista's behalf are prohibited from disbursing or transferring any funds over which they or any person acting on their behalf exercises control (including bank, trading and other types of accounts), without prior approval from NFA; and

3.  Arista and Walji are required to provide copies of this MRA/ARA by overnight courier or e-mail to all: a) customers; b) investors; and c) banks, brokerage firms, and other financial institutions with which money is on deposit in the name of Arista, or over which Arista exercises control.

This action is effective immediately and deemed necessary to protect investors in futures accounts and other investment vehicles controlled by Arista, Walji

CONFIDENTIAL

PLAINTIFF 359

**EXHIBIT 8 - PAGE 1**

and/or Reniero Francisco ("Francisco"), a listed principal of Arista, because Arista, Walji and/or Francisco have provided false and misleading information to NFA and Arista's current investors concerning the firm's trading performance and its significant loss of investor funds, and Arista and Walji have provided false and misleading information to NFA concerning the firm's operations. Arista and Walji have also failed to cooperate with NFA in its examination of the firm by failing to produce books and records and other information that NFA has requested from them. Consequently, NFA has been unable to determine whether Arista, Walji and Francisco have acted properly in their dealings with Arista's investors or whether they have misappropriated funds and provided false information to NFA and investors concerning their investments.

In support of these actions, NFA attaches the affidavit of Chris Mitseff, who is a Supervisor in NFA's Compliance Department, and based thereon alleges as follows:

Background:

1.  Arista is located in Newport Coast, California and became a registered CPO and NFA Member on April 20, 2011, although records for the California Secretary of State indicate the firm began operating in February 2010. Since January 24, 2012, the firm has been pending withdrawal from NFA membership and Commodity Futures Trading Commission ("CFTC") registration.

2.  Walji has been a registered AP and listed principal of Arista, as well as an NFA Associate, since April 2011. NFA's records list Francisco as the president and a principal of Arista. However, Francisco is not an NFA Associate or registered AP, even though several investors interviewed by NFA stated that Francisco solicited their investments in Arista. Neither Walji nor Francisco has any prior NFA membership or CFTC registration status.

3.  Shortly after becoming a Member, Arista listed a pool with NFA, called Arista Fund (the "Fund"). Because Arista had informed NFA that its "pool" was operational, NFA's Compliance Rules required the firm to report certain information about the "pool" to NFA on a quarterly basis within 45 days after the end of each quarterly reporting period. Consequently, Arista filed pool quarterly reports ("PQRs") with NFA for the quarters ending June 30, 2011 and September 30, 2011.

4.  The September 30, 2011 PQR was filed in mid-November 2011 and contained information that was of concern since a comparison of the June and September reports revealed that the September report contained dramatic losses and incorrect profit information. Specifically, the September PQR reported significant losses of more than 70% in July and 99% in August 2011. Yet, despite these losses and no significant capital

2

**EXHIBIT 8 - PAGE 2**

additions, the Fund surprisingly reported an ending net asset value ("NAV") of more than $8.4 million, which was about $1.2 million more than its NAV at the beginning of the quarter.

5. Given the significance of these numbers, NFA decided to begin an investigation of Arista in early January, which subsequently evolved into an emergency examination. As explained below in more detail, NFA has learned that, prior to becoming an NFA Member, Arista received almost $10 million from about 28 investors and has been holding all monies in its name since then, rather than setting up a commodity pool as a separate legal entity. NFA also discovered that all but about $750,000 of the firm's assets have been lost, mainly due to more than $5 million in undisclosed trading losses the firm has incurred since its inception and from "incentive fees" totaling approximately $4.3 million that Arista has paid to Walji and Francisco during 2010 and 2011.

6. Furthermore, Arista and Walji have failed to cooperate with NFA during NFA's examination by failing to provide complete bank records, including cancelled checks, wire advices, and deposit slips and corresponding checks, as well as other information NFA needs to determine the true nature of all of Arista's transactions and the extent to which Arista, Walji and Francisco have misappropriated investors' funds and misrepresented the value of their investments.

Arista's Operations and its Failure to Cooperate

7. In early January 2012, NFA commenced its investigation by contacting Arista to learn more about the firm's operations and inquire about the performance results of its "pool." NFA staff spoke with Francisco who apparently is responsible for managing most of the firm's operations. Through this conversation, NFA learned that, contrary to information Arista had previously reported to NFA, no separate commodity pool existed. Instead, Francisco indicated that all investors had actually invested in Arista directly, and the firm had been receiving and accepting funds in its name since 2010. Francisco also represented that Arista had about 28 investors, many of whom had each invested $250,000 in Arista, though others had invested as much as $1 million.

8. NFA also asked Francisco about the accuracy of the dramatic rates of return and the reported ending NAV that were included on the September 30 PQR in light of the significant losses that Arista had supposedly incurred. Francisco acknowledged Arista had, in fact, incurred trading losses and stated that the net liquidating value of Arista was currently about $750,000.

3

CONFIDENTIAL

PLAINTIFF 361

**EXHIBIT 8 - PAGE 3**

9.   NFA also contacted Walji since NFA's online registration system lists him as the AP/principal of Arista and because he apparently is responsible for the firm's trading operations. Walji also acknowledged that Arista had experienced substantial trading losses, which he claimed mainly occurred in July and August 2011 because of the European debt crisis and U.S. debt-ceiling talks.

10.  These disclosures prompted NFA to contact the two brokerage firms where Walji and Francisco indicated Arista carried trading accounts and obtain Arista's account opening documents and trading statements through December 31, 2011. From reviewing documents the brokerage firms provided, NFA determined that the account at one firm, which opened in April 2010, had become inactive in December 2011. The account at the other brokerage firm, which opened in October 2010, was still active and had a December 31, 2011 ending balance of about $633,000. NFA also confirmed with this brokerage firm on January 10, 2012 that Arista's current balance as of January 9 was about $752,000.

11.  NFA also analyzed Arista's trading performance on these statements and found that Arista underreported trading losses to NFA on the firm's September 30, 2011 PQR. Specifically, NFA's analysis showed that Arista's net liquidating value as of September 30, 2011 was actually $523,000, which is nowhere near the $8.4 million NAV the firm had reported on its PQR. NFA's analysis also revealed that, of the approximately $10 million received from investors, Arista committed about $8.3 million to futures trading since April 2010 and sustained a net overall loss of just over $5 million. In addition, the vast majority of Arista's trading losses were suffered in July and August 2011.

12.  Because of the information that NFA had received about Arista's operations and in light of the firm's significant trading losses, NFA commenced an emergency examination of Arista. On January 17, 2012, NFA commenced fieldwork and asked Arista and Walji to produce various documents and records, including bank statements, cancelled checks, wire advices and deposit slips for the firm's bank accounts, as well as copies of activity statements sent to customers and supporting documentation for all claimed performance results.

13.  However, more than two weeks have passed since NFA initially asked for these records, yet Arista and Walji have not fully complied with all of NFA's requests. Specifically, while NFA has received copies of Arista's bank statements, and some of its cancelled checks, deposit slips and wire advices, NFA has not received all the requested cancelled checks for Arista from March 2011 to present or its wire advices from January 2011 to present. In addition, while NFA has received the requested deposit slips and the checks that correspond to the deposits for 2010, Arista has

4

CONFIDENTIAL

PLAINTIFF 362

**EXHIBIT 8 - PAGE 4**

yet to provide deposit slips and corresponding checks from January 2011 to present.

14. In addition, although Arista produced copies of quarterly activity statements that the firm has sent to its investors since 2010, the firm has not provided NFA with adequate support for the investment and performance information contained in the activity statements. Moreover, NFA found that Arista's activity statements contained false and misleading performance results. Specifically, the activity statements are materially inaccurate since they reflect neither the total value of Arista's investment assets nor the individual investors' current investment value, particularly in light of the significant trading losses Arista has incurred. To illustrate, one investor informed NFA that she believed the current value of her investment was approximately $642,000 based on the information in her September 30, 2011 quarterly statement. However, NFA's calculations show that the value of this person's investment as of September 30 was actually closer to $31,000. Another Arista investor informed NFA staff that she cannot understand Arista's quarterly activity statements, but believed her account value was higher than the $282,000 she invested in June 2010. However, NFA's calculations show the value of her investment as of September 30, 2011 is closer to $15,000.

15. In addition, while reviewing bank statements that Arista produced, NFA noticed several questionable fund transfers involving Walji and Francisco. For example, in May 2011, NFA noticed that Arista paid $650,000 to an entity named Bendisyon Inc., which Francisco indicated is a firm he set up for "tax reasons" only. NFA also noted that Arista paid $650,000 to an entity named Stone Lamm Trust ("Stone Lamm"), which Walji represented is his trust. In addition to these transfers totaling $1.3 million, NFA noticed similar fund transfers to bank accounts controlled by Walji and Francisco that totaled about $3 million and occurred in August, October and November 2010, prior to Arista and Walji becoming NFA Members.

16. When NFA initially asked about these transactions, Francisco said they represented compensation due to Walji and him under written agreements that existed. Therefore, NFA asked for copies of the agreements and found that Walji entered into a Consulting Agreement with Arista, which essentially provided for Walji to receive what was tantamount to an incentive fee, which was to be based off the net trading profits for Arista. Specifically, the Agreement between Walji and Arista provided for Arista to pay Walji a fee based on 75% of 90% of the realized cash gains from Arista's investments (net of commissions, fees and expenses paid to third parties), less operating expenses that Arista would incur during the same period for which the Consulting Fee is paid. In turn, under a Services Agreement between Walji and Francisco, Walji was to pay Francisco 50% of the net cash proceeds that Walji received from the incentive fee he

5

PLAINTIFF 363

**EXHIBIT 8 - PAGE 5**

received from Arista in return for "services" allegedly performed by Francisco that related to investment research and analysis.

17.   Because of these payment arrangements and the fund transfers from Arista to Walji and Francisco, NFA also asked them to produce bank records for accounts they controlled so that NFA could determine the appropriateness of the transfers and how Walji and Francisco used Arista's funds.  Although Walji and Francisco have produced statements for certain bank accounts they control, they have not produced all the records NFA has requested and some of the documents they have produced raise additional questions.

18.   In particular, NFA has identified two transactions that occurred in 2010 where Arista wired a total of $1.5 million to Walji's trust, Stone Lamm, yet Walji has not provided NFA with any of the 2010 bank statements for Stone Lamm.  NFA also noted at least two wire transfers from Arista that supposedly went to Francisco, but the corresponding deposits do not appear in the bank records that Francisco has provided to NFA.  NFA also identified a $500,000 wire transfer in November 2010 from Arista to an entity named "Milagros Investments LLC," for which NFA has received no additional bank records.  California Secretary of State's records list Cynthia D. Francisco, who is Francisco's wife, as Milagros' agent for service of process.

19.   NFA is also concerned about the propriety of the incentive fee payments to Walji and Francisco.  To illustrate, since Arista calculates the compensation due to Walji based on the firm's <u>realized cash gains</u>, it appears from NFA's trading analysis that Walji and Francisco were not entitled to the $1.3 million in "incentive fees" that they received in 2011 because of the significant trading losses that Arista incurred during the year.  Furthermore, while Walji and Francisco might have been entitled to some form of incentive fee in 2010, NFA's calculations show that the amount actually due to them was probably closer to $900,000, rather than the almost $3 million they received.  Therefore, it appears that Walji and Francisco received at least $3.4 million in incentive fees to which they were not entitled.

20.   Although Arista's attorney has repeatedly represented to NFA that the firm, Walji and Francisco are working to obtain the documents requested by NFA, many of the requested bank records have been outstanding for at least two weeks.  In addition, while Walji and Francisco have produced some of their requested bank records, certain documents from them remain outstanding.

21.   As a result of the failure to cooperate by Arista and its principals, Walji and Francisco, certain critical documents that NFA has requested from them

6

CONFIDENTIAL

PLAINTIFF 364

**EXHIBIT 8 - PAGE 6**

remain outstanding, which has impeded NFA's efforts to determine the nature of all of their transactions and the extent to which Arista, Walji and Francisco have misappropriated investors' funds and misrepresented investment values to investors. In addition, NFA has been unable to complete its examination or make a determination as to whether Arista and Walji are currently in full compliance with NFA Requirements.

The MRA and ARA will remain in effect until such time as Arista and Walji have demonstrated to the satisfaction of NFA that they are in complete compliance with all NFA Requirements.

Arista and Walji are entitled to a prompt hearing on this matter before NFA's Hearing Committee if they so request. The request for a hearing shall be made in writing to:

> National Futures Association
> 300 South Riverside Plaza
> Suite 1800
> Chicago, Illinois 60606
> Attn: Legal Department-Docketing
>
> E-Mail: Docketing@nfa.futures.org
> Facsimile: 312-781-1672

Aggrieved parties may petition the CFTC for a stay of this MRA and ARA pending a hearing pursuant to and in conformity with the terms set forth in CFTC Regulation 171.41.

NATIONAL FUTURES ASSOCIATION

Date: _February 2, 2012_     By: _Daniel J. Roth_ per DJR

Daniel J. Roth, President

m/cxc/mra/arista MRA 02 01 12

7

CONFIDENTIAL

PLAINTIFF 365

**EXHIBIT 8 - PAGE 7**

## AFFIDAVIT

THE AFFIANT, CHRIS MITSEFF, BEING DULY SWORN AND UNDER
OATH STATES THAT:

1. My name is Christopher Mitseff, and I am employed by National Futures
   Association ("NFA") as a Supervisor in NFA's Compliance Department.  In
   my capacity as a Supervisor, I participated in an examination and
   investigation of Arista LLC ("Arista"), a commodity pool operator ("CPO")
   NFA Member, and Abdul Sultan Walji ("Walji"), a/k/a Abdul Valji, an
   associated person ("AP") and listed principal of Arista, and an NFA
   Associate.

2. Arista is located in Newport Coast, California and became a registered
   CPO and NFA Member on April 20, 2011, although records for the
   California Secretary of State indicate the firm began operating in February
   2010.  Since January 24, 2012, the firm has been pending withdrawal from
   NFA membership and Commodity Futures Trading Commission ("CFTC")
   registration.

3. Walji has been a registered AP and listed principal of Arista, as well as an
   NFA Associate, since April 2011.  NFA's records list Francisco as the
   president and a principal of Arista.  However, Francisco is not an NFA
   Associate or registered AP, even though several investors interviewed by
   NFA stated that Francisco solicited their investments in Arista.  Neither
   Walji nor Francisco has any prior NFA membership or CFTC registration
   status.

4. Shortly after becoming a Member, Arista listed a pool with NFA, called
   Arista Fund (the "Fund").  Because Arista had informed NFA that its "pool"
   was operational, NFA's Compliance Rules required the firm to report
   certain information about the "pool" to NFA on a quarterly basis within 45
   days after the end of each quarterly reporting period.  Consequently,
   Arista filed pool quarterly reports ("PQRs") with NFA for the quarters
   ending June 30, 2011 and September 30, 2011.

5. The September 30, 2011 PQR was filed in mid-November 2011 and
   contained information that was of concern since a comparison of the June
   and September reports revealed that the September report contained
   dramatic losses and incorrect profit information.  Specifically, the
   September PQR reported significant losses of more than 70% in July and
   99% in August 2011.  Yet, despite these losses and no significant capital
   additions, the Fund surprisingly reported an ending net asset value
   ("NAV") of more than $8.4 million, which was about $1.2 million more than
   its NAV at the beginning of the quarter.

8

PLAINTIFF 366

**EXHIBIT 8 - PAGE 8**

6.  Given the significance of these numbers, NFA decided to begin an investigation of Arista in early January, which subsequently evolved into an emergency examination. As explained below in more detail, NFA has learned that, prior to becoming an NFA Member, Arista received almost $10 million from about 28 investors and has been holding all monies in its name since then, rather than setting up a commodity pool as a separate legal entity. NFA also discovered that all but about $750,000 of the firm's assets have been lost, mainly due to more than $5 million in undisclosed trading losses the firm has incurred since its inception and from "incentive fees" totaling approximately $4.3 million that Arista has paid to Walji and Francisco during 2010 and 2011.

7.  Furthermore, Arista and Walji have failed to cooperate with NFA during NFA's examination by failing to provide complete bank records, including cancelled checks, wire advices, and deposit slips and corresponding checks, as well as other information NFA needs to determine the true nature of all of Arista's transactions and the extent to which Arista, Walji and Francisco have misappropriated investors' funds and misrepresented the value of their investments.

Arista's Operations and its Failure to Cooperate

8.  In early January 2012, NFA commenced its investigation by contacting Arista to learn more about the firm's operations and inquire about the performance results of its "pool." NFA staff spoke with Francisco who apparently is responsible for managing most of the firm's operations. Through this conversation, NFA learned that, contrary to information Arista had previously reported to NFA, no separate commodity pool existed. Instead, Francisco indicated that all investors had actually invested in Arista directly, and the firm had been receiving and accepting funds in its name since 2010. Francisco also represented that Arista had about 28 investors, many of whom had each invested $250,000 in Arista, though others had invested as much as $1 million.

9.  NFA also asked Francisco about the accuracy of the dramatic rates of return and the reported ending NAV that were included on the September 30 PQR in light of the significant losses that Arista had supposedly incurred. Francisco acknowledged Arista had, in fact, incurred trading losses and stated that the net liquidating value of Arista was currently about $750,000.

10. NFA also contacted Walji since NFA's online registration system lists him as the AP/principal of Arista and because he apparently is responsible for the firm's trading operations. Walji also acknowledged that Arista had experienced substantial trading losses, which he claimed mainly occurred

9

PLAINTIFF 367

**EXHIBIT 8 - PAGE 9**

in July and August 2011 because of the European debt crisis and U.S. debt-ceiling talks.

11.    These disclosures prompted NFA to contact the two brokerage firms where Walji and Francisco indicated Arista carried trading accounts and obtain Arista's account opening documents and trading statements through December 31, 2011. From reviewing documents the brokerage firms provided, NFA determined that the account at one firm, which opened in April 2010, had become inactive in December 2011. The account at the other brokerage firm, which opened in October 2010, was still active and had a December 31, 2011 ending balance of about $633,000. NFA also confirmed with this brokerage firm on January 10, 2012 that Arista's current balance as of January 9 was about $752,000.

12.    NFA also analyzed Arista's trading performance on these statements and found that Arista underreported trading losses to NFA on the firm's September 30, 2011 PQR. Specifically, NFA's analysis showed that Arista's net liquidating value as of September 30, 2011 was actually $523,000, which is nowhere near the $8.4 million NAV the firm had reported on its PQR. NFA's analysis also revealed that, of the approximately $10 million received from investors, Arista committed about $8.3 million to futures trading since April 2010 and sustained a net overall loss of just over $5 million. In addition, the vast majority of Arista's trading losses were suffered in July and August 2011.

13.    Because of the information that NFA had received about Arista's operations and in light of the firm's significant trading losses, NFA commenced an emergency examination of Arista. On January 17, 2012, NFA commenced fieldwork and asked Arista and Walji to produce various documents and records, including bank statements, cancelled checks, wire advices and deposit slips for the firm's bank accounts, as well as copies of activity statements sent to customers and supporting documentation for all claimed performance results.

14.    However, more than two weeks have passed since NFA initially asked for these records, yet Arista and Walji have not fully complied with all of NFA's requests. Specifically, while NFA has received copies of Arista's bank statements, and some of its cancelled checks, deposit slips and wire advices, NFA has not received all the requested cancelled checks for Arista from March 2011 to present or its wire advices from January 2011 to present. In addition, while NFA has received the requested deposit slips and the checks that correspond to the deposits for 2010, Arista has yet to provide deposit slips and corresponding checks from January 2011 to present.

10

CONFIDENTIAL

PLAINTIFF 368

**EXHIBIT 8 - PAGE 10**

15. In addition, although Arista produced copies of quarterly activity statements that the firm has sent to its investors since 2010, the firm has not provided NFA with adequate support for the investment and performance information contained in the activity statements. Moreover, NFA found that Arista's activity statements contained false and misleading performance results. Specifically, the activity statements are materially inaccurate since they reflect neither the total value of Arista's investment assets nor the individual investors' current investment value, particularly in light of the significant trading losses Arista has incurred. To illustrate, one investor informed NFA that she believed the current value of her investment was approximately $642,000 based on the information in her September 30, 2011 quarterly statement. However, NFA's calculations show that the value of this person's investment as of September 30 was actually closer to $31,000. Another Arista investor informed NFA staff that she cannot understand Arista's quarterly activity statements, but believed her account value was higher than the $282,000 she invested in June 2010. However, NFA's calculations show the value of her investment as of September 30, 2011 was closer to $15,000.

16. In addition, while reviewing bank statements that Arista produced, NFA noticed several questionable fund transfers involving Walji and Francisco. For example, in May 2011, NFA noticed that Arista paid $650,000 to an entity named Bendisyon Inc., which Francisco indicated is a firm he set up for "tax reasons" only. NFA also noted that Arista paid $650,000 to an entity named Stone Lamm Trust ("Stone Lamm"), which Walji represented is his trust. In addition to these transfers totaling $1.3 million, NFA noticed similar fund transfers to bank accounts controlled by Walji and Francisco that totaled about $3 million and occurred in August, October and November 2010, prior to Arista and Walji becoming NFA Members.

17. When NFA initially asked about these transactions, Francisco said they represented compensation due to Walji and him under written agreements that existed. Therefore, NFA asked for copies of the agreements and found that Walji entered into a Consulting Agreement with Arista, which essentially provided for Walji to receive what was tantamount to an incentive fee, which was to be based off the net trading profits for Arista. Specifically, the Agreement between Walji and Arista provided for Arista to pay Walji a fee based on 75% of 90% of the realized cash gains from Arista's investments (net of commissions, fees and expenses paid to third parties), less operating expenses that Arista would incur during the same period for which the Consulting Fee is paid. In turn, under a Services Agreement between Walji and Francisco, Walji was to pay Francisco 50% of the net cash proceeds that Walji received from the incentive fee he received from Arista in return for "services" allegedly performed by Francisco that related to investment research and analysis.

11

PLAINTIFF 369

**EXHIBIT 8 - PAGE 11**

18. Because of these payment arrangements and the fund transfers from Arista to Walji and Francisco, NFA also asked them to produce bank records for accounts they controlled so that NFA could determine the appropriateness of the transfers and how Walji and Francisco used Arista's funds. Although Walji and Francisco have produced statements for certain bank accounts they control, they have not produced all the records NFA has requested and some of the documents they have produced raise additional questions.

19. In particular, NFA has identified two transactions that occurred in 2010 where Arista wired a total of $1.5 million to Walji's trust, Stone Lamm, yet Walji has not provided NFA with any of the 2010 bank statements for Stone Lamm. NFA also noted at least two wire transfers from Arista that supposedly went to Francisco, but the corresponding deposits do not appear in the bank records that Francisco has provided to NFA. NFA also identified a $500,000 wire transfer in November 2010 from Arista to an entity named "Milagros Investments LLC," for which NFA has received no additional bank records. California Secretary of State's records list Cynthia D. Francisco, who is Francisco's wife, as Milagros' agent for service of process.

20. NFA is also concerned about the propriety of the incentive fee payments to Walji and Francisco. To illustrate, since Arista calculates the compensation due to Walji based on the firm's realized cash gains, it appears from NFA's trading analysis that Walji and Francisco were not entitled to the $1.3 million in "incentive fees" that they received in 2011 because of the significant trading losses that Arista incurred during the year. Furthermore, while Walji and Francisco might have been entitled to some form of incentive fee in 2010, NFA's calculations show that the amount actually due to them was probably closer to $900,000, rather than the almost $3 million they received. Therefore, it appears that Walji and Francisco received at least $3.4 million in incentive fees to which they were not entitled.

21. Although Arista's attorney has repeatedly represented to NFA that the firm, Walji and Francisco are working to obtain the documents requested by NFA, many of the requested bank records have been outstanding for at least two weeks. In addition, while Walji and Francisco have produced some of their requested bank records, certain documents from them remain outstanding.

22. As a result of the failure to cooperate by Arista and its principals, Walji and Francisco, certain critical documents that NFA has requested from them remain outstanding, which has impeded NFA's efforts to determine the nature of all of their transactions and the extent to which Arista, Walji and Francisco have misappropriated investors' funds and misrepresented

12

CONFIDENTIAL

PLAINTIFF 370

EXHIBIT 8 - PAGE 12

investment values to investors. In addition, NFA has been unable to complete its examination or make a determination as to whether Arista and Walji are currently in full compliance with NFA Requirements.

Further Affiant sayeth naught.

_____
Christopher Mitseff

Subscribed and sworn to before me
on this 2nd day of February 2012.

_____
Notary Public

OFFICIAL SEAL
MARY A PATTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8/28/2013

13

PLAINTIFF 371

**EXHIBIT 8 - PAGE 13**

## AFFIDAVIT OF SERVICE

I, Myra Lewis, on oath state that on February 2, 2012, I served copies of the

attached Notice of Member Responsibility Action and Associate Responsibility Action by sending

such copies by facsimile and overnight mail in envelopes addressed as follows:

David Stawick, Secretariat
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Facsimile: 202/418-5521

Terry Montgomery
Division of Enforcement
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Facsimile: 202/418-5523

By e-mail and overnight mail:

Darryl Sheetz
Law Offices of Darryl C. Sheetz
335 Centennial Way, Suite 100
Tustin, California 92780
E-mail: dcsheetz@aol.com

Abdul Sultan Walji
31381 Old San Juan Road
San Juan Capistrano, CA 92675
E-mail: abdul.walji@mindspring.com

Arista LLC
7 Coastal Oak
Newport Coast, CA 92657
Attn: Reniero Francisco
E-mail: reniero@live.com

_Myra Lewis_
Myra Lewis

Subscribed and sworn to before
me on this 2nd day of February, 2012.

_Mary a Patton_
Notary Public

m:\my\\sffd\arista.llc.&.abdul.walji.mra.affd.2-12.cxc

OFFICIAL SEAL
MARY A PATTON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8/28/2013

PLAINTIFF 372

**EXHIBIT 8 - PAGE 14**

E X H I B I T   9



**Secretary of State**
**Business Programs Division**
Business Entities - Records, P.O. Box 944260, Sacramento, CA 94244-2600

December 4, 2012

SHAUN SWIGER

RE:  ARISTA, LLC    201006010171

This letter is in response to your request for information.

The 'not to exceed' or blank check submitted with your request has been completed in the amount of $7.00.    #3088

Certification and Records
Business Entities Section

California Secretary of State
www.sos.ca.gov/business/be
(916) 657-5448

**EXHIBIT 9 - PAGE 1**

2 0 1 0 0 6 0 1 0 1 7 1

| LLC-1 | File # _____ |

**State of California**
**Secretary of State**

**LIMITED LIABILITY COMPANY**
**ARTICLES OF ORGANIZATION**

A $70.00 filing fee must accompany this form.

IMPORTANT – Read Instructions before completing this form.

**FILED**
In the Office of the Secretary of State
of the State of California

**FEB 2 5 2010**

This Space For Filing Use Only

ENTITY NAME (End the name with the words "Limited Liability Company," or the abbreviation "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

   ARISTA, LLC

PURPOSE (This following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

INITIAL AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and item 3 must be completed (leave item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

   Abdul S. Walji

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA

   | | CITY | STATE | ZIP CODE |
   |---|---|---|---|
   | 335 Centennial Way, Suite 100, Tustin, | | CA | 92780 |

MANAGEMENT (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

   ☐ ONE MANAGER

   ☑ MORE THAN ONE MANAGER

   ☐ ALL LIMITED LIABILITY COMPANY MEMBER(S)

ADDITIONAL INFORMATION

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

EXECUTION

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

   February 24, 2010
   DATE

   SIGNATURE OF ORGANIZER

   Abdul S. Walji
   TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)

APPROVED BY SECRETARY OF STATE

**EXHIBIT 9 - PAGE 2**



# State of California
## Secretary of State

STATEMENT OF INFORMATION
(Limited Liability Company)

84

| Filing Fee $20.00. If amendment, see instructions. |
| --- |
| **IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM** |

1. LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted.)

ARISTA, LLC

L

**FILED**
in the office of the Secretary of State
of the State of California

AUG 1 1 2011



This Space For Filing Use Only

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION |
| --- | --- |
| 201006010171 | California |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | ZIP CODE |
| --- | --- | --- |
| 7 Coastal Oak | Newport Coast, CA | 92657 |

| 5. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| 7 Coastal Oak | Newport Coast | CA | 92657 |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| --- | --- | --- | --- |
| Reniero C. Francisco | 7 Coastal Oak | Newport Coast, CA | 92657 |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| --- | --- | --- | --- |
| Abdul S. Walji | 7 Coastal Oak | Newport Coast, CA | 92657 |
| 8. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |
| 9. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| | | | |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

| 10. NAME OF AGENT FOR SERVICE OF PROCESS |
| --- |
| Abdul S. Walji |

| 11. ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| 7 Coastal Oak | Newport Coast | CA | 92657 |

**TYPE OF BUSINESS**

| 12. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY |
| --- |
| Investments |

| 13. THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT. |
| --- |

| Reniero C. Francisco | | President | 3/25/11 |
| --- | --- | --- | --- |
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

| LLC-12 (REV 03/2007) | APPROVED BY SECRETARY OF STATE |
| --- | --- |

**EXHIBIT 9 - PAGE 3**



# State of California
## Secretary of State

**L**

### STATEMENT OF INFORMATION
(Limited Liability Company)

**53**

Filing Fee $20.00.  If this is an amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FILED**
In the office of the Secretary of State
of the State of California

APR 16 2012

*EC*
This Space For Filing Use Only

1. LIMITED LIABILITY COMPANY NAME

ARISTA, LLC

| File Number and State or Place of Organization | | |
|---|---|---|
| 2. SECRETARY OF STATE FILE NUMBER<br>201006010171 | 3. STATE OR PLACE OF ORGANIZATION (if formed outside of California)<br>California | |

**No Change Statement**

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 15.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | | | |
| 7. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | | | CA | |

**Name and Complete Address of the Chief Executive Officer, If Any**

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

**Name and Complete Address of Any Manager or Managers, or if None Have Been Appointed or Elected, Provide the Name and Address of Each Member** (Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 9. NAME | | | | |
| 10. NAME | | | | |
| 11. NAME | | | | |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable.  If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

| 12. NAME OF AGENT FOR SERVICE OF PROCESS | | | | |
|---|---|---|---|---|
| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | | STATE<br>CA | ZIP CODE |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 03/15/2012 | Reniero C. Francisco | President | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

LLC-12 (REV 01/2012)                                                                 APPROVED BY SECRETARY OF STATE

**EXHIBIT 9 - PAGE 4**

CAPTION:

CFTC v. Walji

CERTIFICATE OF SERVICE*

United States Commodity Futures
Trading Commission

Docket Number: 16-3391

v.

Abdul Walji

I, _____Abdul Walji_____, hereby certify under penalty of perjury that
(print name)
on _____, I served a copy of __Motion for reconsideration__
(date)

_____
(list all documents)

by (select all applicable)**

____ Personal Delivery          _XX_ United States Mail          ____ Federal Express or other
                                                                      Overnight Courier

____ Commercial Carrier         ____ E-Mail (on consent)

on the following parties:

| Mary T. Connelly, CFTC | 1155 21st St. N.W. | Washington | DC | 20581 |
|------------------------|--------------------|-----------|-------|----------|
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |
| Name | Address | City | State | Zip Code |

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or
proceeding. The Court will reject papers for filing if a certificate of service is not simultaneously
filed.

**If different methods of service have been used on different parties, please complete a separate
certificate of service for each party.

_____              _____
Today's Date                               Signature

Certificate of Service Form (Last Revised 12/2015)



ABDUL WALI
# 64127-112
FEDERAL PRISON CAMP - LA TUNA
PO BOX 8000
ANTHONY, NM 88021

7000 1670 0009 4295 1506

◇64127-112◇
The Clerk Of The Court
US Court of Appeals 2 Cir.
40 Foley SQ
US Courthouse
NEW YORK, NY 10007
United States

MAILED FROM ZIP CODE 79821